# EXHIBIT "A"

FEB-25-2005  09:13          7-ELEVEN, INC.                    214 828 7631    P.04/13

## SUMMONS IN A CIVIL ACTION

| | |
|---|---|
| UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA | |

| | |
|---|---|
| ROBYN E. ZAVODNICK<br><br>v.<br><br>KAILASH SAYL, 7-ELEVEN, INC. and MARTUSCELLI INVESTMENT ASSOCIATES | CIVIL ACTION NO. 05-660<br><br>TO (NAME AND ADDRESS OF DEFENDANT) :<br><br>7. Eleven, Inc. |

**YOU ARE HEREBY SUMMONED** and required to serve upon

Plaintiff's Attorney (Name and Address)

    Robert S. Miller, Esq.
    115 South 21st Street
    Philadelphia, PA 19147

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service

| | |
|---|---|
| Michael E. Kunz, Clerk of Court | Date: 02/11/2005 |

(By) Deputy Clerk

GREGG KELLER

APPENDIX I

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

Robyn E. Zavodnick                         :                    CIVIL ACTION

                          v.               :
                                           :
Kailash Sayl and                           :              NO.
7-Elven, Inc. and Martuscelli Investment Assoc.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a)  Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.                    ( )

(b)  Social Security – Cases requesting review of a decision of the Secretary of Health
      and Human Services denying plaintiff Social Security Benefits                          ( )

(c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (X)

(d)  Asbestos – Cases involving claims for personal injury or property damage from
      exposure to asbestos.                                                                  ( )

(e)  Special Management – Cases that do not fall into tracks (a) through (d) that are
      commonly referred to as complex and that need special or intense management by
      the court.  (See reverse side of this form for a detailed explanation of special
      management cases.)                                                                     ( )

(f)  Standard Management – Cases that do not fall into any one of the other tracks.          ( )


| 2/11/05 | Robert S. Miller | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-569-0900 | 215-569-4621 | millerr@wnwlaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Clv. 660) 10/02

FEB-25-2005  09:13    7-ELEVEN, INC.    Feb 25 20    9:58    214 828 7631    P.06/13

JS 44 (Rev. 11/04)    **CIVIL COVER SHEET**    APPENDIX H

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS<br>Robyn E. Zavodnick | DEFENDANTS<br>Kailash Sayl and 7-Eleven INc., and<br>Martuscelli Investment Assoc. |
|---|---|
| (b) County of Residence of First Listed Plaintiff _____<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant _____<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED. |
| (c) Attorney's (Firm Name, Address, and Telephone Number)<br>ROBERT S. Miller    215-569-0900<br>115 S. 21st Street<br>Philadelphia, PA  19103 | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1  U.S. Government  Plaintiff
- ☐ 3  Federal Question  (U.S. Government Not a Party)
- ☐ 2  U.S. Government  Defendant
- ☒ 4  Diversity  (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☒ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence Habeas Corpus:<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Brief description of cause: Plaintiff was caused to fall due to a negligently maintained condition of defendants premises

**VII. REQUESTED IN COMPLAINT:**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ _____    CHECK YES only if demanded in complaint
JURY DEMAND: ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**  (See instructions):  JUDGE _____    DOCKET NUMBER _____

DATE _____    Robert S. Miller    SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

FEB-25-2005  09:13        7-ELEVEN, INC.                    214 828 7631    P.07/13

# JS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBYN E. ZAVODNICK<br>180 Yorkshire Way<br>Hatboro, PA 19040 | : | CIVIL ACTION |
| | : | |
| vs. | : | NO.  05cv0660 |
| | : | |
| KAILASH SAYL<br>100 Four Seasons Parkway<br>Newark, DE 19702<br>and | : | |
| 7-ELEVEN, INC.<br>2711 North Haskell Avenue<br>Dallas, TX 75204-2906<br>and | : | |
| MARTUSCELLI INVESTMENT<br>ASSOCIATES<br>100 Four Seasons Parkway<br>Newark, DE 19702 | : | JURY TRIAL DEMANDED |

## CIVIL ACTION COMPLAINT

1.      Plaintiff, Robyn E. Zavodnick, is a citizen and resident of the Commonwealth of Pennsylvania, residing at 180 Yorkshire Way, Hatboro, PA 19040

2.      Defendant, Kilash Sayl (hereinafter "Sayl"), is a citizen and resident of the State of Delaware, residing therein at 100 Four Seasons Parkway, Newark, DE 19702.

3.      Defendant, 7-Eleven (hereinafter "7-Eleven"), is a corporation organized and existing under and by virtue of the laws of the State of Texas with it's principle place of business therein at 2711 North Haskell Avenue, Dallas, Texas 75204-2906.

FEB-25-2005  09:13          7-ELEVEN, INC.

Feb 25 '05  3:08
214 828 7631    P.08/13

4.    Defendant, Martuscelli Investment Associates (hereinafter "Martuscelli"), is a corporation organized and existing under and by virtue of the laws of the State of Delaware with it's principle place of business therein at 100 Four Seasons Parkway, Newark, DE 19702.

5.    This Court has jurisdiction pursuant to 28 U.S.C. §1332(a) because the amount in controversy, exclusive of interest and costs, exceeds the sum of Seventy-Five Thousand ($75,000.00) Dollars and there is diversity of citizenship between the plaintiff and defendants.

6.    Venue in this Court is proper under 28 U.S.C. §1391 because the defendants regularly conduct business within this district.

7.    At all times material hereto, defendant, 7-Eleven, was acting by and through its agents, servants and/or employees who were then and there acting in the course and scope of their employment with and under the direct control and/or right of control of the defendant.

8.    At all times material hereto, defendant, Sayl, was acting by and through its agents, servants and/or employees who were then and there acting in the course and scope of their employment with and under the direct control and/or right of control of the defendant.

9.    At all times material hereto, defendant, Martuscelli, was acting by and through its agents, servants and/or employees who were then and there acting in the course and scope of their employment with and under the direct control and/or right of control of the defendant.

10.    At all times material hereto, defendant, 7-Eleven, owned, operated, controlled and maintained building/property/convenience store including the parking lot adjacent thereto located at 100 Four Seasons Parkway, in the State of Delaware (hereinafter referred to as "premises").

FEB-25-2005  09:14          7-ELEVEN, INC.                    214 828 7631    P.09/13

11.    At all times material hereto, defendant, Sayl, owned, operated, controlled and maintained building/property/convenience store including the parking lot adjacent thereto located at 100 Four Seasons Parkway, in the State of Delaware (hereinafter referred to as "premises").

12.    At all times material hereto, defendant, Martuscelli, owned, operated, controlled and maintained building/property/convenience store including the parking lot adjacent thereto located at 100 Four Seasons Parkway, in the State of Delaware (hereinafter referred to as "premises").

13.    On or about December 1, 2003, at or about 7:30 a.m., plaintiff, Robyn Zavodnick, was a lawful business invitee on said premises.

14.    At the time and place as aforementioned, plaintiff, Robyn Zavodnick, was walking carefully when she was suddenly and without warning caused to fall due to a negligently maintained and defective condition on/off defendants' premises, as a result of which plaintiff sustained serious, painful, permanent, personal injuries.

15.    The aforesaid accident was caused by the individual, joint and/or several negligence, carelessness and/or recklessness of the defendants, their agents, servants, employees and/or representatives, and consisted inter alia, of the following:

     a.    Causing plaintiff, Robyn Zavodnick, to fall;

     b.    Failing to adequately maintain the said premises;

     c.    Failing to warn plaintiff;

     d.    Failing to take steps to provide for the safety of business invitees such as plaintiff, Robyn Zavodnick;

e.    Failing to provide plaintiff with a safe and ade-
quate passageway for business invitees such as
plaintiff herein;

f.    Permitting a dangerous condition to exist for an
unreasonable length of time;

g.    Failing to perform duties which it had assumed;

h.    Failing to properly maintain parking lot on said premises;

i.    Failing to use due care under the circumstances;

j.    Failing to provide adequate light in said premises;

k.    Permitting a dangerous condition to exist for
an unreasonable period of time;

l.    Failing to fill holes within parking lot;

m.    Failing to retain/hire a qualified contractor to repair the
dangerous condition on said premises;

n.    Being guilty of willful, wanton and reckless mis-
conduct; and

o.    Being otherwise careless and negligent under the
circumstances.

p.    Failing to correct a dangerous condition;

q.    Failing to warn plaintiff of a dangerous
condition and/or defect of the said
premises;

r.    Failing to inspect the said premises;

FEB-25-2005  09:14        7-ELEVEN, INC.

Feb 25 2    9:58
214 828 7631    P.11/13

16.    The accident aforementioned was caused by the negligence of the defendants herein, their respective agents, servants and/or employees, and was due in no manner whatsoever to any act or failure to act on the part of the plaintiff herein.

17.    At all times material hereto, the aforesaid premises was maintained by the defendants herein, their respective agents, servants and/or employees who were then and there acting in the course and scope of their employment with and under the direct control of the defendants.

18.    As a result of the accident aforementioned, plaintiff, Robyn Zavodnick, sustained multiple injuries, including, but not limited to, headaches, cervical strain and sprain, disc herniation at C5-6, cervical rediculopathy, tear of the distal supraspinatus tendon right shoulder, impingement syndrome bilateral shoulders, lumbar strain and sprain, thoracic sprain and sprain,, elbow strain and sprain as well as other injuries to her head, neck, back, spine, torso and extremities, their bones, cells, tissues, discs, muscles, cartilage, nerves and functions; together with shock and injury to her nerves and nervous system, some or all of which plaintiff has been advised are or may be permanent in nature.

19.    As a result of the aforesaid, plaintiff has undergone great physical pain and mental anguish. and she will continue to endure the same for an indefinite time in the future, to her great detriment and loss.

20.    As a further result of defendants negligence as aforesaid, plaintiff has become obliged to expend and/or incur large sums of money for medical attention and various purposes in an attempt to effect a cure for the aforesaid injuries, and plaintiff may be compelled to expend and/or incur additional sums for such medical attention and purposes for an indefinite time in the future.

21.    As a result of this accident, plaintiff has suffered an injury which may be permanent, irreparable and severe.

22.    As a further result of the defendants negligence, plaintiff was unable to attend to her daily duties and occupation, thereby suffering a loss of earnings and/or impairment of earning capacity, which plaintiff may continue to suffer for an indefinite time in the future.

23.    As a further result of this accident, plaintiff has or may suffer a severe loss because of expenses which have been or may be reasonably incurred in obtaining ordinary and necessary services in lieu of those which plaintiff would have performed, not for income, but for the benefit of herself, if she had not been so grievously injured.

24.    As a further result of defendants' negligence, plaintiff sustained associated incidental expenses and property damage loss.

WHEREFORE, plaintiff demands judgment against defendants, jointly and severally, in an amount in excess of Seventy-Five Thousand ($75,000.00), as well as lawful interest and costs.

A jury trial is demanded.

WAPNER, NEWMAN, WIGRIZER & BRECHER

BY

ROBERT S. MILLER, ESQUIRE
115 South 21st Street
Philadelphia, PA 19147
(215.569.0900)

# V E R I F I C A T I O N

The undersigned, having read the attached which was prepared by my attorneys, hereby verifies that the information contained therein may include information furnished to my attorneys by individuals other than myself; that the language used therein is that of my attorneys, and that to the extent the information set forth therein is not known to me, I have relied upon my attorneys in taking this Verification.  Subject to the above limitations, the information contained therein is true and correct to the best of my information, knowledge and belief, subject to the penalties imposed by 18 Pa. C.S. §4904.

# EXHIBIT "B"

Jan 25 2006  5:07
01/25/2006  17:00    7172347710        RAWLE AND HENDERSON                    PAGE 02/16

## LEASE ASSIGNMENT

The DATE of this Assignment is June 20, 1983.

The PARTIES to this Assignment are:

A.  MORRIS LEWIS STOLTZ and JACK P. STOLTZ, individually, of New Castle County, Delaware

AND

B.  MARTUSCELLI INVESTMENT ASSOCIATES, a Delaware general partnership.

MORRIS LEWIS STOLTZ and JACK P. STOLTZ hereby grant, transfer and assign to MARTUSCELLI INVESTMENT ASSOCIATES all of their rights, title and interest in and to all leases, addenda and agreement now existing and hereafter negotiated affecting FOUR SEASONS CENTER, ROUTE #896 and FOUR SEASONS PARKWAY, NEWARK, DELAWARE.

IN WITNESS WHEREOF, the said MORRIS LEWIS STOLTZ and JACK P. STOLTZ have hereunto set their hands and seals this 20th day of June, 1983.

WITNESS:

_____        _____ (SEAL)

_____        _____ (SEAL)

STATE OF DELAWARE:
                    : S.
NEW CASTLE COUNTY:

SWORN TO AND SUBSCRIBED before me this 20th day of June, 1983.

_____
Notary Public

Jan 25 2006  .6:07
01/25/2006  17:00    7172347710          RAWLE AND HENDERSON                    PAGE  03/16

## LEASE ASSIGNMENT

The DATE of this Assignment is June 15, 1983.

The PARTIES of this Assignment are:

A.   W S H INVESTMENTS, a Delaware general partnership,

AND

B.   MORRIS LEWIS STOLTZ and JACK P. STOLTZ, individually, of New Castle County, Delaware.

W S H INVESTMENTS hereby grants, transfers and assigns to MORRIS LEWIS STOLTZ and JACK P. STOLTZ, individually, all of its rights, title and interest in and to all leases, addenda and agreements now existing and hereafter negotiated affecting FOUR SEASONS CENTER, ROUTE #896 and FOUR SEASONS PARKWAY, NEWARK, DELAWARE.

IN WITNESS WHEREOF, the said W S H INVESTMENTS has hereunto set its hand and seal this 15th day June, 1983.

Witness:                               W S H INVESTMENTS, a Delaware
                                       general partnership

                                       BY                        (SEAL)

                                       BY                        (SEAL)

STATE OF DELAWARE:
                  :  SS.
NEW CASTLE COUNTY:

1983.       SWORN TO AND SUBSCRIBED before me this 15th day of June,

                              Notary Public

Jan 25 2006  o:07
01/25/2006   17:00    7172347710        RAWLE AND HENDERSON                    PAGE  04/16

## LEASE AGREEMENT

**1. PARTIES. THIS LEASE AGREEMENT** is between___M.G.H.  Investments_____

herein referred to as LESSOR, and THE SOUTHLAND CORPORATION, a Texas Corporation, herein re-
ferred to as LESSEE.

**2. PREMISES.** LESSOR hereby leases to LESSEE and LESSEE leases from LESSOR, for the term and
upon the terms and conditions hereinafter set forth, the premises described in Schedule A and shown on the
plot plan which is Schedule B, both of which schedules are attached hereto and made a part hereof, together
with the building and other improvements to be constructed thereon as hereinafter provided, and together
with the right to use all adjoining parking areas, driveways, sidewalks, roads, alleys and means of ingress
and egress in the shopping center of which the leased premises are a part, insofar as LESSOR has the power
to lease or license the use thereof. (If Schedule B conflicts with the revised plot plan as hereinafter provided,
the revised plot plan shall control.)

**3. CONSTRUCTION.** LESSOR agrees at LESSOR'S expense to construct on the leased premises a build-
ing and other improvements in accordance with plans and specifications approved by LESSEE. LESSOR
                                                            *Mansard
acknowledges receipt of Set No.75F 60_x_40 of LESSEE'S standard plans and Set No.75F 60 x 40
of LESSEE'S standard specifications. The parties agree promptly to obtain an architect's plot plan and, if
revision of LESSEE'S standard plans and specifications is necessary, to obtain revised plans and specifica-
tions. The plot plan and any revision of the plans and specifications to be approved by LESSEE and the
cost thereof to be paid by LESSOR. LESSEE'S approval shall be evidenced by the signature of LESSEE'S
authorized representative on the plot plan and on the top sheet of one set of plans and specifications. LES-

SOR agrees on or before _____ _____ _____ March 31 _____ 19_77_, to complete construction of
the building and other improvements in strict accordance with the plot plan and plans and specifications as
approved by LESSEE. If without the prior written consent of LESSEE to extend the time for construction,
which consent LESSEE shall not unreasonably withhold, LESSOR shall fail to complete the construction
on or before the agreed date, LESSEE may enforce specific performance of LESSOR'S covenants and agree-
ments or may pursue any other available legal or equitable remedy. If LESSOR for any reason whatever shall

fail to complete the construction before _____ June 30 _____ _____ 19 _77_, LESSEE shall
have the option to terminate this lease.     **See Addendum #31**

**4. TERM.** The primary term of this lease shall commence on the first day of the first calendar month
following (1) 15 days after the acceptance by LESSEE'S architect of the building and other improvements
to be constructed on the demised premises, or (2) the date that LESSEE or its assigns shall first be open for
business to the public, whichever event first occurs, and shall continue for a period of __ __ years there-
after, unless sooner terminated or extended as hereinafter provided. Should such event occur on other than
the first day of a calendar month, LESSEE agrees to pay a proportionate part of the monthly rental herein
provided for that month only. LESSEE shall have and is hereby granted a total of _5_ successive options to
extend the term of this lease for _2_ty period of _five_ _____ years for each such option upon the
same covenants and conditions as herein provided. If LESSEE shall elect to exercise one or more of such
options it shall do so by giving LESSOR written notice at least 90 days prior to the expiration of the primary
term or of the then current extension, and in such notice LESSEE shall state the date to which it elects to
extend the term.

**5. RENT.** LESSEE agrees to pay to LESSOR or his designee a minimum rental of __ Twelve _____

_Hundred and Fifty_ _____ _____ Dollars ($1250.00 _____) per month for each and every month
during the terms of this lease, such monthly rental to be paid in advance on or before the fifth day of each
month (unless such rental shall be abated or diminished as provided hereinafter.) Not later than 60 days after
the end of each calendar year, LESSEE shall furnish LESSOR a statement showing the gross sales (computed
as hereinafter provided) made in the store on the leased premises during such calendar year. At the time
such statement is furnished LESSEE agrees to pay to LESSOR, as additional rent due hereunder, an

amount of money equal to _Two_ _____ per cent (_2_ %) of such sales, less the total of the monthly
rentals paid during the preceding calendar year. In computing sales for the purposes of this provision, LES-
SEE shall take the total amount of all sales of every kind made in the store on the leased premises and deduct
therefrom the following to the extent that same are included in such total amount: (1) refunds made to cus-
tomers, (2) sales, excise and gross receipts taxes, and (3) proceeds from the sale of money orders (less
received for issuance of money orders shall not be deducted). Such rental payments may be paid by check
and sent to LESSOR by ordinary first class mail.     **See Addendum #32**

**6. USE.** The premises may be used for the retail sale of merchandise customarily sold at stores oper-
ated by or under franchise from LESSEE or at grocery stores of the type customarily called supermarkets,
including but not limited to groceries, produce, meat, dairy products, beer, wine and alcoholic beverages, gaso-
line and petroleum products, and sundries. With the written consent of LESSOR, which consent shall not be
unreasonably withheld, the premises may be used for any other lawful purpose not in conflict with any
use provision contained in leases covering other buildings leased by LESSOR in the shopping center of
which the LESSEE has actual knowledge. ~~LESSEE agrees promptly to apply for and obtain a~~
wine license for the premises. If LESSEE finds that such a license is not obtainable, LESSEE may terminate
this lease at any time within forty days after the date of executing ~~of this lease, but~~ if LESSEE fails to termi-
nate this lease within such period, thereafter LESSEE ~~shall not have any right to terminate this lease because~~
such a license is not obtained. If LESSEE terminates this lease under this provision, LESSEE agrees to reim-
burse LESSOR ~~for any reasonable expenses actually incurred by LESSOR for the preparation of the plot and~~
~~_____ _____ _____ _____ _____ _____~~

**7. UTILITIES.** LESSEE agrees to pay all charges for gas, electricity and water used by it

**8. TAXES.** ~~_____ _____ _____ _____ _____ _____ _____ _____ _____ including taxes for the~~

INITIALS

See Addendum #33

**9. MAINTENANCE.** LESSOR agrees to maintain in good repair the outside walls, roof and floor of the building and surface of the parking areas, sidewalks and driveways, as well as the structural soundness of the building, and all underground gas, water and sewer pipes except those parts of such pipes as are in or directly beneath the floor of the building. LESSEE agrees to keep the inside of the building in good repair, including the plumbing, electrical wiring, air conditioning and heating equipment, and those parts of underground gas, water and sewer pipes as are contained in or are directly beneath the floor of the building, and to paint the exterior walls and be responsible for all glass, casualty damage and reasonable wear and tear excepted.

**10. ALTERATIONS.** LESSEE shall not make any alterations involving structural changes without securing LESSOR'S written consent. Other alterations or additions, such as to store front, marquee and non-weight bearing partitions, may be made by LESSEE in a good workmanlike manner without cost to LESSOR.

**11. TRADE AND OTHER FIXTURES.** LESSEE may install or cause to be installed such equipment and trade and other fixtures as are reasonably necessary for the operation of its business. Such equipment and trade and other fixtures may be installed prior to acceptance of the improvements and shall remain personal property, and title thereto shall continue in the owner thereof, regardless of the manner in which same may be attached or affixed to the demised premises. In the event such equipment and trade or other fixtures are subject to a lien or title retention instrument, the holder of such lien or title retention instrument shall have the right and be able to enforce the same as stated therein.

**12. CASUALTY DAMAGE.** If, in the opinion of LESSOR, the leased premises are rendered substantially unfit for the occupancy or use herein contemplated by any casualty or peril insured against in a standard fire and extended coverage insurance policy of the type then commonly purchased by owners of small commercial buildings in the area in which the leased premises are situated (such a casualty or peril being hereinafter referred to as an insurable casualty or peril) and the primary term or the then current extension of the term shall have at least two years to run, LESSOR at LESSOR'S expense shall promptly and diligently restore the leased premises to the condition existing prior to the occurrence of the insurable casualty or peril. If, in the and all rental shall abate from the date of such occurrence until the leased premises are so restored. If, in the opinion of LESSEE, the leased premises are rendered substantially unfit for the occupancy or use herein contemplated by any casualty or peril other than an insurable casualty or peril, or by any casualty or peril whatever when the primary term or the then current extension of the term shall have less than two years to run.

INITIALS LESSOR may either restore the leased premises at LESSOR'S expense as above provided or LESSOR may terminate this lease effective as of the date of the occurrence of the casualty or peril; provided, that LESSOR shall not have the right to so terminate this lease if the casualty or peril is an insurable casualty or peril and within 10 days after the occurrence of the casualty or peril LESSEE exercises any option to extend the term of this lease for a period of at least two years, or if the casualty or peril shall agree in casualty or peril and LESSEE within 10 days after the occurrence of the casualty or peril. If, in the opinion of LESSEE, the leased premises writing to restore the leased premises at LESSEE'S expense. If, in the opinion of LESSEE, the leased premises are not thereby rendered substantially unfit for the occupancy or use herein contemplated, LESSOR shall promptly and diligently restore the leased premises at LESSOR'S expense to the condition existing prior to the occurrence of the casualty or peril and the rental shall not abate because of such damage. On written request of LESSOR, LESSOR shall furnish to LESSEE the name and address of its casualty insurance carrier.

See Addendum #34

**13. LIABILITY INSURANCE.** LESSEE agrees at LESSEE'S expense to maintain in force continuously throughout the term of this lease and any extension hereof public liability insurance covering the leased premises, with limits of $100,000.00 for death or injury to one person, $300,000.00 for death or injury to more than one person, and $20,000.00 for property damage, and shall upon written request of LESSOR furnish LESSOR a certificate by the insurer that such insurance is in force.

**14. COMPLIANCE WITH LAWS.** LESSEE will promptly comply with all applicable and valid laws, ordinances and regulations of Federal, State, County, Municipal or other lawful authority pertaining to the use and occupancy of the leased premises.

**15. ASSIGNMENT AND SUBLETTING.** LESSEE shall have the right to assign or sublease the whole or any part of the demised premises, provided that any assignment or sublease shall be subject to all of the terms and conditions of this lease and that LESSEE shall remain primarily liable for the payment of the rent and the performance of the terms and conditions of this lease.

**16. BANKRUPTCY.** Should LESSEE make an assignment for benefit of creditors, or be adjudicated bankrupt, such action shall constitute a breach of this lease for which LESSOR, at its opinion, may terminate all rights of LESSEE or its successors in interest under this lease.

**17. EMINENT DOMAIN.** If all of the leased premises and common areas is taken under the power of eminent domain or conveyed under threat of condemnation proceedings, or if only a part of such premises or common areas is so taken or conveyed and LESSEE shall determine that the remainder is inadequate or unsatisfactory for its purposes, which determination shall not be arbitrarily or capriciously made, then, in either event, this lease shall terminate effective as of the date LESSEE is required to give up the right to occupy or use any part of the leased premises or common areas. The termination of this lease as above provided shall not operate to deprive LESSEE of the right to make claim against the condemning authority for any damages suffered by LESSEE, but LESSEE shall have no right to make any claim against LESSOR because of such termination. If this lease is not terminated as above provided, LESSOR and LESSEE shall agree upon an equitable reduction of the rental. If the parties fail to agree upon such reduction within 30 days from the date of the final award or payment for the part of the leased premises so taken or conveyed, LESSOR and LESSEE shall each choose one arbitrator and the two arbitrators so chosen shall choose a third arbitrator. The choice of any two of the arbitrators as to the rental reduction, if any, shall be binding.

on LESSEE and LESSOR and any expense of the arbitration shall be divided equally between LESSEE and LESSOR.

**18. ATTORNEYS' FEES.** If suit is brought to enforce any covenant of this lease or for the breach of any covenant or condition herein contained, the parties hereto agree that the losing party shall pay to the prevailing party a reasonable attorneys' fee, which shall be fixed by the court, and court costs.

**19. DEFAULT.** In the event LESSEE shall default in the payment of the monthly rent as provided herein, LESSOR shall promptly so notify LESSEE in writing, and failure of LESSEE to cure such default within twenty days after receipt of such notice shall, at the option of the LESSOR, work as a forfeiture of this lease, or LESSOR may enforce performance in any manner provided by law, and LESSOR'S agent or attorney shall have the right without further notice or demand to reenter and remove all persons from LESSEE'S property without being deemed guilty of any manner of trespass and without prejudice to any remedies for arrears of rent or breach of covenant, or LESSOR'S agent or attorney may resume possession of the property and relet the same for the remainder of the term at the best rental such agent or attorney can obtain for the account of LESSEE, who shall pay any deficiency, and LESSEE shall have a lien as security for such rental upon the fixtures and equipment belonging to LESSEE which are the demised premises. In the event LESSEE shall default in the performance of any of the terms or provisions of this lease other than the payment of monthly rent, LESSOR shall promptly so notify LESSEE in writing. If LESSEE shall fail to cure such default within twenty days after receipt of such notice, or if the default is of such character as to require more than twenty days to cure and LESSEE shall fail to commence to do so within twenty days after receipt of such notice and thereafter diligently proceed to cure such default, then in either such event LESSOR may cure such default and such expense shall be added to the rent otherwise due, but any such default shall not work as a forfeiture of this lease.

In the event LESSOR shall default in the performance of any of the terms or provisions of this lease (other than Art. 4 dealing with construction of improvements which contains special terms for notice and correction of defaults), LESSEE shall promptly so notify LESSOR in writing. If LESSOR shall fail to cure such default within twenty days after receipt of such notice, or if the default is of such character as to require more than twenty days to cure and LESSOR shall fail to commence to do so within twenty days after receipt of such notice and thereafter diligently proceed to cure such default, then, in either event, LESSEE may cure such default and such expense shall be deducted from the rent otherwise due or cancel and terminate this lease.

**20. RIGHT OF FIRST REFUSAL.** If during the term of this lease, or any extension thereof, LESSOR shall receive a bona fide offer to purchase the demised premises, which offer is acceptable to LESSOR, LESSOR agrees that LESSEE shall have and is hereby granted an option to purchase the demised premises upon the same terms and provisions. LESSOR agrees immediately after receipt of such offer to give LESSEE notice in writing of the terms and provisions thereof, and that LESSEE may exercise its option to purchase said property at any time within twenty days after such notice is received by LESSEE. If LESSEE shall elect to exercise such option it shall do so by giving notice in writing to LESSOR within such twenty-day period and a contract of sale shall be executed by the parties and title closed within a reasonable time thereafter. The failure of LESSEE to exercise the option provided in this article shall in no way relieve or release LESSOR from the terms and effect of the option granted in Article 21.

**21. OPTION TO PURCHASE.** ~~LESSOR agrees that LESSEE shall have an~~ ......... hereby ........ ... tion to purchase the leased premises at the expiration of the term of this lease, or any extension thereof ......... Dollars ($ ......... ). LESSEE .... may exercise this option to purchase at any time within twenty days prior to the date of expiration by giving written notice to LESSOR and a contract of sale shall be executed by the parties and title closed within a reasonable time thereafter ......... should such reasonable time extend beyond said expiration, this lease and all of its terms and .........tions shall automatically be extended until closing. Rent is to be apportioned to date of .........

**22. COMMON AREAS.** LESSOR shall be responsible for cleaning and lighting the parking and other common areas of the shopping center designated on Schedule B, but LESSEE shall bear a part of the cost of such cleaning and lighting in proportion to the number of square feet of floor space of the building leased by LESSEE as compared with the total number of square feet of floor space of all the buildings in the shopping center. That part of the common areas which primarily serves the customers of the building leased to LESSEE shall be lighted at night during LESSEE'S business hours. Upon the written request of LESSEE LESSOR shall award a contract for cleaning the common areas to the lowest of three bidders, one of whom may be LESSEE.  Lessee's maximum cost shall not exceed 525.00 per month.  Excepting one liquor store & one tavern selling prepared food.

**23. CO-TENANCY.** LESSOR agrees that no building in the shopping center shall be occupied for ..... selling food or alcoholic beverages for consumption on the premises without the prior written consent of LESSEE.  Also included hereby: pizza outlets, sandwich shops, beauty shops and barber shops.

**24. EXCLUSIVE.** LESSOR agrees that no occupant of any building in the shopping center other than the herein leased building shall be allowed to sell packaged fluid milk, packaged bread products, or delicatessen type food products for consumption off the premises, except a grocery store occupying a building containing more than 10,000 square feet of floor space.

**25. LESSOR'S COVENANTS.** LESSOR covenants that he has good and marketable title to the demised premises in fee simple absolute and that the same is subject to no leases, tenancies, agreements, encumbrances, liens, restrictions or defects in title affecting the demised premises or the rights granted LESSEE in this lease, that there are no restrictive covenants, zoning or other ordinances or regulations applicable to the demised premises which will prevent LESSEE from conducting its usual business and that in the event the demised premises are in an area where the sale of beer for off premises consumption is not prohibited by law, there are no restrictive covenants applicable to the demised premises which will prevent LESSEE from selling beer for off premises consumption.

**26. QUIET ENJOYMENT.** LESSEE upon paying the rent and performing the covenants of .........

Form 4400911
From 2 of 2

Jan 25 2006    5:09
RAWLE AND HENDERSON                          PAGE  07/16

agreements of this lease shall quietly have, hold and enjoy the demised premises and all rights granted LESSEE in this lease during the term thereof and extensions thereto, if any.

27. SUBORDINATION. LESSEE hereby agrees that its leasehold interest hereunder is subordinate to any mortgages now on or hereafter to be placed on, the premises leased hereunder; provided, as a condition precedent to such subordination, such mortgagee shall expressly covenant or each such mortgage shall expressly provide that so long as the LESSEE is not in default under said Lease Agreement, the LESSEE'S quiet possession of the portion of the premises leased hereunder shall remain undisturbed on the terms and conditions stated herein, whether or not the mortgage is in default and notwithstanding any foreclosure or other action brought by the holder of the mortgage in connection therewith.

This Subordination Agreement shall be self operative and no further instrument or certificate of subordination shall be required from LESSEE.

28. NOTICES. Any notices required or permitted hereunder shall be in writing and delivered either in person to the other party or the other party's authorized agent, or by United States Certified Mail, Return Receipt Requested, postage fully prepaid, to the addresses set forth hereinafter, or to such other address as either party may designate in writing and deliver as herein provided.

LESSOR:     W.G.B. Investments
            2302 Silverside Road, Suite 8
            Wilmington, DE 19803


LESSEE:     THE SOUTHLAND CORPORATION
            Attn: Director of Property
            2828 North Haskell Avenue
            Dallas, Texas 75204

29. RECORDING. This lease agreement shall not be filed for public record by any party hereto, but when the construction of the building and other improvements is completed as herein provided LESSOR and LESSEE shall execute and acknowledge a memorandum or short form lease setting forth the parties description of the leased premises, term of the lease, options for extension of the term, if any, and any other provision hereof, the inclusion of which shall be mutually agreed upon by LESSOR and LESSEE, which memorandum or short form lease may be filed for public record by any party hereto. However, at the option of either party, a short form or memorandum of lease may be filed by either party at any time after the execution of this lease agreement.

30. COMPLETE AGREEMENT. This lease contains a complete expression of the agreement between the parties and there are no promises, representations or inducements except such as are herein provided.

          Added Addendum containing Articles 31 through 34 is
          hereby incorporated into and made a part of this
          lease.




This lease agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.

EXECUTED BY LESSOR this_____day of_____19____.

                              LESSOR_____ (Seal)


EXECUTED BY LESSEE this_____day of_____19___.

ATTEST                        THE SOUTHLAND CORPORATION

_____             _____
Assistant Secretary           Vice President

Page 4

The items to be included in such bids are as follows:

a.  Construction cost of the building from the "ground up" complete with electrical service, plumbing and sanitary mains to be stubbed out 5' from the building perimeter all as shown on Lessee's typical drawings and specifications described in paragraph 5 of this lease.

b.  Additional cost to extend and connect sewers, water, gas, and electrical mains from item a. to service locations not to exceed 35' from the leased property lines.  (Not including city front-footage connection fees in excess of $1.00 per front foot or liens against the property for city-installed mains, should either exist.)

c.  Cost of grading and paving parking lot within Lessee's leased area and to Lessee's specifications adequate to insure natural drainage from site.

d.  Construction of concrete apron as described in Paragraph 31.

01/25/2006  17:00   7172347710                                     PAGE  09/16

PROPERTY DESCRIPTION

Attached to and made a part of Lease dated _____ *Oct 14 1976* _____
between W S H Investments, referred to as Lessor, and The
Southland Corporation, referred to as Lessee.

Leased premises are a part of the below described property
and further depicted on attached Schedule B:

Said property beginning at a point on the Southwesterly
side of Delaware Route 896, said point being a common corner
for lands herein being described and the entrance road to the
Four Seasons development; thence from said point of beginning
along said Delaware Route 896, S2 17 44 W 148.339' to a point;
thence proceeding N 85 23 30 W  274.999' to a point thence
proceeding N 2 17 44 E 137.289' to a point; thence proceeding
S 87 42 16 E  274.789' to the point of beginning.

Said lessee's property is shown and further described on
plot plan drawing #2, dated 8/2/76, attached hereto and entitled
Schedule B, as Proposed Retail Store, 2400 square feet, #1 and
is outlined in red.  Common use areas are outlined in green.

exclusive right to use the 5 parking spaces
immediately North of said store, all as



SCHEDULE A

AMENDMENT NO.   one (1)
STORE NO.   1176-18494

On the __14th__ day of __October__, 19__76__, W.S.H. Investments

2502 Silverside Rd., Suite 8, Wilmington, Delaware   19803

as LESSOR, and The Southland Corporation as LESSEE, entered into a lease agreement

covering the premises commonly known as   Store #1, 4 Seasons Center, Rt. 896,

New Castle County, Dela. and more fully described in Schedule A, which Schedule is

attached hereto and made a part hereof.

LESSOR and LESSEE presently desire to amend said lease agreement.

Now therefore, in consideration of the premises and $10 in hand paid each to

the other, receipt of which is hereby acknowledged, said lease agreement shall be

and is hereby amended as follows:

1.   Article 3, Line 26, change date to read:  "July 1, 1977" and change date in
     line 33 to read:  "July 31, 1977".

2.   Article 5, Rent, is amended to read:

     "Twelve hundred and fifty one dollars and 59/100 ($1,251.59)" due to
     lowest bid being $70,159.00.

In all other respects said lease agreement is hereby ratified and reaffirmed.

Executed this _____ day of _____, 19 77

ATTEST:                                    LESSEE
                                           THE SOUTHLAND CORPORATION

By_____                   By_____
   Assistant Secretary                        Vice President


_____                     LESSOR

                                           _____

## PROPERTY DESCRIPTION

Attached to and made a part of Lease dated ____Oct 14 1976____
between W S H Investments, referred to as Lessor, and The
Southland Corporation, referred to as Lessee.

Leased premises are a part of the below described property
and further depicted on Attached Schedule B:

Said property beginning at a point on the Southwesterly
side of Delaware Route 896, said point being a common corner
for lands herein being described and the entrance road to the
Four Seasons development; thence from said point of beginning
along said Delaware Route 896, S2 17 44 W 148.339' to a point;
thence proceeding N 85 23 30 W 274.993' to a point thence
proceeding N 2 17 44 E 137.289' to a point; thence proceeding
S 87 42 16 E  274.789' to the point of beginning.

Said lessee's property is shown and further described on
plot plan drawing #2, dated 8/2/76, attached hereto and entitled
Schedule B, as Proposed Retail Store, 2400 square feet, #1 and
is outlined in red.  Common use areas are outlined in green.



exclusive right to use the 5 parking spaces
immediately North of said store, all as

INITIALS

SCHEDULE A

AMENDMENT NO.  ONE (1)
STORE NO.  1176-18494

On the  14th  day of October        , 19 76 , W.S.H. Investments

2502 Silverside Rd., Suite 8, Wilmington, Delaware    19803

as LESSOR, and The Southland Corporation as LESSEE, entered into a lease agreement

covering the premises commonly known as    Store #1, 4 Seasons Center, Rt. 896,

New Castle County, Dela. and  more fully described in Schedule A, which Schedule is

attached hereto and made a part hereof.

LESSOR and LESSEE presently desire to amend said lease agreement.

Now therefore, in consideration of the premises and $10 in hand paid each to

the other, receipt of which is hereby acknowledged, said lease agreement shall be

and is hereby amended as follows:

1.  Article 3, Line 26, change date to read:  "July 1, 1977" and change date in
    line 33 to read:  "July 31, 1977".

2.  Article 5, Rent, is amended to read:

    "Twelve hundred and fifty one dollars and 59/100 ($1,251.59)" due to
    lowest bid being $70,159.00.

In all other respects said lease agreement is hereby ratified and reaffirmed.

Executed this ____ day of _____, 19 77

ATTEST:                                           LESSEE
                                                  THE SOUTHLAND CORPORATION

By _____                       By _____
   Assistant Secretary                               Vice President


                                                  LESSOR


SCHEDULE A

## PROPERTY DESCRIPTION

Attached to and made a part of Lease dated ___Oct 14 1976____
between W S H Investments, referred to as Lessor, and The
Southland Corporation, referred to as Lessee.

Leased premises are a part of the below described property
and further depicted on attached Schedule B:

    Said property beginning at a point on the Southwesterly
side of Delaware Route 896, said point being a common corner
for lands herein being described and the entrance road to the
Four Seasons development; thence from said point of beginning
along said Delaware Route 896, S2 17 44 W 148.399' to a point;
thence proceeding N 35 23 30 W  274.999' to a point thence
proceeding N 2 17 44 E 137.289' to a point; thence proceeding
S 87 42 16 E  274.789' to the point of beginning.

    Said lessee's property is shown and further described on
plot plan drawing #2, dated 8/2/76, attached hereto and entitled
Schedule B, as Proposed Retail Store, 2400 square feet, #1 and
is outlined in red.  Common use areas are outlined in green.

exclusive right to use the 5 parking spaces
immediately North of said store, all as

INITIALS

SCHEDULE A

01/25/2006  17:00   7172347710    Jan 25 2006   11
                                  RAWLE AND HENDERSON                    PAGE  14/16

7-ELEVEN FOOD STORES • DIVISION 1149 • 2711 EASTON ROAD • WILLOW GROVE, PA. 19090 • PHONE (215) 672-5711

March 21, 1977

Mr. Carl G. Wittig
W.S.H. Investments
2502 Silverside Road, Suite 8
Wilmington, Delaware  19803

RE:  Lease Amendment No. 1, Location 1126-18494

Dear Jim:

     Enclosed please find fully executed lease amendment changing
construction dates and increasing rent for your file.  I am pleased that
you have commenced construction and hope you can complete prior to agreed
dates.

Sincerely,

Lowell A. Pyke
Real Estate Manager

dl

Enclosure

cc:  Division Manager
     Zone Manager
     1149 RE
     1129 RE

Jan 25 2006    :11
01/25/2006  17:00   7172347710          RAWLE AND HENDERSON                    PAGE 15/16

AMENDMENT NO.  one (1)
STORE NO.  1176-18494

On the  14th  day of  October _____ , 19 76 ,  W.S.H. Investments

2502 Silverside Rd., Suite 8, Wilmington, Delaware   19803

as LESSOR, and The Southland Corporation as LESSEE, entered into a lease agreement covering the premises commonly known as ___Store #1, 4 Seasons Center, Rt. 896,__ New Castle County, Dela. and  more fully described in Schedule A, which Schedule is attached hereto and made a part hereof.

LESSOR and LESSEE presently desire to amend said lease agreement.

Now therefore, in consideration of the premises and $10 in hand paid each to the other, receipt of which is hereby acknowledged, said lease agreement shall be and is hereby amended as follows:

1.  Article 3, Line 26, change date to read:  "July 1, 1977" and change date in line 33 to read:  "July 31, 1977".

2.  Article 5, Rent, is amended to read:

"Twelve hundred and fifty one dollars and 59/100 ($1,251.59)" due to lowest bid being $70,159.00.

In all other respects said lease agreement is hereby ratified and reaffirmed.

Executed this _____ day of _____, 19____.

ATTEST:

By _____          LESSEE
Assistant Secretary                THE SOUTHLAND CORPORATION

                                   By _____
                                        Vice President


                                   LESSOR

# EXHIBIT "C"

## SHEET 1  PAGE 1

1

```
 1        UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF DELAWARE
 3                 NO. 05-CV-639
 4
 5   ROBYN ZAVODNICK,    ) DEPOSITION UPON
 6        Plaintiff, )    ORAL
 7      - vs -       ) EXAMINATION OF
 8   KAILASH SAYL and   ) ANNA MARTUSCELLI
     7-ELEVEN, INC.    )
 9        and        )
10   MARTUSCELLI INVESTMENT )
11   ASSOCIATES,      )
12        Defendants.)
     - - - - - - - - - - -
13
14
15     TRANSCRIPT OF DEPOSITION taken by and
16   before SUSAN M. ALESSANDRONI, Professional
17   Reporter and Notary Public, at the offices of
18   CASARINO, CHRISTMAN & SHALK, 800 North King
19   Street, Suite 200, Wilmington, Delaware, on
20   Thursday, June 1, 2006, commencing at 2:10 p.m.
21
22
23
24
```

CENTER CITY REPORTING

## PAGE 3

3

```
 1               I N D E X
 2
 3   WITNESS              PAGE
 4   ANNA MARTUSCELLI
 5
 6   By: Mr. Miller        4, 78
 7   By: Mr. Wagner        66, 78
 8
 9
10
11
12            E X H I B I T S
13
14
15   NUMBER      DESCRIPTION        MARKED
16   Martuscelli-1  Lease Agreement      34
17   Martuscelli-2  2/22/02 J. B. O'Connell  48
                    Invoice
18
19   Martuscelli-3  6/7/02 Deramo Proposal   52
20   Martuscelli-4  6/12/02 Deramo Invoice   54
21   Martuscelli-5  9/13/02 Richards Paving  55
                    Contract
22
23
24
```

Center City Reporting, Inc.

## PAGE 2

2

```
 1   A P P E A R A N C E S :
 2
 3   WAPNER, NEWMAN, WIGRIZER & BRECHER
 4     BY: ROBERT S. MILLER, ESQUIRE
       115 South Twenty-First Street
 5       Philadelphia, PA 19103-4483
       Attorneys for the Plaintiff
 6       215.560.0900
 7
 8   CASARINO, CHRISTMAN & SHALK
       BY: KENNETH M. DOSS, ESQUIRE
 9       800 North King Street, Suite 200
       P.O. Box 1276
10       Wilmington, DE 19899
       Attorneys for the Defendant,
11       Martuscelli Investment Associates
       302.594.4500
12
13   RAWLE & HENDERSON, LLP
       BY: THOMAS P. WAGNER, ESQUIRE
14     The Widener Building
       One South Penn Square
15     Philadelphia, PA 19107
       Attorneys for the Defendants,
16       Kailash Sayl and 7-Eleven, Inc.
       215.574.4200
17
18
19
20
21
22
23
24
```

Center City Reporting, Inc.

## PAGE 4

4

```
 1        (By agreement of Counsel,
 2   the sealing, filing and certification
 3   are waived; and all objections, except
 4   as to the form of the question, are
 5   reserved until the time of trial.)
 6           - - -
 7   A N N A   M A R T U S C E L L I , Sworn
 8           - - -
 9        EXAMINATION
10           - - -
11   BY MR. MILLER:
12   Q.   Can you state your name, please?
13   A.   Anna Martuscelli.
14   Q.   Mrs. Martuscelli, my name is Robert
15   Miller. We met earlier.
16   A.   Um-hum.
17   Q.   I represent Robyn Zavodnick in
18   reference to a claim that she's brought for a
19   fall that occurred on December 1, 2003.
20        I'm going to ask you questions today
21   concerning facts and circumstances surrounding
22   the fall and the location of her fall.
23   A.   Right.
24   Q.   If at any time you do not understand
```

Center City Reporting, Inc.

ANNA MARTUSCELLI

9

1  A.      No, I was 16.
2  Q.      Thirty-two years, that's 1970?
3  A.      I came here in '62, no '63.
4  Q.      But you got married in the early '70s?
5  A.      '73.
6  Q.      When you moved to the United States,
7  did you move directly to Delaware, or another
8  state?
9  A.      Philadelphia.
10  Q.     When did you move from Pennsylvania?
11  A.     We move in 1978.
12  Q.     Was that to Delaware?
13  A.     Yes.
14  Q.     Are you employed?
15  A.     We own a business, La Casa Pasta
16  Restaurant.
17  Q.     L-A, space, C-A-S-A, space, P-A-S-T-A?
18  A.     Right.
19  Q.     Where is that located?
20  A.     On Four Seasons Shopping Center.
21  Q.     Where is the Four Seasons Shopping
22  Center?
23  A.     Route 896 South, Newark, Delaware.
24  Q.     You said we own, who is we?
              Center City Reporting, Inc.

ANNA MARTUSCELLI

10

1  A.      Me and my husband.
2  Q.      Is that through a corporation, or is
3  that as individuals you own that?
4  A.      A corporation.
5  Q.      What is the name of the corporation?
6  A.      AJT, Incorporated, La Casa Pasta.
7  Q.      You and your husband are the only two
8  shareholders or owners of that company?
9  A.      Yes.
10  Q.     Any other businesses that you are a
11  shareholder in besides La Casa Pasta?
12  A.     Yes.
13  Q.     Yes?
14  A.     We own Chesapeake City, it's
15  Chesapeake Inn Restaurant on Chesapeake City, it
16  is.
17  Q.     A restaurant in Chesapeake City?
18  A.     Chesapeake Inn Restaurant.
19  Q.     Individually you own that, or is that
20  a corporation as well?
21  A.     A corporation, me, my husband, and my
22  son.
23  Q.     Which son?
24  A.     The 31.
              Center City Reporting, Inc.

ANNA MARTUSCELLI

11

1  Q.      What is his name?
2  A.      Gianmarco, G-I-A-N-M-A-R-C-O,
3  Martuscelli.
4  Q.      What is the name of the corporation
5  that owns that restaurant?
6  A.      MM.
7  Q.      It's called MM, Incorporated?
8  A.      Chesapeake Inn Restaurant and Marina.
9  Q.      Any other --
10  A.     We own the shopping center, me and my
11  husband.
12  Q.     The shopping center that you're
13  referring to as the Four Seasons Shopping
14  Center?
15  A.     That's correct.
16  Q.     It's my understanding that the Four
17  Seasons Shopping Center is Martuscelli
18  Investment Associates, Inc.?
19  A.     No, it's a partnership.
20  Q.     Who are the principals in that
21  partnership?
22  A.     Me and my husband.
23  Q.     What is the full name of the
24  partnership?
              Center City Reporting, Inc.

ANNA MARTUSCELLI

12

1  A.      It's Martuscelli Investment, is the
2  partnership.
3  Q.      Do you know what the full legal name
4  is, for instance, your counsel gave me a
5  document --
6        MR. DOSS:  Just for the
7  record, I think it's actually in my
8  answer, which I don't have in front of
9  me, but I think it's Martuscelli
10  Investment Associates.
11        MR. MILLER:  But Martuscelli
12  Investment Associates is the correct
13  name, and it's --
14        MR. DOSS:  I don't recall
15  sitting here without my answer in
16  front of me. I don't know if she
17  knows or not.
18        MR. MILLER:  Fair enough.
19        MR. DOSS:  For the record, I
20  will note that it is in the answer.
21  BY MR. MILLER:
22  Q.      Does Martuscelli Investment Associates
23  own any business interest or property other than
24  the Four Seasons Shopping Center?
              Center City Reporting, Inc.

## ANNA MARTUSCELLI

17

1  sweep to make sure it's clean.
2  Q.    Other than sweeping, picking up
3  debris, anything else that the dishwasher does?
4  A.    Yes.
5  Q.    And the restaurant is open seven days
6  a week?
7  A.    Yes, we open at eleven.
8  Q.    So, every day at four o'clock in the
9  afternoon the dishwasher --
10  A.    Every day.
11  Q.    How long has that been an ongoing
12  event?
13  A.    Since we opened the restaurant.
14  Q.    When did you open the restaurant?
15  A.    1978.
16  Q.    Other than the dishwasher that goes
17  outside at four o'clock to pick up debris and
18  sweep, anybody else that does any type of
19  maintenance that is an employee of yours, the
20  restaurant, or Martuscelli Investment?
21  A.    No. We call when we need it. We call
22  the contractor to clean the snow. When we need
23  paving, we call the paving company that you have
24  there in the document.
              Center City Reporting, Inc.

## ANNA MARTUSCELLI

18

1  Q.    How about daily maintenance or upkeep?
2  A.    No, we do, me and my husband.
3  Q.    Let's talk about the shopping center,
4  Four Seasons Shopping Center?
5  A.    Okay.
6  Q.    You mention there's a restaurant?
7  A.    Um-hum.
8  Q.    Yes?
9  A.    Yes.
10  Q.    And next to the restaurant is a
11  7-Eleven?
12  A.    Yes.
13  Q.    Are there other shops or stores or
14  retail outlets in the shopping center?
15  A.    No.
16  Q.    What is the size of the shopping
17  center?
18  A.    I don't know, I don't know the
19  measurement really.
20  Q.    Can you approximate?
21  A.    I have no idea. I would be guessing.
22  It's a pretty good size, I mean. I can call --
23  I don't know.
24  Q.    So, we know the two stores, 7-Eleven
              Center City Reporting, Inc.

## ANNA MARTUSCELLI

19

1  and La Casa Pasta?
2  A.    The only two, yes.
3  Q.    There's also a parking lot?
4  A.    Yes.
5  Q.    How many spaces are there in the
6  parking lot for cars to park?
7  A.    Back and front, I cannot answer the
8  question because I'm not sure.
9  Q.    Can you estimate?
10  A.    No.
11  Q.    Are there parking spaces -- by the
12  way, does both the restaurant and the 7-Eleven
13  face the road, 896?
14  A.    It's on the side. 896 sits like this
15  and shopping center. This is 896. You go in
16  and shopping center is right here. It's like
17  face -- the 7-Eleven, the side faces 896.
18  Q.    Is there parking in front of the
19  7-Eleven and the restaurant?
20  A.    There's parking in front and --
21  Q.    Is there parking in front of the
22  7-Eleven and the restaurant?
23  A.    Yes.
24  Q.    Is the parking on the side of the
              Center City Reporting, Inc.

## ANNA MARTUSCELLI

20

1  7-Eleven closest to 896?
2  A.    It's close, but it's -- there's a big
3  road. It's far from 896.
4  Q.    Are there any spots for cars to park
5  on that side of the 7-Eleven?
6  A.    Yeah, you can park, there is a parking
7  space, yes.
8  Q.    Are there any parking spaces on the
9  side of the restaurant furthest from 896?
10  A.    There is, yes.
11  Q.    By the way, does the restaurant and
12  7-Eleven share a wall, so to speak, they're
13  connected, or are they two distinct buildings?
14  A.    It's one building.
15  Q.    So, there would be no parking between
16  the two?
17  A.    No on the side.
18  Q.    On both sides there's parking?
19  A.    Yes.
20  Q.    In front there is parking?
21  A.    Yes.
22  Q.    How about behind the restaurant and
23  7-Eleven?
24  A.    There's parking.
              Center City Reporting, Inc.

ANNA MARTUSCELLI

25

1  Q.    Is that a copy of your signature on
2  the bottom of that document?  We'll acknowledge
3  we did not receive original documents.
4  **A.    I don't see my signature here.**
5  Q.    To tell you the truth, I can't make
6  out the signatures.
7      I'm going to show you a 12-page lease
8  agreement.  And the lease agreement appears to
9  be between WSH Investments and the Southland
10  Corporation.
11      When you purchased Four Seasons
12  Shopping Center, did you purchase it from a
13  company called WHS Investments?
14  **A.    Yes.**
15  Q.    This 12-page document that I'm showing
16  you, is that the lease that we referred to that
17  was in place at the time of your purchase?
18  **A.    Yes.**
19  Q.    Did you assume that lease by
20  purchasing the shopping center --
21          MR. DOSS:  I'm just going to
22      object to the extent you're asking her
23      for a legal conclusion.  You can ask
24      her understanding of what the lease

Center City Reporting, Inc.

---

ANNA MARTUSCELLI

26

1     says.
2  BY MR. MILLER:
3  Q.    Do you know if the lease was
4  transferred from WHS Investments to Martin
5  Investments at the time of your purchase?
6  **A.    I don't understand the question.**
7  Q.    When Martuscelli Investment Associates
8  purchased the property, Four Seasons Shopping
9  Center --
10  **A.    Yes.**
11  Q.    It's your testimony that lease
12  agreement that I just showed you, the 12-page
13  document, was in place at that time?
14  **A.    Yes.**
15  Q.    Do you know, as part of this lease
16  assignment that I also showed you, separate from
17  the 12 pages which is the lease agreement, if
18  the lease agreement was assigned from WSH
19  Investments to Martuscelli Investment
20  Associates?
21          MR. DOSS:  I assert the same
22      objection to the extent it calls for a
23      legal conclusion, and for that matter,
24      the document speaks for itself.  She

Center City Reporting, Inc.

---

ANNA MARTUSCELLI

27

1     can answer if she understands the
2     question.
3  BY MR. MILLER:
4  Q.    Let's back up.
5      You said to me earlier there's a 30
6  year lease in place between your company and
7  7-Eleven.  Do you have a copy of that lease?
8  **A.    This is not a copy of the lease.**
9          MR. DOSS:  He's asking do
10      you have a copy.
11  BY MR. MILLER:
12  Q.    Do you have a copy of that lease?
13  **A.    Sure, I have.**
14  Q.    Is that a lease specifically between
15  7-Eleven or Southland Corporation and
16  Martuscelli Investment Associates, or is it the
17  lease that was signed with the prior owner of
18  the Four Seasons Shopping Center, if you know?
19  **A.    I don't understand the question.  When**
20  **we purchase this in 1983 we purchase the lease.**
21  **Yes, this is the lease.**
22  Q.    So, the lease that I just placed in
23  front of you is the lease that's in effect --
24  **A.    Right.**

Center City Reporting, Inc.

---

ANNA MARTUSCELLI

28

1  Q.    Between your company and --
2  **A.    My company.**
3  Q.    And Southland; or that's the agreement
4  in place between your company and Southland
5  Corporation, now known as 7-Eleven?
6          MR. WAGNER:  Correct, it's
7      Southland Corporation.  It is now
8      known as 7-Eleven.
9          THE WITNESS:  Correct.
10  BY MR. MILLER:
11  Q.    You're saying this is the lease?
12  **A.    This is the lease.**
13          MR. DOSS:  Mrs. Martuscelli,
14      why don't you look at every page of
15      the document to make sure it's what
16      you think it is.
17  BY MR. MILLER:
18  Q.    Do you want a greater opportunity to
19  look --
20  **A.    I'm going to read all of this?**
21          MR. DOSS:  Well, it's up to
22      you.
23  BY MR. MILLER:
24  Q.    You can read it, look at it, however

Center City Reporting, Inc.

ANNA MARTUSCELLI

33

1    something more or not.
2          MR. DOSS: I'm not trying to
3    make that an issue.
4          MR. MILLER: I think you
5    have.
6          MR. WAGNER: I think you
7    have too. Wouldn't it be enough for
8    us to have the witness tell us whether
9    this is the lease as far as she
10   knows?
11         MR. MILLER: It might be.
12   But that also doesn't go back to the
13   heart of my issue. I want to know if
14   there's something else. Maybe I don't
15   have a complete copy, for whatever
16   reason there was an incomplete copy
17   sent to me.
18         We're stipulating that what
19   we mark as Martuscelli-1 is the
20   complete lease agreement.
21         MR. DOSS: Are you including
22   the other assignment documents?
23         MR. MILLER: Well, I will.
24   It's now a 14-page document, which is
              Center City Reporting, Inc.

ANNA MARTUSCELLI

34

1    the two lease assignments, one dated
2    June 15, 1983, the other dated June
3    20, 1983, and a 12-page lease
4    agreement. We'll mark that
5    collectively as Martuscelli-2.
6          (At this time,
7    Martuscelli-1, a Lease Agreement and
8    two Lease Assignments, were marked for
9    identification.)
10         (At this time, a discussion
11   was held off the record.)
12   BY MR. MILLER:
13   Q.    Mrs. Martuscelli, we've now agreed
14   among all counsel that what I have shown you and
15   marked as Martuscelli-1 is a complete copy of
16   the lease assignment and lease agreement?
17   A.    Um-hum.
18   Q.    You've had an opportunity to look at
19   it now, I think a couple of times.
20         Per your review, do you recall, are
21   there any pages that are missing that you
22   believe should be included, if you recall, to
23   your recollection?
24   A.    I think it's complete.
              Center City Reporting, Inc.

ANNA MARTUSCELLI

35

1    Q.    Are there any agreements that are in
2    place between Martuscelli Investment Associates
3    and either 7-Eleven or Mr. Sayl, who is the
4    franchisee for that particular 7-Eleven at the
5    Four Seasons Shopping Center, with regard to
6    maintenance or inspections or any type of
7    upkeep?
8    A.    No. The 7-Eleven I don't have nothing
9    to do with that. I'm directly with the
10   Southland Corporation.
11   Q.    But with regard to the exterior of the
12   buildings, the outside of the buildings, the
13   sidewalks, parking lot and landscaping?
14   A.    Martuscelli Investment is responsible.
15   Q.    Is this your understanding as far as
16   what the responsibility is given by the lease?
17   A.    By the lease.
18   Q.    Are there any type of agreements that
19   were entered into since 1983 that changed that
20   in any way?
21   A.    No.
22   Q.    Have you had any non-written agreement
23   or conversations war with either Southland
24   Corporation, 7-Eleven, Incorporated, or Mr.
              Center City Reporting, Inc.

ANNA MARTUSCELLI

36

1    Sayl, the franchisee, which changed that in any
2    way?
3    A.    No.
4    Q.    So, since 1983 through the present,
5    which specifically would include the fall and
6    winter of 2003, the parking lot, sidewalks and
7    exterior of the Four Seasons Shopping Center
8    maintenance, upkeep, repair, inspection were the
9    responsibility of Martuscelli Investment?
10   A.    Yes.
11   Q.    In the year 2003, other than what you
12   told me about the dishwasher at four o'clock
13   coming out and picking up trash and sweeping,
14   what did Martuscelli Investment Associates do to
15   meet that responsibility?
16   A.    Well, you mean if a parking lot for
17   the paving, you mean, if I -- we responsible for
18   paving. We responsible for cleaning when it
19   snow, and cleaning.
20   Q.    Did you hire a contractor to remove
21   ice and snow?
22   A.    Yes, we do, J. B. O'Connell. It's a
23   small contractor that we call. And we don't
24   have a contract, but we call him to -- we did
              Center City Reporting, Inc.

ANNA MARTUSCELLI

41

1  park there.  It's not exactly he park there
2  every day.
3  Q.    Would you circle the entire building
4  every day?
5  A.    Every day.
6  Q.    How many times a day?
7  A.    Two times.
8  Q.    Two?
9  A.    Um-hum.
10 Q.    Do you talk to your husband about the
11 two times that you circle the entire parking
12 lot?
13 A.    I go for lunch for working.  I go
14 around.  If I see something, I tell my husband.
15 I see, we do this, we need landscape, we need to
16 do that.
17 Q.    How about your husband?
18 A.    Same thing.
19 Q.    He does it more than twice, less than
20 twice?
21 A.    Maybe one time.
22 Q.    Would he talk to you about it?
23 A.    Sure.
24 Q.    Would he say, I just got done walking
            Center City Reporting, Inc.

ANNA MARTUSCELLI

42

1  around, everything looks okay, or this needs to
2  be done, or --
3  A.    Yes.
4  Q.    But never anything in writing?
5  A.    No.
6  Q.    Prior to December 2, 2003, say in the
7  twelve-month period ending December 2, 2003, do
8  you recall during that time period whether there
9  were any defects in the parking lot in front of
10 7-Eleven?
11 A.    No.
12 Q.    No, you don't recall, or, no, there
13 weren't any?
14 A.    I don't recall.
15 Q.    Have you spoken to your husband about
16 the condition of the parking lot in front of
17 7-Eleven in October, November and December of
18 2003?
19 A.    I don't remember.
20 Q.    Well, you knew you were coming for a
21 deposition today?
22 A.    Yeah, I don't remember exactly the
23 date when I talk with my husband.  I mean --
24 Q.    But you knew you were coming for a
            Center City Reporting, Inc.

ANNA MARTUSCELLI

43

1  deposition today?
2  A.    Yes.
3  Q.    Before you arrived here today, did you
4  know it was regarding a fall involving
5  Mrs. Zavodnick?
6  A.    Yes, I know, but didn't know anything
7  about it that she fall.
8  Q.    Did you know that it happened in front
9  of 7-Eleven in the parking lot?
10 A.    I know when I receive the letter in
11 the mail.
12 Q.    But did you know before arriving today
13 that it was in the parking lot in front of the
14 7-Eleven?
15 A.    Yes, but I know nothing about somebody
16 fall in the parking lot.
17 Q.    You didn't know at the time, but you
18 you've since learned that this is a fall that
19 occurred in the parking lot in front of
20 7-Eleven?
21 A.    Yes, when I receive a letter I know,
22 but nobody told me anything before.
23 Q.    Did you since learn that it happened
24 on December 1, 2003?
            Center City Reporting, Inc.

ANNA MARTUSCELLI

44

1          MR. DOSS:  Objection to
2      form.
3          THE WITNESS:  No.
4          MR. DOSS:  Only to the
5      extent that that sounds like a
6      conclusion, because she didn't know
7      one way or another.
8  BY MR. MILLER:
9  Q.    Well, at any time, did you become
10 aware of the date that Mrs. Zavodnick said that
11 she fell?
12 A.    I didn't know nothing that she fell.
13 Q.    I'm not asking if you know that she
14 fell, I'm asking if you know the date that she
15 said she fell, December 1, 2003?
16 A.    I know when I receive the letter.
17 Q.    When you received the letter you
18 learned that Mrs. Zavodnick has testified that
19 she fell on December 1, 2003?
20 A.    Right.
21 Q.    How long ago was it that you received
22 that information?
23 A.    Well, I don't have the letter in front
24 of me.
            Center City Reporting, Inc.

ANNA MARTUSCELLI

49

1       O'Connell & Son, Incorporated Invoice,
2       was marked for identification.)
3  BY MR. MILLER:
4  Q.      Your counsel produced today four
5  documents. And the first one is dated February
6  22, 2001 from J. B. O'Connell & Son,
7  Incorporated. It references a total expenditure
8  for maintaining exterior of Four Season Center
9  and three acre parcel at 2000 South College
10 Avenue for year 2000.
11      And included in that is: Yard
12 maintenance, parking lot maintenance, removing
13 200 square foot stone and grading, installed new
14 dumpster location, striping lot, changing all
15 sign-age and directional sign-age and fencing,
16 miscellaneous repairs, chimney, flat roofing and
17 AC sheds, grease traps, sewerage pipes,
18 etcetera. $24,500 is the total due.
19      First, let me ask you, what was that,
20 2000 South College Avenue?
21 A.      2000 College Avenue is right in back
22 of the shopping center. It belong to the
23 shopping center, but it's like woodsy. But it's
24 the same -- it's called -- there's a house in
              Center City Reporting, Inc.

ANNA MARTUSCELLI

50

1  the back. It's owned by the shopping center
2  too. It's one piece of land. They called it
3  College and Four Seasons, but it's one big
4  land.
5  Q.      Are you aware, specifically with
6  regard to the parking lot, he references parking
7  lot maintenance?
8  A.      Um-hum.
9  Q.      Do you know what that included for the
10 year 2000?
11 A.      Well, what I said before, Jack
12 O'Connell, we call him for a lot of maintenance
13 things when we need. One time he do like a wall
14 on the side, and he do this, he do a lot of
15 stuff. I don't remember exactly, but whatever
16 he did here is what he did.
17 Q.      And that's for the year 2000?
18 A.      Right.
19 Q.      Correct?
20 A.      Yes.
21 Q.      According to your counsel, this is the
22 last invoice from J. B. O'Connell that you have
23 before December 1, 2003?
24 A.      Yeah, because I ask him, but he had a
              Center City Reporting, Inc.

ANNA MARTUSCELLI

51

1  problem with his computer. He said he can do it
2  by hand if we really need. But he had a crash
3  on the computer or something and he lost all of
4  his information.
5  Q.      Did he continue to do --
6  A.      Yes.
7  Q.      Similar maintenance in 2001, 2002 and
8  2003?
9  A.      Still today, he still does, yes.
10 Q.      Would J. B. O'Connell do maintenance
11 that you specifically requested him to do, or is
12 this a weekly maintenance, monthly maintenance?
13 A.      We call him. When we request
14 something, we call him. We don't have a
15 contract with him.
16 Q.      If you don't call him and request it,
17 he doesn't do it?
18 A.      No.
19 Q.      Do you know the last time he was at
20 the property prior to December 1, 2003?
21 A.      No.
22 Q.      At any time prior to December 1, 2003,
23 do you recall asking him to repair or re-pave
24 the parking lot?
              Center City Reporting, Inc.

ANNA MARTUSCELLI

52

1  A.      The paving is a different company.
2  Q.      I'm asking if you had asked J. B.
3  O'Connell to repair or re-pave --
4  A.      Before 2003?
5  Q.      Before December 1, 2003?
6  A.      I don't remember.
7          (At this time,
8          Martuscelli-3, a 6/7/02 Frank Deramo
9          Proposal, were marked for
10         identification.)
11 BY MR. MILLER:
12 Q.      The next document that was produced is
13 a proposal from Frank Deramo & Son,
14 Incorporated, dated 6/7/02. And this references
15 a proposal to: Repaint parking area lines,
16 handicap space, and arrows on restaurant side,
17 front and back; and repaint parking area lines
18 and handicap space in front of 7-Eleven.
19 A.      Yes.
20 Q.      So, that's just painting, as best I
21 can tell. Are you aware of this --
22 A.      Whatever they say, that's what he did.
23 Q.      Again, that's 6/7/02, correct?
24 A.      Yeah.
              Center City Reporting, Inc.

ANNA MARTUSCELLI

57

1   did the front.
2       THE WITNESS: Usually when
3   he come he does whatever the parking
4   lot needed.
5  BY MR. MILLER:
6  Q.   So, other than this one invoice, which
7  is for September 13, 2002 are there any other
8  invoices with Richard Paving, Incorporated
9  before December 1, 2003?
10  A.   **Before 2003?**
11  Q.   Before December 1, 2003?
12  A.   **This is it.**
13  Q.   This doesn't involve repaving or
14  filling holes. This involve is like a seal coat
15  or stripping, correct?
16  A.   **This means we got a hole, so we got to**
17  **fix. It's paving.**
18  Q.   Are you aware if in December of 2003
19  anyone from 7-Eleven, or on behalf of 7-Eleven,
20  filled holes in the parking lot in front of the
21  7-Eleven?
22  A.   **Sometime I see somebody outside to do,**
23  **but sometime I see steam, or I see somebody**
24  **stripe right in front. But I don't know, I**
          Center City Reporting, Inc.

ANNA MARTUSCELLI

58

1  don't know what they doing.
2  Q.   Well, describe for me what you recall
3  seeing somebody doing?
4  A.   **Well, sometime I saw somebody outside**
5  **of the 7-Eleven. I no call. I don't know who**
6  **they are. Somebody cleaning with the steam or**
7  **somebody stripe.**
8  Q.   You say clean with steam; what do you
9  mean?
10  A.   **Maybe he's cleaning his own place,**
11  **7-Eleven; he wanted to himself.**
12  Q.   Are you talking about cleaning the
13  parking lot?
14  A.   **Sometime I saw somebody steam.**
15  Q.   Was it one guy, more than one guy?
16  A.   **Couple of guys.**
17  Q.   Where were they steaming?
18  A.   **In front of 7-Eleven.**
19  Q.   Was it in front, like steaming, like a
20  steam cleaner?
21  A.   **Steam cleaning.**
22  Q.   Were they doing that in the parking
23  lot?
24  A.   **Yeah, in front, yes. I didn't call.**
          Center City Reporting, Inc.

ANNA MARTUSCELLI

59

1  **I don't know.**
2  Q.   Was that more than one occasion, or
3  just one occasion?
4  A.   **More than one occasion.**
5  Q.   Do you recall if any of it was in
6  December of 2003?
7  A.   **I don't know the date.**
8  Q.   Do you know if it was more than five
9  times?
10  A.   **I don't know the date.**
11  Q.   How about stripe, you said you saw
12  someone stripe?
13  A.   **I saw someone stripe one time. And we**
14  **holler because he stripe yellow and we no want**
15  **that. We want one color.**
16  Q.   When did he do that?
17  A.   **I don't know the date, but he did**
18  **maybe before or after. I don't recall.**
19  Q.   When you see people steaming the
20  parking lot in front of the 7-Eleven, did you
21  anything?
22  A.   **No.**
23  Q.   Did you walk over and say, what are
24  you doing?
          Center City Reporting, Inc.

ANNA MARTUSCELLI

60

1  A.   **No, because if he want to clean what**
2  **am I going to say, don't clean.**
3  Q.   So, you see --
4  A.   **He's got a mess every day, every hour**
5  **he should clean. We can not be there 24 hours a**
6  **day cleaning.**
7  Q.   Well, this is your parking lot?
8  A.   **But not 24 hours a day.**
9  Q.   But, it's your parking lot 24 hours a
10  day?
11  A.   **Yes, but if he cleans -- I mean, we**
12  **clean every day.**
13  Q.   You see somebody doing something with
14  steam in the parking lot that you own. You
15  don't walk over and say what are you doing?
16  A.   **No.**
17  Q.   Why are you doing it?
18  A.   **No.**
19  Q.   Who asked you to do this?
20  A.   **No, I don't do because it was just**
21  **clean. And I didn't do.**
22  Q.   How close did you get to them when
23  they were doing this --
24  A.   **I went past with the car.**
          Center City Reporting, Inc.

SHEET 9   PAGE 65

## ANNA MARTUSCELLI

65

1  Q.    I think your testimony is the last
2  time it was done it would have been done by
3  Richards Paving, incorporated?
4  A.    Yes.
5  Q.    The last time it was done it was done
6  at your request?
7  A.    It's always our request, yes.
8  Q.    You made the request because you saw
9  that the parking lot needed to be repaved?
10  A.    When you're paving it's --
11  Q.    It needed to be repaved, therefore,
12  you made the request?
13  A.    It's not because we got maintenance.
14  When we see that we need it, we do.
15  Q.    Do you recall what it was that you saw
16  about the parking lot --
17  A.    No, I don't.
18  Q.    That caused you to realize that it
19  needed to be repaved?
20  A.    No.
21  Q.    Do you recall how long after you
22  noticed the parking lot needed to be repaved it
23  was that you called Richards Paving to re-pave
24  it?

Center City Reporting, Inc.

PAGE 66

## ANNA MARTUSCELLI

66

1  A.    No.
2  Q.    Do you know was it you or your husband
3  that made the call?
4  A.    No.
5  Q.    You don't know?
6  A.    Nope.
7  Q.    Do you know how long how long have
8  after you called Rich paving that it was that he
9  came out and actually do the repaving?
10  A.    No.
11  Q.    Do you know of anybody that saw Robyn
12  Zavodnick fall?
13  A.    No.
14  Q.    Do you know anybody who knows Robyn
15  Zavodnick?
16  A.    No.
17      MR. MILLER:  I'm done for
18  now.  Thank you.
19  BY MR. WAGNER:
20  Q.    Mrs. Martuscelli --
21  A.    Yes.
22  Q.    My name is Tom Wagner.  I'm an
23  attorney and I represent the 7-Eleven and the
24  store owner, Mr. Sayl.

Center City Reporting, Inc.

PAGE 67

## ANNA MARTUSCELLI

67

1      I just have a few questions to ask you
2  too.
3  A.    Sure.
4  Q.    Ma'am, if you saw a hole in the
5  parking lot in front of the 7-Eleven store when
6  you're making your inspection, what would you do
7  about it?
8  A.    Well, if we saw hole we call the
9  paving company and get it fixed.
10  Q.    What paving company would you call?
11  A.    Richards Paving.
12  Q.    When you call them, do they come?
13  A.    Right away.
14  Q.    Who pays for that then?
15  A.    Martuscelli Investment.
16  Q.    Do you actually write the check
17  yourself?
18  A.    Yes, or my bookkeeper.
19  Q.    Who is your bookkeeper?
20  A.    She work for us for the restaurant and
21  for the 7-Eleven, but usually I do it.
22  Q.    Usually you do it yourself?
23  A.    Usually I do.
24  Q.    So, sometimes you've had Richards

Center City Reporting, Inc.

PAGE 68

## ANNA MARTUSCELLI

68

1  Paving Company pave the entire lot, and
2  sometimes you've had them just make repairs of
3  holes; is that fair to say?
4  A.    Yes.
5  Q.    And regardless, you and your company
6  pay for that whenever it's done?
7  A.    Yes, but we even for the other
8  restaurant.  In other words, we call all the
9  time for both restaurant, he work for us.
10  Q.    So, you would do that at the Four
11  Seasons Shopping Center?
12  A.    Yes.
13  Q.    At your Chesapeake Inn Restaurant too;
14  is that right?
15  A.    Right.
16  Q.    There was a point I was not clear
17  about.  You told us that you got one company
18  named AJT, Inc.?
19  A.    It's La Casa Pasta, AJT, Inc. is La
20  Casa Pasta.  It's one place.
21  Q.    So that's a restaurant?
22  A.    Yes.  Then we own Martuscelli
23  Investment, it's a shopping center.
24  Q.    And Martin Investment, that owns the

Center City Reporting, Inc.

SHEET 10    PAGE 73

ANNA MARTUSCELLI

73

1 A.    Yes, we do especially those two
2 months.
3 Q.    As far as you know, you did them in
4 November of 2003?
5 A.    Yes.
6 Q.    I'm going to ask you to take another
7 look at this document, it's a Richards Paving,
8 Inc. Invoice, which was Exhibit-5.
9        (At this time, a discussion
10        was held off the record.)
11 BY MR. WAGNER:
12 Q.    Mrs. Martuscelli, taking a look at
13 that document again. I'm trying to understand
14 what areas of the lot this covers. It seems to
15 me that it covers the whole lot, but I'm not
16 sure about that?
17 A.    It covers everything.
18 Q.    It covers everything you think; is
19 that right?
20 A.    Yes.
21 Q.    There is one part of this invoice that
22 refers to the side and back parking lot. Do you
23 see that?
24 A.    Where?

Center City Reporting, Inc.

---

PAGE 74

ANNA MARTUSCELLI

74

1 Q.    Right in the middle there?
2 A.    Yes.
3 Q.    That seems to state a price of $2,875
4 for the side and back parking lot. Is that how
5 you read that?
6 A.    Yes. Usually give us like, if you
7 want to do it one time. I don't know, maybe. I
8 don't recall now. Usually the price for the
9 side and price for all of it and --
10 Q.    What I am asking is this, ma'am, just
11 looking at this invoice, do you think that the
12 lines just above where it says, side and back
13 parking lot, do you think that those lines refer
14 to the front of the lot? Do you see what I'm
15 talking about?
16 A.    Yes. Now, your question is if it's --
17 Q.    I'm trying to figure out which part of
18 this refers to the front and which refers to the
19 back, if that's the way it is, if any, because
20 those first three lines talk about doing some
21 very specific things, including the seal coat
22 and striping and all of that. And it states a
23 price of $2,780. And the next line says, side
24 and back parking lot, price $2,875.

Center City Reporting, Inc.

---

PAGE 75

ANNA MARTUSCELLI

75

1        Do you think this invoice refers to
2 the entire parking lot?
3 A.    The entire, yes.
4 Q.    Now, take a look, please, at -- I'll
5 tell you what, before that, looking at the same
6 exhibit, number five, for Richards Paving, when
7 you say the entire parking lot, that includes
8 the area in front of the 7-Eleven, as well as
9 the area in front of the restaurant, La Casa
10 Pasta, right?
11 A.    Yes.
12 Q.    Now, go to number three, which would
13 be the Frank Deramo proposal. And that's for
14 painting in the packing lot, right? Do you have
15 that in front of you?
16 A.    Um-hum.
17 Q.    This is talking about painting the
18 parking lot; is that correct, this is talking
19 about painting the parking lot?
20 A.    Yes.
21 Q.    In fact, right in the middle of that
22 proposal this talks about the fact that the
23 lines can be done in white; however, if yellow
24 is used at the 7-Eleven it will break up parking

Center City Reporting, Inc.

---

PAGE 76

ANNA MARTUSCELLI

76

1 lot between restaurant and convenience store.
2 Do you see that?
3 A.    Yes.
4 Q.    Did you have that done that way, the
5 yellow in front of the 7-Eleven and white in
6 front of the restaurant, or not?
7 A.    Yes.
8 Q.    You did?
9 A.    (Witness nods.)
10 Q.    Again, who paid for this work to be
11 done?
12 A.    The Deramo, Martuscelli Investment.
13 Q.    So, in other words, you paid for it,
14 right?
15 A.    Yeah.
16 Q.    Mrs. Martuscelli, do you remember
17 having holes repaired in the parking lot at any
18 time?
19 A.    No.
20 Q.    I don't mean just now, but at any
21 time?
22 A.    I don't remember.
23 Q.    You don't remember one way or the
24 other?

Center City Reporting, Inc.

SHEET 11   PAGE 81

## ANNA MARTUSCELLI

81

1 parking lot?
2 A.    Yes.
3 Q.    It looks like the 7-Eleven would be
4 just off to the right of the photograph?
5 A.    It's right here.
6 Q.    The red brick building, that would be
7 the 7-Eleven?
8 A.    Yes.
9 Q.    And this is where there appears to be
10 five, not perfect circles, but five patches or
11 five areas of like a darker black macadam or
12 asphalt on a lighter grey parking lot. Do you
13 see that?
14 A.    I see that, but I don't remember that
15 I saw before.
16 Q.    But in December of 2003, do you recall
17 at any time the parking lot appearing as it does
18 in that photograph?
19      MR. DOSS: Objection, asked
20      and answered.
21      THE WITNESS: No.
22 BY MR. MILLER:
23 Q.    Let's move to the photograph which is
24 on the right-hand side, the middle photograph.
Center City Reporting, Inc.

PAGE 82

## ANNA MARTUSCELLI

82

1      Do you recall the parking lot ever
2 appearing as it does in this photograph at any
3 time in November or December of 2003?
4 A.    No, I don't remember.
5 Q.    How about the top photograph on the
6 right-hand side, it looks like we see the Pepsi
7 can again, and now a tire in the left side of
8 this photograph.
9      Do you recall there ever being patches
10 like the one shown in that photograph in
11 November or December of 2003?
12 A.    What I am saying, there's always cars
13 here. How can I see this. No.
14 Q.    I'll come back to that. I want to
15 know specifically if you ever recall seeing any
16 patches as is depicted in this photograph?
17 A.    No.
18 Q.    You testified that there are usually
19 or always cars there. Do you mean in the
20 parking spots shown in these three photographs
21 that we just referenced?
22 A.    The 7-Eleven is always busy. There's
23 always a car there. I mean -- I don't know. I
24 never see these. I never saw this before.
Center City Reporting, Inc.

PAGE 83

## ANNA MARTUSCELLI

83

1 Q.    So, when you do your inspections that
2 you talked about in November and December of
3 2003 --
4 A.    Yes.
5 Q.    And the months preceding November and
6 December of 2003, is it your general
7 recollection that there are cars parked in the
8 spots shown in these photographs that I just
9 showed?
10 A.    When I pass, I mean, there's a car
11 sometimes, sometimes not. I don't know. I
12 don't remember those spots. I don't remember,
13 no.
14 Q.    At the times that you would look and
15 there are cars parked in the parking spots, did
16 you ever wait for the cars to leave so --
17 A.    No.
18 Q.    Did you ever make any effort to
19 inspect in any manner under or beside or next to
20 the cars that are parked in the spots?
21 A.    No.
22 Q.    How is it that you're able to testify
23 today that there are no holes or divots or
24 conditions that needed to be repaired in the
Center City Reporting, Inc.

PAGE 84

## ANNA MARTUSCELLI

84

1 spots where those cars occupy?
2      MR. DOSS:  Now I object,
3      because that just -- she's testified
4      that she's observed that area in all
5      different kinds of conditions.
6      MR. MILLER:  I don't think
7      she has.
8      MR. WAGNER:  I make the same
9      objection. The witness unquestionably
10      testified that sometimes there's cars
11      there, and sometimes not.
12      MR. DOSS:  She just said it
13      two questions ago to you, not to
14      mention a couple of other times when
15      you were asking the same question.
16      MR. WAGNER:  My further
17      objection, it's not fair to ignore
18      that in asking her a question now.
19 BY MR. MILLER:
20 Q.    The times that you would do an
21 inspection and you would see a car there, what
22 would you do to ensure that there wasn't a hole
23 or divot or something underneath of that car
24 that needed repair?
Center City Reporting, Inc.

ANNA MARTUSCELLI

89

1  Q.     Can you give me any idea at all of
2  approximately how often you go in there?
3  **A.     Maybe like once a week, if we need**
4  **like milk or things like that.  I don't go every**
5  **day inside, no.**
6  Q.     Maybe once a week?
7  **A.     Maybe once a week, or two times a**
8  **week.**
9         MR. WAGNER:  Thank you very
10  much.
11         THE WITNESS:  You're
12  welcome.
13         MR. MILLER:  I don't have
14  anything.
15         MR. DOSS:  I have no
16  questions.  We'll read.
17         (Witness excused.)
18         (Deposition concluded at
19  3:45 p.m.)
20         ---
21
22
23
24

              Center City Reporting, Inc.

---

91

1         C E R T I F I C A T I O N
2
3         I, ANNA MARTUSCELLI, having read the
4  foregoing, find it to be a true and accurate
5  transcript of the testimony given by me on
6  Thursday, June 1,, 2006, in the aforementioned
7  matter, with the following additions, deletions,
8  or corrections.  I understand that I may make no
9  additions, deletions, or corrections as an
10  afterthought upon my reading of this
11  transcript.
12
13  PAGE   LINE    CORRECTION
14
15
16
17
18
19
20
21
22  DATED: _____
23              ANNA MARTUSCELLI
24

          Center City Reporting, Inc.

---

90

1         C E R T I F I C A T I O N
2
3         I, SUSAN M. ALESSANDRONI, Professional
4  Reporter and Notary Public, do hereby certify
5  that the foregoing is a true and accurate
6  transcript of the stenographic notes taken by me
7  in the aforementioned matter, on Thursday,
8  June 1, 2006.
9
10
11
12
13
14
15
16
17
18  DATED: 6/14/06
19
20         SUSAN M. ALESSANDRONI
21
22
23
24

              Center City Reporting, Inc.