EXHIBIT A

Kailish Sayl

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ROBYN ZAVODNICK                    :
                                   :  Civil Action
        v.                         :  No. 05-CV-639
                                   :
KAILASH SAYL and 7-ELEVEN, INC. :
                                   :
        and                        :
                                   :
MARTUSCELLI INVESTMENT             :
ASSOCIATES                         :


            Deposition of KAILASH SAYL, taken

pursuant to notice before Adam D. Miller, Registered

Professional Reporter and Certified Shorthand

Reporter, in the law offices of Casarino, Christman &

Shalk, 800 North King Street, Suite 200, Wilmington,

Delaware, on Thursday, April 20, 2006, beginning at

approximately 1:23 p.m., there being present:

APPEARANCES:

            WAPNER, NEWMAN, WIGRIZER & BRECHER
              115 S. 21st Street
              Philadelphia, Pennsylvania 19103
            BY:  ROBERT S. MILLER, ESQUIRE
            Attorney for Plaintiff




                CORBETT & WILCOX
          Registered Professional Reporters
    1400 French Street      Wilmington, DE 19801
                 (302) 571-0510
              www.corbettreporting.com

Kailish Sayl

2 (Pages 2 to 5)

Page 2

1  APPEARANCES CONTINUED:
2          RAWLE & HENDERSON, LLP
            The Widener Building
3          One South Penn Square
            Philadelphia, Pennsylvania 19107
4      BY: THOMAS P. WAGNER, ESQUIRE
            Attorney for Defendants Kailash Sayl and
5          7-Eleven, Inc.
6      CASARINO, CHRISTMAN & SHALK
            800 North King Street
7          Suite 200
            P.O. Box 1276
8          Wilmington, Delaware 19899
            BY: KENNETH M. DOSS, ESQUIRE
9          Attorney for Defendant Martuscelli
            Investment Associates
10             - - - - -
11             KAILASH SAYL, having first been duly
12 sworn according to law, was examined and testified as
13 follows:
14             - - - - -
15 BY MR. DOSS:
16     Q.   What's your name?
17     A.   Kailash Sayl.
18     Q.   And Mr. Sayl -- and I'll probably
19 mispronounce that at some point.
20     A.   No. That's okay. You're very close.
21 That's okay.
22     Q.   I'll just ask that you keep your voice up
23 and that you wait until I finish a question before
24 you --

Page 3

1      A.   Sure.
2      Q.   -- answer.
3           Like then, don't interrupt.
4      A.   That's okay. Yeah.
5      Q.   You got to wait --
6      A.   Yes.
7      Q.   -- until I'm done.
8      A.   Okay. I'll wait. Yeah.
9           MR. MILLER: This is an example of you
10 not waiting.
11          (Discussion held off the record.)
12 BY MR. DOSS:
13     Q.   Where do you live, sir?
14     A.   I live in Maryland.
15     Q.   What's your address?
16     A.   197 Thomas Jefferson Terrace, Elkton,
17 Maryland.
18     Q.   What's the ZIP there?
19     A.   21921.
20     Q.   How old are you, sir?
21     A.   47.
22     Q.   And your date of birth?
23     A.   4 August 1958.
24     Q.   Where are you from originally?

Page 4

1      A.   India.
2      Q.   And how long have you been in the United
3  States?
4      A.   16 years.
5      Q.   What's your highest level of education?
6      A.   I have a bachelor degree in accounting.
7      Q.   In?
8      A.   Accounts.
9      Q.   Was that from an Indian school?
10     A.   Yeah, from India.
11          MR. MILLER: Accounting.
12          MR. WAGNER: Accounting, I believe.
13 BY MR. DOSS:
14     Q.   And since that time, have you had any
15 further training in any other specialties, aside from
16 accounting?
17     A.   No.
18     Q.   When you came to the United States, can
19 you just give me, broadly, your employment history up
20 to the time you started with this particular 7-Eleven
21 here in Delaware?
22     A.   Actually, I start my first job with
23 7-Eleven.
24     Q.   Was that with the 7-Eleven that was

Page 5

1  involved in this case?
2      A.   No.
3      Q.   Where was that 7-Eleven?
4      A.   That 7-Eleven was in Baltimore.
5      Q.   And what did you do there?
6      A.   I was a store clerk.
7      Q.   How long were you there?
8      A.   Two years.
9      Q.   And then you moved to where?
10     A.   Pennsylvania.
11     Q.   To another 7-Eleven?
12     A.   Another 7-Eleven.
13     Q.   Where was that one in Pennsylvania?
14     A.   That was in Phoenixville Pike.
15     Q.   What road?
16     A.   Phoenixville Pike.
17     Q.   What was your position there?
18     A.   Store manager.
19     Q.   How long were you there?
20     A.   I would say six -- five, six years.
21     Q.   Where did you go after that point?
22     A.   Go to the same store.
23     Q.   The 7-Eleven --
24     A.   -- in 896, Newark.

Corbett & Wilcox

Kailish Sayl

Page 6

1    Q.  Okay.  What's the actual address there?
2    A.  100 Four Seasons Parkway, Newark, Delaware
3  19701.
4    Q.  And what's your position or relationship
5  with this 7-Eleven?
6    A.  I'm the franchisee/owner.
7    Q.  So each stage, you worked your way up?
8    A.  Yeah.  Yes.
9        MR. MILLER:  When did they start
10  franchising?
11  BY MR. DOSS:
12    Q.  How long, then, have you been at this
13  particular 7-Eleven?
14    A.  Since 1998.  It's August 13th, I believe
15  that.
16    Q.  And how did you obtain this particular
17  franchise?  Did you have to bid on it -- I don't know
18  how 7-Eleven works it.
19    A.  No.  We have -- I have to apply.  Then I
20  have to pass the whole training.  And when you pass
21  the training, then you can go for 7-Eleven.  There's
22  a procedure which is a seven-week training.
23    Q.  What types of training do they give you in
24  order to get a franchise?

Page 7

1    A.  Food service, security, maintenance; this
2  all.
3    Q.  What training do you get in the area of
4  maintenance?
5    A.  They just show you how it's supposed to be
6  look like, built, something like parking lot, inside,
7  outside.
8    Q.  So they give you maintenance training with
9  regard to both the inside and the outside of the
10  building?
11    A.  Yes.
12    Q.  With regard to maintenance, what do they
13  teach you with regard to upkeep of the exterior of
14  the building?
15    A.  Like building glass with a front mirror,
16  supposed to be clean and no crack in case something
17  happened.  Parking lot supposed to be even, no hole
18  or anything like that.
19    Q.  Do you have a contract for your franchise
20  with 7-Eleven?
21    A.  Contract for?
22    Q.  For the franchise?
23    A.  Oh, yes.
24    Q.  Do you have a franchise agreement?

Page 8

1    A.  Sure.  Ten years.
2    Q.  And you're familiar with that franchise
3  agreement --
4    A.  Sure.
5    Q.  -- since you've had it for ten years?
6    A.  Yes.
7    Q.  Does that have anything in it in terms of
8  7-Eleven having to do regular checks or reviews of
9  your care of the franchise that they've given you?
10    A.  They does that.
11    Q.  Pardon me?
12    A.  I don't know when they does it, but they
13  does that "oftenly," every four months, five months,
14  something like that.
15    Q.  So they have the right to come in and do a
16  check on you for your services?
17    A.  Right.
18    Q.  And they do that on a regular basis and
19  probably do it sort of like a surprise, almost, so
20  they can check on you?
21    A.  Actually, I honestly don't know when they
22  came.  Maybe they come in at 12:00 o'clock midnight.
23  I don't know.
24    Q.  Okay.

Page 9

1    A.  Yeah.  But they comes.  Yes, I know that.
2    Q.  Can you provide a copy of that franchise
3  agreement to your attorney for him to provide to us?
4    A.  Sure.
5    Q.  You do not have any separate contract,
6  it's my understanding, with the actual owner of the
7  property, Martuscelli Investment Associates; is that
8  right?
9    A.  Yeah.
10    Q.  And you're not familiar at all with the
11  terms of any agreements that Martuscelli might have
12  with 7-Eleven or anybody else?
13        MR. WAGNER:  Well, objection.  He
14  didn't say he wasn't familiar with it.  He just said
15  that he didn't have one himself with them.
16        MR. DOSS:  I understand that.  That's
17  why I was asking him the next question.
18        MR. WAGNER:  But you weren't asking
19  him a question.  You were making a statement and
20  trying to get him to agree with it.
21        MR. DOSS:  And he can tell me no.
22        MR. WAGNER:  Well, you can ask him a
23  question.  But I, I'm objecting to the form of your
24  question in that you are simply making a statement

Kailish Sayl

4 (Pages 10 to 13)

Page 10

1  and attempting to get this witness to agree with it.
2       I don't mind you asking him if he is
3  familiar with the terms of any agreement between the
4  landlord and 7-Eleven.
5       MR. DOSS: Okay. Let me get to that,
6  then.
7  BY MR. DOSS:
8       Q. Have you ever reviewed any of the terms of
9  the agreement or any agreements between the landlord,
10 Martuscelli Investment, and 7-Eleven?
11      A. No, I don't know that. It's 7-Eleven does
12 that. They have to.
13      Q. Do you generally let, then, 7-Eleven take
14 care of that agreement and its enforcement --
15      A. Yes.
16      Q. -- over whatever it deals with?
17      A. Yeah, because they deal with the landlord,
18 not I deal with.
19      Q. You don't make any direct payments to
20 Martuscelli Investment Associates?
21      A. No. Nothing.
22      MR. WAGNER: And you do need to let
23 counsel finish asking his questions. We're going to
24 remind you about that periodically, Mr. Sayl. The

Page 11

1  whole reason is because the court reporter can't take
2  down --
3       THE WITNESS: Right. I understand
4  that.
5       MR. WAGNER: -- Mr. Doss and you at
6  the same time.
7       THE WITNESS: Same time; right.
8       MR. WAGNER: So just let him get the
9  question out and then answer. Thank you.
10 BY MR. DOSS:
11      Q. What do you do in your franchise business?
12 What are your duties?
13      A. I'm the store manager, actually.
14      Q. What does that involve? What do you do?
15      A. All work; everything.
16      Q. Okay. You work behind the cash register?
17      A. Sure.
18      Q. What do you do in terms of maintenance of
19 the store?
20      A. I look at it every day.
21      Q. Inside. Do you do anything outside as
22 well?
23      A. Yes.
24      Q. What do you do outside?

Page 12

1       A. I just look around and see if everything
2  all right.
3       Q. Okay. If something's not all right, do
4  you do anything about that?
5       A. Sure.
6       Q. What types of things do you do? Can you
7  give us examples of things you do if something's not
8  right on the exterior?
9       A. I'll give you example, for example,
10 parking lot.
11      Q. Okay.
12      A. When this incident happened and she showed
13 me, I called 7-Eleven same day.
14      Q. Okay. And what did you do about that
15 other than call 7-Eleven, if anything?
16      A. I called 7-Eleven. I supposed to.
17      Q. Okay.
18      A. Yeah.
19      Q. After that, did you do anything else with
20 regard to what she showed you?
21      MR. WAGNER: You mean did he
22 personally do that?
23      MR. DOSS: Yes.
24 BY MR. DOSS:

Page 13

1       Q. Did you do anything else with regard to
2  the parking lot and what she showed you?
3       A. Right.
4       Q. After you called 7-Eleven, did you do
5  anything else yourself physically or have your
6  employees do it?
7       A. Okay. Actually, I didn't see, I didn't
8  see anything serious. So that's why I didn't do
9  anything. All I think I should call 7-Eleven, so I
10 did call 7-Eleven.
11      Q. After that point, did you do anything
12 else?
13      A. No.
14      Q. When you generally get into the store
15 each day?
16      A. I have no time, actually. Sometime 6:00,
17 7:00, 8:00, before 9:00 o'clock.
18      Q. In the morning?
19      A. Uh-huh.
20      Q. Yes?
21      A. Yeah.
22      Q. And you work, generally, until when?
23      A. No time. No time.
24      Q. Could be --

Corbett & Wilcox

Kailish Sayl

Page 14

1      A.  12:00, 1:00, 2:00, 3:00.
2          MR. WAGNER:  You mean no set time?
3          THE WITNESS:  No set time; that's
4    exactly.
5    BY MR. DOSS:
6      Q.  When you first obtained the franchise, did
7    you have to do any work to make it into a 7-Eleven or
8    was it already an existing 7-Eleven?
9      A.  If I worked before 7-Eleven before I
10   franchise it?
11     Q.  When you first got it as a franchise, did
12   you have to do anything to the building or was it
13   already a 7-Eleven?
14     A.  Yeah, that was 7-Eleven.
15     Q.  Did you change anything about the way it
16   was set up?
17     A.  No, sir.
18     Q.  Did you change anything about the exterior
19   setup?
20     A.  No.
21     Q.  Is the setup of the interior of the
22   7-Eleven based on some general setup that 7-Eleven
23   likes you to use for the way a store is set up?
24     A.  I can't tell you because this is a

Page 15

1    7-Eleven job.  Whatever they give me, I'm supposed to
2    take it.
3      Q.  Okay.  So you left it the way it was?
4      A.  Right.
5      Q.  So the setup the way the counter was and
6    the aisles and all of that stays the same?
7      A.  Stays same.
8      Q.  Okay.  How many entrances and exits are
9    there to the store for customers?
10     A.  One entrance.
11     Q.  How many -- is it -- are they doors?
12     A.  Doors.
13     Q.  Okay.  How many doors?
14     A.  Two doors.
15     Q.  Okay.  Meet in the middle and they both
16   swing either way?
17     A.  Right.
18     Q.  Is that located in the middle of the front
19   of the store?
20     A.  Yeah, I believe that is the middle.
21     Q.  And where is the counter that you have a
22   cash register at in relation to that door?
23     A.  As soon as you walk in, it's the left-hand
24   side.

Page 16

1          MR. WAGNER:  I'm sorry.  Counsel, can
2    we go off the record for minute.
3          (Discussion held off the record.)
4    BY MR. DOSS:
5      Q.  There's one entrance/exit to the front of
6    the 7-Eleven; correct?
7      A.  Right.
8      Q.  But it has two doors in that opening;
9    correct?
10     A.  Right.
11     Q.  Okay.  They are hinged on the edges of the
12   door, and they both move in the middle?
13     A.  Right.
14     Q.  Is there parking located in front of the
15   door?
16     A.  Yes.
17     Q.  Is there any other parking located on the
18   side of the building?
19     A.  It's not mine.
20     Q.  Okay.  Are there any signs that restrict
21   the parking in front of the 7-Eleven to 7-Eleven
22   customers?
23     A.  Right.
24     Q.  Are there signs that say --

Page 17

1      A.  There's a sign there; yeah.
2      Q.  Is there other parking that 7-Eleven
3    customers can use if all the spots in front of the
4    7-Eleven are taken?
5      A.  Yes.
6      Q.  Where is that located?
7      A.  Right in front of 7-Eleven, other side.
8      Q.  So it's basically across from the parking
9    that's directly in front of you?
10     A.  Directly in front, yes.
11     Q.  Is there any exterior lighting that lights
12   the area in front of the 7-Eleven?
13     A.  Yes.
14     Q.  What type of lighting is that?
15     A.  Fluorescent light, tube lights.
16     Q.  Are there fluorescent lights that are
17   located in the overhang on the front of the 7-Eleven?
18     A.  Yes.
19     Q.  Are there other separate lights like up on
20   poles?
21     A.  They have a separate light.  I have one,
22   two, three, four separate light, plus in front.
23     Q.  Are the controls for those lights located
24   inside your 7-Eleven?

Kailish Sayl

6 (Pages 18 to 21)

Page 18

1    A.  Yes.
2    Q.  Are they on a timer or are they just
3  switches?
4    A.  Switches as to when it gets dark.
5    Q.  They're on a light sensor?
6    A.  Light sensor.
7    Q.  It's my -- well, did you speak personally
8  to the plaintiff in this action at any time after
9  this incident happened or did she speak to you?
10    A.  No.
11    Q.  She did not speak to you?
12    A.  You mean after the incident?
13    Q.  After the incident.
14    A.  Yeah.  She came inside.  Right.  Yeah.
15    Q.  Since you met with her at that point, did
16  you recognize her as being anybody who had come into
17  your store as a regular from before that time?
18    A.  She -- I don't think she's my regular
19  customer.
20    Q.  Okay.
21    A.  Yeah.
22    Q.  You can't rule out that she might have
23  been in there once before, but she's not a regular?
24    A.  I think she's first-time customer.  I

Page 19

1  believe that.
2    Q.  How do you know that?
3    A.  Because I remember a few things, you know.
4    Q.  I mean, is that something she told you?
5    A.  No.
6    Q.  Or that's because you recognize that she
7  didn't come in?
8    A.  Yeah.  I think it was a new face.  Yeah.
9    Q.  Okay.  How did you find out that she said
10  she fell?
11    A.  She told me that.
12    Q.  Where were you at that time?
13    A.  I was behind the register.
14    Q.  Did you see her fall?
15    A.  No.
16    Q.  Did you see her get up after her fall?
17    A.  No, sir.
18    Q.  Is there anything -- and I know -- tell me
19  if this is a typical 7-Eleven setup --
20    A.  Sure.
21    Q.  -- where's there full windows on the front
22  of the store; correct?
23    A.  Right.
24    Q.  Are there some counters that come up to

Page 20

1  about waist height that block the lower glass?
2    A.  Right.
3    Q.  Is there anything else blocking your view
4  on the upper glass?
5    A.  No, sir.  Very clean view.
6    Q.  In fact, isn't that probably a rule;
7  you're supposed to keep the upper part clear --
8    A.  Yeah.
9    Q.  -- for security purposes?
10    A.  Security purposes.
11    Q.  Did you at any time see her get up or come
12  in, back to the store after the incident happened?
13    A.  No, sir.
14    Q.  Did you speak with her at any time when
15  she first came into the store, before the incident
16  happened, that you recall?
17    A.  No.  I don't remember that.
18    Q.  Had you been in the store that whole
19  morning?
20    A.  Yes.
21    Q.  Do you remember about what time of day it
22  was when she actually came in and told you that she
23  had fallen?
24    A.  Day?  I don't remember day, but I remember

Page 21

1  time; I have an idea.  Was 7:00, between 7:00 and
2  8:00, something like that.
3    Q.  In the morning?
4    A.  Yeah; between 7:00 and 8:00.
5    Q.  What was the lighting like outside?
6    A.  Even I told -- I says right in back.  I
7  told her about the light.  I just say, Why this
8  happen if you say you fall?  This is a bright light.
9        So that's what I remember.
10    Q.  Let me back up.  I'm not sure I understood
11  you exactly.
12    A.  Yeah.
13    Q.  Outside was it daylight yet?
14    A.  Yes.
15    Q.  Okay.  Were your overhead, automatic
16  lights that have the light sensor, were they still
17  on?
18    A.  I didn't look that.  I'm sorry.  I didn't
19  look that.
20    Q.  But it was light enough that you could --
21    A.  Yes.
22    Q.  -- see the ground?
23    A.  Yes.
24    Q.  What exactly did she tell you and what

Corbett & Wilcox

Kailish Sayl

7 (Pages 22 to 25)

Page 22

1 conversation did you have with her when she came in
2 and talked about this?
3     A.  All she said, she fall.  So we walked
4 together outside.  She showed me where the spot.
5     Q.  What did you say in response to her when
6 she told you she fell -- this is inside.  Did you say
7 anything back to her?
8     A.  Yeah.  I said, If you need some help, I
9 can help you.
10        She said, No.  I'm all right.
11     Q.  When you went back outside, what happened
12 out there?
13     A.  I asked her again.  I said, Do you want me
14 to call ambulance, 911, or you want me to drop you by
15 your car?
16        She said, No.  I'm fine.
17     Q.  Did you have any conversation or do
18 anything about, Here's where I fell; here's how I
19 fell?  Anything like that?
20     A.  No.  She didn't tell me that.
21     Q.  Did she show you anywhere where she fell?
22     A.  Yes, she showed me.
23     Q.  What did you see there?
24     A.  Was like the parking lot was uneven.

Page 23

1     Q.  Okay.
2     A.  The surface is not even; that's all.
3     Q.  Okay.  The parking lot is asphalt?
4     A.  What do you mean?
5     Q.  It's black?
6     A.  Yeah, it's black.
7        MR. MILLER:  Blacktop.
8        MR. WAGNER:  Blacktop.
9        THE WITNESS:  Blacktop.
10 BY MR. DOSS:
11     Q.  Blacktop.  Did you observe anything about
12 the parking lot other than it was uneven?
13     A.  No.
14     Q.  Did you see anything else about the
15 parking lot or the area that she was pointing to
16 other than what you've already told us, that it was
17 uneven?  Anything on the ground, anything else?
18     A.  Only thing I say, if I look, like a small
19 area was missing some blacktop; that's all.
20     Q.  Can you describe for us what that area
21 looked like?
22     A.  Area looked like?  I would say like, you
23 know, long time ago you have a one-dollar bill --
24 coin, one dollar.

Page 24

1     Q.  A one-dollar coin, like the old-fashioned
2 silver dollar?
3     A.  Exactly.
4     Q.  Okay.
5     A.  That's, that's all.
6     Q.  That's the area you would describe that
7 you saw in the area she pointed to?
8     A.  Right.
9     Q.  Can you tell us at all whether that
10 coin-size area had any depth to it?
11     A.  I would say, like, about one, a little
12 more than one and a half -- most, it is one and a
13 half.
14     Q.  One and a half what?
15     A.  Inch.
16     Q.  Okay.  I'll borrow a page.  Would a
17 baseball fit inside that hole?
18     A.  No.  Never.
19     Q.  Did she tell you anything about how she
20 fell?
21     A.  No.
22     Q.  Do you remember what the weather was like
23 that morning?
24     A.  It was good weather; I mean, no rain or

Page 25

1 anything.  It was clean.
2     Q.  Was there any leftover precipitation from
3 any earlier snowfall, anything like that?
4     A.  Oh, no, sir.
5     Q.  Was it above freezing that day?
6     A.  No, sir.
7     Q.  It was below freezing?
8     A.  I can't actually -- that was a good day;
9 that's all I know.  I can't remember temperature at
10 all.
11     Q.  Were there any other substances around
12 this silver-dollar-sized hole, such as grease, oil --
13     A.  No, sir.
14     Q.  -- water, anything else around that area?
15     A.  No, sir.
16        MR. WAGNER:  (Indicating.)
17        THE WITNESS:  I'm sorry.
18        MR. WAGNER:  That's okay.
19 BY MR. DOSS:
20     Q.  Were you aware or did she tell you about
21 anybody who witnessed her falling?
22     A.  No.
23     Q.  When she came into the store and first
24 told you about this, was she carrying anything?

Kailish Sayl

8 (Pages 26 to 29)

**Page 26**

1    A.  What do you mean?
2    Q.  Was she carrying anything in either of her
3  hands?
4    A.  I believe was coffee.
5    Q.  Okay.  Was she still carrying that when
6  she came in to tell you about the fall?
7    A.  Really I don't remember.
8    Q.  Could you tell whether the coffee had been
9  spilled or not?
10    A.  Actually, it was a long time.  I don't
11  remember.
12    Q.  Okay.
13    A.  I'm sorry.
14    Q.  Do you remember what she was wearing?
15    A.  You're talking about her?
16    Q.  Yes.
17    A.  No.
18    Q.  Do you remember or did anything stick out
19  to you like any damage to her clothing?
20    A.  No.  That was, I'm sure, about when she
21  walking in my store, I didn't see any damage in her
22  clothes.
23    Q.  Did you see any areas on her that looked
24  like she was bleeding, bruised, injured, anything

**Page 27**

1  like that?
2    A.  No, sir.  No, sir.
3    Q.  Did she ever complain of any injuries, I'm
4  hurting here, anything like that?
5    A.  No, sir.
6    Q.  Did she request any sort of medical
7  treatment from you?
8    A.  No, sir.  Even I offer.
9    Q.  And she didn't request any other type of
10  medical treatment, like an ambulance or anything
11  else?
12    A.  No, sir.
13    Q.  And you said you actually offered that to
14  her as well?
15    A.  Yes, I did that.
16    Q.  Did she fill out any sort of report about
17  here's what happened?
18    A.  What do you mean?
19    Q.  Did she fill out any sort of written
20  report to you about here's what happened?
21    A.  No, sir.  No, sir.
22    Q.  Is she required to do that as part of --
23  well, strike that.
24      When somebody comes in and says

**Page 28**

1  something like this has happened around one of your
2  stores, are you required to fill out any sort of
3  report?
4    A.  No; actually, we don't supposed to do
5  anything.
6      (Discussion held off the record.)
7      THE WITNESS:  No, I do not.
8  BY MR. DOSS:
9    Q.  Can you tell for me where this
10  silver-dollar-sized spot was in relation to the front
11  of the 7-Eleven store?
12    A.  You mean where it was?
13    Q.  Yeah.  Where was it?
14    A.  Right in front, right front of the door
15  and on the left-hand side.
16    Q.  Okay.  Was it on the sidewalk or in the
17  parking lot?
18    A.  Parking lot.
19    Q.  Was it within one of the spots that would
20  be in front of your store, or was it out into the lot
21  itself?
22    A.  It's, it's parking lot.
23    Q.  Okay.  Do you understand my question in
24  terms of there are lines for cars to park right in

**Page 29**

1  front of your --
2    A.  Right.
3    Q.  -- store; correct?
4    A.  Right.
5    Q.  Was the silver-dollar-sized hole within
6  one of those lines where a car would normally be --
7    A.  Yes.
8    Q.  -- or was it farther out into the parking
9  lot?
10    A.  No.  Right in between the line.
11    Q.  When she went out and showed it to you, I
12  take it there wasn't a car parked there --
13    A.  No.
14    Q.  -- when she went and showed it to you?
15    A.  No -- yes.
16      MR. WAGNER:  I'm not sure that was
17  clear as it came out.
18      Was there a car parked there at the
19  time when she came out and showed you this mark?
20      THE WITNESS:  No.  That was an empty
21  spot.
22  BY MR. DOSS:
23    Q.  Were there any cars parked out there when
24  she came out and showed this to you?

Kailish Sayl

Page 30

1     MR. WAGNER: You mean in other spots?
2     MR. DOSS: Right. Yeah.
3     MR. WAGNER: Do you understand?
4     THE WITNESS: Yeah. I can't remember,
5  actually. It was too long.
6  BY MR. DOSS:
7     Q.  Okay. Did you talk to anybody else or did
8  she direct you to anybody else to talk to you about,
9  "they saw me," "they saw what happened," anything
10  like that?
11     A.  No.
12     Q.  Did anybody else come up to you and say,
13  "I saw what happened" or "I want to" --
14     A.  No, sir.
15     Q.  -- "talk to you about this"?
16     A.  No.
17     Q.  Did that ever happen at any time?
18     A.  Nobody tell me anything.
19     Q.  And that includes the days after and like
20  that?
21     A.  No. Day to day.
22     Q.  When did you call 7-Eleven?
23     A.  Same day.
24     Q.  And what happens when you call them?

Page 31

1     A.  I just called 7-Eleven. I said, you know,
2  a lady told me what happened. And they send
3  somebody. That's all.
4     Q.  Did they eventually -- strike that.
5        Did they tell you they were going to
6  send somebody?
7     A.  No, no. They send somebody already and
8  they did work.
9     MR. MILLER: I'm having trouble with
10  the accent.
11     MR. WAGNER: They sent somebody who
12  did work.
13     MR. MILLER: Okay.
14  BY MR. DOSS:
15     Q.  When did that person come?
16     A.  You want day or time?
17     Q.  Well, first, give me an approximation of
18  how long it was after.
19     A.  Next day.
20     Q.  And what did that person do when they came
21  the next day?
22     A.  They make the parking lot even. That's
23  all.
24     Q.  Okay. That was a person from 7-Eleven?

Page 32

1     A.  Person from 7-Eleven.
2     Q.  And how did they make the parking lot
3  even?
4     A.  I think they used some blacktop, and they
5  have some kind of fire which work with the gas. They
6  melt that, you know, blacktop; and they pour and beat
7  it hard with some kind of thing.
8     Q.  They tamp it down?
9     A.  Tamp it, whatever they call it. Yeah.
10     MR. WAGNER: Did you get the fire with
11  the gas first?
12     MR. DOSS: That part I understood.
13     THE WITNESS: You know what it is;
14  right?
15  BY MR. DOSS:
16     Q.  I just wanted to make sure about that last
17  part.
18     A.  Yeah.
19     Q.  And that was the very next day?
20     A.  Yes, sir.
21     Q.  Did you actually request them to do that?
22     A.  Yeah. I, I call them.
23     Q.  Okay. Well, that wasn't quite what my
24  question is. I know you called them --

Page 33

1     A.  Right.
2     Q.  -- and you told them that this had
3  happened.
4     A.  Right.
5     Q.  Did you tell them anything about she
6  pointed to something in the parking lot?
7     A.  No. All I said is my parking lot having
8  some problem. It's not that like uneven. So they
9  send someone to make it better. That's all.
10     Q.  Did you actually tell them, I need you to
11  send me somebody to make the parking lot better?
12     A.  When I call means I need something, so
13  obviously they would send somebody.
14     Q.  Okay. Well, I know that's -- you've been
15  in this business a long time?
16     A.  No, no, no. I just want to say it right.
17     Q.  What I'm trying to get an idea is, did you
18  actually make a request for, I need somebody to fix
19  this, or did they just send somebody out after you
20  said there's some parking lot problem and that person
21  started to fix it?
22     A.  No.
23     Q.  Do you understand the difference?
24     A.  Yeah, exactly. Yes, I request them to fix

Kailish Sayl

10 (Pages 34 to 37)

Page 34

1    it.
2            MR. MILLER:  You requested a crew to
3    fix it?
4            THE WITNESS:  Yes.  Yeah.
5            MR. MILLER:  Okay.
6    BY MR. DOSS:
7        Q.  Were any other workers or employees of
8    yours or of 7-Eleven working that day in the store?
9        A.  Yeah.  One lady was working with me.
10       Q.  One lady?
11       A.  Yeah.
12       Q.  What's her name?
13       A.  Janice.
14       Q.  Do you know her last name?
15       A.  Mayle.
16       Q.  Can you spell that?
17       A.  M-A-Y-L-E.
18       Q.  Is she still an employee of yours?
19       A.  Yes.
20       Q.  Do you know where she lives?
21       A.  I don't know address, but she lives close
22    to the store.
23       Q.  Anybody else working for you that day?
24       A.  No.

Page 35

1        Q.  Do you have a separate manager whose
2    name's Mohammed?
3        A.  Separate manager Mohammed?
4        Q.  Back at that time, did you have a separate
5    manager or worker who was named Mohammed?
6        A.  Maybe one worker; yeah.
7        Q.  But he wasn't there that day?
8        A.  Maybe in the late evening; yeah.
9        Q.  What's Mohammed's last name?
10       A.  He's not working for me.  That name was...
11       Q.  Do you know where he is at all?
12       A.  Hmm.  I'm not sure if I can find him.
13    But...
14       Q.  You don't know exactly where he is?
15       A.  No.  I can't remember.
16       Q.  Okay.  After she'd shown you this spot and
17    you had offered her to have treatment and she said
18    no --
19       A.  No.
20       Q.  -- what happened then?  Where did she go?
21    What happened?
22       A.  Yeah.  When I asked her if I call
23    ambulance, you know, something, even I ask, Can you
24    want to sit down?  I can give you my chair.

Page 36

1            She said, I'm fine.
2            Then we walked together.  And even I
3    asked her, You want me to drop you by car?
4            She said, No.
5            And she walked very nicely, and she
6    sit in the car and she go.
7        Q.  Did you offer to replace her coffee or
8    anything like that?
9        A.  I ask every single day, what I can
10    remember.  Medical treatment.  I -- even I ask, Do
11    you want me to call police?
12            She said, No.
13       Q.  I was just asking about, did you make any
14    statements to her about I'll replace your coffee and
15    give you a free cup of coffee?
16       A.  I said, I said that.
17       Q.  Okay.
18       A.  Yeah.
19       Q.  Did you have any part of the payment or
20    the purchasing of the materials and the employees who
21    filled in the spots the next day?
22       A.  Okay.  Number one, my employee did not do
23    anything.
24       Q.  Right.  I mean the 7-Eleven people.

Page 37

1        A.  7-Eleven does that.  Right.  I don't pay
2    anything.  This is under my contract.
3        Q.  Okay.  So you didn't have to pay those
4    guys anything?
5        A.  No, sir.
6        Q.  7-Eleven did that?
7        A.  Yes, sir.
8        Q.  Okay.  Did you ever call up or report this
9    specific incident to the Martuscellis?
10       A.  Next day.
11       Q.  The next day you did?
12       A.  Yeah.
13       Q.  What did you tell and who did you tell?
14       A.  Okay.  That is the store owner -- I don't
15    know his name, even though I see him many times -- he
16    was in my store next day.  And I told him, and we
17    walked together and he look it.  So even he laugh
18    first.  And he said, Okay.  I will take care of it.
19            (Discussion held off the record.)
20    BY MR. DOSS:
21       Q.  Do you know specifically the name of the
22    man you described as the owner that you spoke to the
23    next day?
24       A.  I don't know the name, but I know he's the

Kailish Sayl

Page 38

1  owner, because we talk. He say that many time.
2      Q. What, specifically, do you remember about
3  your conversation with him? You said you told him
4  about the incident --
5      A. Yeah.
6      Q. -- and then what did he say back to you?
7      A. We walked outside. And we, I showed him
8  what happened. He laughed first. Then he said,
9  Nothing bad, but I will take care of it.
10     Q. Was this before or after you called
11 7-Eleven? Well, it was after because it's the next
12 day.
13     A. Next day.
14     Q. Okay. Had 7-Eleven done the repairs yet
15 to the area that you called them up about?
16     A. Yes.
17     Q. So when you showed the owner the area the
18 next day --
19          MR. MILLER: "Owner" being
20 Martuscelli?
21          MR. DOSS: Well, he said he didn't
22 know the name.
23          THE WITNESS: I don't know the name.
24          MR. MILLER: I'm saying a

Page 39

1  representative of Martuscelli, you're talking about?
2          MR. DOSS: I'm talking about, he said
3  he spoke to a gentleman who he thinks is the owner.
4          THE WITNESS: No. More than think.
5  He is the owner.
6  BY MR. DOSS:
7      Q. Do you know what either of his names are?
8      A. No.
9      Q. Okay. The next day when you talked with
10 that gentleman and you went outside and showed him,
11 had the work already been done by 7-Eleven people?
12     A. Yes, I think it's done.
13          MR. WAGNER: Are you sure of that? Do
14 you know it? Because you say you think it was done.
15          THE WITNESS: No. Can you tell me?
16          MR. WAGNER: If you know, that's fine.
17 If you don't know, that's also fine. Tell counsel
18 one way or the other.
19          MR. DOSS: And I'm with your attorney
20 on this. I don't want you to guess.
21          THE WITNESS: No. No. I'm not
22 guessing. So you're saying when I talked with the
23 owner?
24 BY MR. DOSS:

Page 40

1      Q. I'm saying you told me about the day of
2  the incident you called 7-Eleven?
3      A. Right.
4      Q. Correct?
5      A. Uh-huh.
6          MR. MILLER: Yes?
7  BY MR. DOSS:
8      Q. Yes?
9      A. Yes.
10     Q. Okay. By the next day, they had sent
11 somebody out that you didn't have to pay for but that
12 fixed the problem. That's what you told me about?
13     A. Right.
14     Q. I'm trying to figure out --
15     A. Uh-huh.
16     Q. -- you said at some point -- and I think
17 you told me the next day -- you saw a man that you
18 know is the owner?
19     A. Right.
20     Q. Okay. And then you went outside with him
21 and pointed to the area?
22     A. Yes.
23     Q. By the time you went outside and pointed
24 to the area with this man --

Page 41

1      A. Uh-huh.
2      Q. -- had the work been done by the 7-Eleven
3  people or not?
4      A. I understand your question now. No.
5      Q. Okay.
6      A. No.
7      Q. Was the work done later that same day --
8  let me finish.
9      A. Uh-huh.
10     Q. -- by the 7-Eleven people?
11     A. Right.
12     Q. Yes?
13     A. Yes.
14     Q. Okay. Had you ever had to request the
15 7-Eleven people to do that type of work before that
16 day?
17     A. No, sir.
18     Q. Had you ever had any complaints from
19 anyone -- either customers, the owner, or anybody
20 from 7-Eleven doing their checks -- about the parking
21 lot area before this woman came in and told you --
22     A. No, sir.
23     Q. -- about her falling?
24          Never had any complaints previously?

Kailish Sayl

12 (Pages 42 to 45)

Page 42

1     A.  No one complained.
2     Q.  Did you ever have anybody who came in and
3  said, I fell and got injured because of something in
4  the parking lot?
5     A.  No, sir.
6     Q.  I'm going to show you some photographs
7  that were provided by your attorney to me. I'm not
8  saying you took them. And I think your attorney may
9  have shown them to you briefly about a -- Looking at
10 the blowups of photographs I have, first of all, did
11 you take these photographs?
12    A.  No, sir.
13    Q.  Did you ever take any photographs of the
14 outside?
15    A.  No.
16    Q.  Do you know when these photographs were
17 taken?
18    A.  No, sir.
19    Q.  Do you know who took the photographs?
20    A.  No, sir.
21    Q.  Okay. Just looking at the first
22 photograph, does that photograph show in it
23 anywhere -- if you even recognize, does that show the
24 front --

Page 43

1     A.  Yes, sir.
2     Q.  -- area?
3         Does that show anywhere where this
4  person showed you that they fell?
5     A.  Yes, sir.
6     Q.  Can you point that out to us in the
7  photograph?
8     A.  I believe it's this one.
9         (Exhibit 1 was marked for
10 identification.)
11 BY MR. DOSS:
12    Q.  The photo we were just talking about's
13 been marked as Sayl Exhibit 1. It's my understanding
14 from other testimony that's already been given under
15 oath in this case and from my -- from when I received
16 these photographs and comparing them with when they
17 were taken, that this photograph was taken more than
18 a few days and more than a few weeks after this
19 incident happened. You with me?
20    A.  After a few weeks?
21    Q.  Well, it was taken more than a few days
22 after this incident.
23    A.  Few day. Can you clarify for me? Like a
24 few days, like what, a few --

Page 44

1     Q.  Well, the problem is we don't know exactly
2  when they were taken.
3     A.  Okay. But anyway --
4     Q.  That's one of the reasons I'm asking you
5  questions. Do you know if these photographs show
6  what the front of your parking lot looked like on the
7  day of this incident before the woman came in and
8  told you what happened?
9     A.  Yeah. That's, I can see that. Yeah.
10 This way.
11    Q.  Okay. And you're referring to what's been
12 marked as Photo 1?
13    A.  Yeah.
14       MR. MILLER:  Can I see that, please?
15       MR. DOSS:  Sure.
16 BY MR. DOSS:
17    Q.  Were you ever interviewed later by anybody
18 from 7-Eleven or anybody else aside from your
19 attorney about what happened in this incident?
20    A.  No, sir.
21       MR. WAGNER:  When you say
22 "interviewed," counsel, I'm not sure he understands
23 what you mean.
24 BY MR. DOSS:

Page 45

1     Q.  Did 7-Eleven ever call you back or
2  somebody from 7-Eleven call you back and try to get
3  your description of what happened that day at a later
4  time other than the very day when you called?
5     A.  No, sir.
6     Q.  And I'm going to ask you if you're sure
7  about that because your attorney's provided us with
8  some log notes that indicate that you did talk to
9  somebody at either 7-Eleven or their investigator
10 around a month and a half to two months after this
11 accident happened. Does that help you remember at
12 all?
13    A.  No. I don't remember anything else.
14       MR. WAGNER:  It's just if you
15 remember. Do you remember talking to anybody on the
16 phone or not? If you don't...
17       THE WITNESS:  I don't remember.
18 BY MR. DOSS:
19    Q.  And that's fine. I don't want you to
20 guess.
21    A.  No, I don't remember.
22    Q.  There's a note that's listed for
23 February 2nd, 2004, which would have been about two
24 months after this incident is alleged to have

Kailish Sayl

13 (Pages 46 to 49)

Page 46

1  happened.
2      MR. WAGNER: Hold on there just one
3  minute, counsel. I want to pull it up and get it in
4  front of the witness.
5      MR. DOSS: That's great. That'll make
6  it easier.
7      MR. MILLER: I don't have a
8  February 2nd note.
9      MR. WAGNER: No. It's February 11th.
10     MR. DOSS: Delayed entry due to no
11 Juris access.
12     MR. WAGNER: The date that we're
13 looking at, though, is off to the left.
14     MR. MILLER: Right. That's what we
15 were looking at.
16     MR. DOSS: Just so we're clear for the
17 record, we're all referring to documents that were
18 attached to 7-Eleven's response to Plaintiff Robyn
19 Zavodnick's Interrogatories.
20     I'm looking at an entry that's listed
21 as 2/11/04 on the left-hand side. Then there's a
22 notation underneath that, Monday 2/2/04, delayed
23 entry due to no Juris access until today.
24 BY MR. DOSS:

Page 47

1      Q. There's a name above that -- at least I
2  think it's a name. It says "Sharon ST." And,
3  Mr. Sayl, you're looking at this with me.
4      A. Yeah. I'm looking. Sharon.
5      Q. Do you remember speaking to a woman or a
6  woman named Sharon at some point about two months
7  after this woman came in to you?
8      A. I don't remember.
9      Q. If you remember.
10     MR. WAGNER: Just if you remember.
11     THE WITNESS: I don't remember.
12 BY MR. DOSS:
13     Q. Okay. I'm just going to go through with
14 you some of the statements she has down here that
15 she's attributed to you.
16     MR. WAGNER: Bearing in mind,
17 according to this document that you're being shown,
18 this conversation you're being asked about is over
19 two years ago. So if you remember it, fine; tell
20 counsel. If you don't remember it, that's fine, too.
21     MR. MILLER: I think you already gave
22 him that instruction.
23     MR. DOSS: And that's fine.
24 BY MR. DOSS:

Page 48

1      Q. I'm just going so see if reading any of
2  these statements helps refresh your recollection
3  about speaking with them or any of the incidents from
4  the day; okay?
5      A. Okay.
6      (Discussion held off the record.)
7  BY MR. DOSS:
8      Q. You can read along with me if I -- if that
9  helps.
10     A. Okay.
11     Q. About the fourth full paragraph down, it
12 says, K. did not see the incident. And by "K," I'm
13 going to represent to you that they're referring to
14 you, to Kailash; okay?
15     A. Yes.
16     Q. Is that correct, first of all?
17     A. Yes.
18     Q. This occurred approximately 8:00 a.m.
19 Weather was clear and bright, not a contributing
20 factor.
21     That's consistent with what you've
22 already told me?
23     A. Right.
24     Q. Then skip over a paragraph. It says,

Page 49

1  Claimant -- and, again, I'm going to represent to you
2  they're referring to the woman who came in and talked
3  to you; okay?
4      A. Yes.
5      Q. Reported this to K., meaning you,
6  directly. She said she was exiting the store. She
7  was carrying coffee and nothing else, and her heel
8  went into a hole outside. They went outside
9  together, and she showed him the hole.
10     Does that help you remember any more
11 about any conversation you had with her?
12     A. Honest with you, I don't remember
13 anything.
14     Q. Okay. Just don't remember one way or
15 another?
16     MR. WAGNER: By "her," you don't mean
17 the plaintiff now; you mean this person on the
18 telephone; is that right?
19     MR. DOSS: Actually, I did mean the
20 plaintiff.
21     MR. WAGNER: Well, counsel, I'm sorry.
22 This is my problem: These questions are not clear.
23     MR. DOSS: Let me clarify.
24     MR. WAGNER: I honestly thought when

Kailish Sayl

14 (Pages 50 to 53)

Page 50

1  you said "her," I assumed you meant the person that
2  he spoke with on the phone.
3        THE WITNESS: That's what I'm
4  thinking.
5        MR. WAGNER: And that's what the
6  witness just said.
7        MR. DOSS: Let me see if I can clear
8  up the record.
9        THE WITNESS: Okay.
10 BY MR. DOSS:
11     Q. The paragraph that I just read --
12     A. Right.
13     Q. -- it starts with, Claimant reported this
14 to K. directly.
15        First of all -- I think you already
16 answered this -- does that help you remember any of
17 your conversation with the woman over the phone?
18     A. I don't remember anything over the phone.
19     Q. Does that help you remember any
20 conversation you had with the woman who's making a
21 claim here, who I'll tell you, her name is Miss
22 Zavodnick?
23     A. Okay.
24     Q. Does that help you remember any

Page 51

1  conversation you had with her the day she came into
2  your store?
3     A. Yeah. This paragraph, this one?
4     Q. Yes.
5     A. Yeah. She told me these whole things;
6  yeah.
7        MR. WAGNER: So she told you the
8  whole -- everything that's represented in that
9  paragraph?
10       MR. MILLER: No. He didn't just say
11 that, counsel.
12       MR. WAGNER: He said, She told me
13 these whole things. I'm asking him to clarify. He
14 said, The whole thing.
15       MR. MILLER: And the question before
16 was about the paragraph.
17       MR. WAGNER: You're going to have to
18 go over it, then, phrase by phrase.
19 BY MR. DOSS:
20     Q. The next paragraph has, K., meaning you,
21 said it was not wide and not deep.
22        And given the previous paragraph, I
23 presume that's referring to the hole. Do you
24 remember if you told this woman over the phone that

Page 52

1  statement?
2     A. No, I don't remember.
3        MR. WAGNER: The witness has said
4  repeatedly he does not recall talking to anyone on
5  the phone about this. Do you want to ask him 20
6  times that? I mean, really.
7        MR. DOSS: I don't want to ask him 20
8  times that. I'm trying to see if this helps him
9  remember at all, okay, not what he's talking about on
10 the phone; let's see if it helps him remember
11 anything about what happened that day.
12       THE WITNESS: Okay.
13 BY MR. DOSS:
14     Q. Okay. They have down here, The rest of
15 the parking lot was clean, no other contributing
16 factors.
17        Do you remember if that was true the
18 day when you went out and she showed you this
19 silver-dollar-sized hole?
20     A. Yeah, I remember that.
21     Q. So the rest of the parking lot was clean?
22     A. Yes.
23     Q. You didn't see any other contributing
24 factors?

Page 53

1     A. No, sir.
2     Q. Is that correct?
3     A. Yes.
4     Q. If you turn to the next page and the first
5  full paragraph, what this person has put on the note
6  is, K. -- again, meaning you -- has since filled the
7  hole himself via supplies he bought at the hardware
8  store.
9        Now, that's not correct?
10    A. No. I never fill anything.
11    Q. Okay. That was done by 7-Eleven that you
12 told us about already?
13    A. Yes, sir.
14    Q. Okay. The next sentence has L.L. -- I'm
15 presuming that means landlord, but I don't know for
16 certain, because this isn't my log note -- but it
17 says, Resurfaced the entire parking lot approximately
18 three to four months ago.
19        I'm not asking you about that
20 statement. But do you remember if the landlord
21 resurfaced the entire parking lot at any time before
22 this woman came in to you and complained?
23    A. I don't remember.
24    Q. You just don't remember one way or

Corbett & Wilcox

Page 54

1  another.
2      A. You mean after?
3          MR. WAGNER: No; before.
4  BY MR. DOSS:
5      Q. Let me make my question clear. Don't even
6  look at that statement.
7      A. Right.
8      Q. Do you remember if the landlord or anybody
9  resurfaced the entire parking lot at any time before
10  this woman came in and complained about this to you?
11      A. Before, I don't think he did anything.
12      Q. Do you know or do you just not remember?
13      A. Actually, I remember.
14      Q. Okay. This statement seems to say,
15  Landlord resurfaced the entire parking lot
16  approximately three to four months ago. That's a
17  rough time estimate, and I don't know where that's
18  dated from.
19      A. Right.
20      Q. But it seems to be dated at some time
21  around either when this note was given or when the
22  incident happened; I don't know which. Do you
23  remember the parking lot, in general, being
24  resurfaced --

Page 55

1      A. Before --
2      Q. -- before she came in and talked to you?
3      A. I don't remember.
4      Q. Okay.
5      A. I don't remember.
6      Q. The next paragraph has, However, K. said
7  there is a problem with this particular spot. For
8  example, even though he filled it recently, there is
9  a depression today.
10          Do you remember if -- and I'm not
11  asking about that statement. Because of that
12  statement, do you remember if, after the holes were
13  filled in by the 7-Eleven people, did the depression
14  come back?
15          MR. WAGNER: Objection. I think you
16  just said something about the holes, plural, being
17  filled in by the 7-Eleven people. And I don't think
18  we have any such testimony.
19          MR. DOSS: That's true. And what I
20  mean is -- let me strike that.
21  BY MR. DOSS:
22      Q. After the 7-Eleven personnel came and did
23  whatever work they did, do you remember there being
24  any other problem with the parking lot?

Page 56

1      A. No, I don't think so any problem after
2  that.
3      Q. Skipping down a couple of paragraphs, it
4  starts with, There were no known witnesses, no names
5  secured. K., meaning you, said there were two
6  teenagers outside. But they did not assist the
7  claimant, meaning the woman. Then, There was only
8  one car outside when this occurred.
9          Does that help you remember as to
10  whether there were more cars, less cars. Because you
11  told me before you just couldn't remember sitting
12  here today.
13      A. Yeah.
14      Q. I don't know if that helped refresh your
15  memory.
16      A. No. I don't remember if I said anybody to
17  anything like that.
18      Q. And then it has, She said she was fine and
19  she left, meaning the woman who came in and talked to
20  you. Is that correct?
21      A. When I asked her, she said, I'm fine; yes.
22      Q. Okay. Did you ever have any later contact
23  with that same woman at any time?
24      A. No.

Page 57

1      Q. Did you ever observe her come back and
2  take photographs or be around the outside of your
3  store?
4      A. No. I don't remember anything.
5      Q. She has testified that she did come back
6  and take photographs several days later, and these
7  have been marked in her deposition. I'm just going
8  to put them in front of you and specifically refer
9  you to what's previously been marked as Zavodnick 1.
10          And, in particular, I'm referring to
11  two -- on the single page, there are two photographs
12  in the upper right-hand side and then two photographs
13  in the left lower side. See if you recognize what's
14  in those photographs.
15      A. That was at this area; right.
16      Q. You've pointed to a photograph that's on
17  the lower left of Zavodnick 1?
18      A. Lower left; right.
19      Q. And you said that shows an area. What
20  area does that show?
21      A. Where this incident happened.
22      Q. So this shows the area of the parking lot
23  in front of your store?
24      A. Right.

Kailish Sayl

16 (Pages 58 to 61)

Page 58

1    Q.   There appear to be on the parking lot
2  itself lighter and darker portions of that parking
3  lot.  Do you see where I'm referring to?
4    A.   Yes.
5    Q.   Do you know why one's lighter and why
6  one's darker?
7    A.   Yeah.  Darker one, what 7-Eleven
8  maintenance, they fixed it.
9    Q.   So the darker stuff is what the 7-Eleven
10 people put in the next day?
11   A.   Yeah; the blacktop or whatever.
12   Q.   Okay.  Is that also shown in the
13 photograph at the top right?
14   A.   Yes, sir.
15   Q.   Can you tell if the photograph in the top
16 right is also the area that she pointed to that she
17 says where she fell?
18   A.   No.  I don't see anything now.
19   Q.   No.  I mean can you tell if that's the
20 area she was actually pointing to outside of your
21 store?  There are not many reference points.
22   A.   I can't -- I would just guess somewhere
23 here.
24   Q.   I don't want you to guess.

Page 59

1    A.   I can't tell you exactly where it is
2  because everything looks fixed to me now.
3    Q.   In any of the other photographs, can you
4  tell from looking at the angle of the reference
5  whether the area she showed you is in any of these
6  other photographs?
7    A.   Maybe the second one.
8    Q.   The middle photograph on the right-hand
9  side?
10   A.   Right-hand side.
11   Q.   Can you point to me where she pointed out
12 to you?
13   A.   Somewhere here.
14   Q.   Somewhere, you pointed almost towards the
15 middle of the photograph where there's a line
16 dividing?
17   A.   No.  No.  I didn't point that.
18   Q.   Then tell me.  I don't want you to mark
19 it.
20   A.   No.  I'm not going to mark.  I'm using the
21 back.
22        It's over here.
23        MR. WAGNER:  He's obviously pointing
24 to roughly the middle of a parking space shown in

Page 60

1  that photograph.
2  BY MR. DOSS:
3    Q.   And the only reason I was trying to narrow
4  it down some is there appear to be two parking spaces
5  shown in the photograph.  Are you pointing to the
6  interior of the parking space that's more towards the
7  bottom of the photograph?
8        MR. WAGNER:  Well --
9        THE WITNESS:  No, no.  Not in the
10 bottom.  It's No. 1, No. 2.  I'm talking about this
11 one.
12       MR. WAGNER:  Clearly the witness
13 pointed to the upper of those two spaces.  You might
14 want to ask him if he -- well, I'll strike that.
15       Clearly he pointed to the upper one.
16       MR. MILLER:  I don't know how clear
17 that was.
18       MR. WAGNER:  Well, it was clear to me.
19       MR. MILLER:  Upper space?
20       MR. WAGNER:  The upper space of the
21 photograph.
22 BY MR. DOSS:
23   Q.   Let's try to do this one at a time.
24       MR. MILLER:  There's technically four

Page 61

1  spaces in the photograph.
2  BY MR. DOSS:
3    Q.   Put your eraser down where you were
4  pointing to, please, sir, so I can try and describe
5  that.
6    A.   (Complies.)  Somewhere here.  I'm not
7  exactly --
8    Q.   I understand.  But between the two full
9  empty spaces shown in the photograph, you were
10 pointing your eraser to the area, the general area
11 inside the spot that is on the -- towards the top of
12 the photograph?
13   A.   Yes, sir.
14       MR. MILLER:  Closer to the car?
15       MR. DOSS:  Yeah.
16       MR. WAGNER:  Could we possibly just
17 have him put a mark there?
18       MR. MILLER:  Not on that photograph.
19       MR. WAGNER:  Well, all right.  But
20 there's other copies of it around.  And I have to say
21 the questions, as they have been asked, were
22 confusing.  It was quite clear to me where the
23 witness was pointing.  And I think your questions
24 were directing him elsewhere, but he continued to