Page 62

1  point to the same spot. Let's just put a spot on
2  what he marked or on a copy of what he marked.
3        MR. DOSS: If you have that other
4  color set of copies --
5        MR. WAGNER: Yeah; we can get them.
6  We have one that's grainier. It's
7  probably adequate.
8        MR. MILLER: More than adequate for
9  our purposes.
10 BY MR. DOSS:
11    Q. Okay. I'm showing you another sheet of
12 photographs that appear to be a copy of the first
13 sheet. Looking at the photograph on the right side
14 of this extra copy, can you actually make a mark in
15 the general area that you were talking about where
16 she says she showed you that she fell? And why don't
17 you do it with --
18    A. Pen?
19    Q. A red pen.
20    A. Okay.
21        MR. MILLER: Hand me the other, my
22 copy.
23        MR. WAGNER: (Complies.)
24        MR. MILLER: Thank you.

Page 63

1        THE WITNESS: (Complies.)
2        MR. WAGNER: For the record, the
3  witness has drawn a circle with a red pen.
4        MR. DOSS: Thank you.
5        (Exhibit 2 was marked for
6  identification.)
7        MR. MILLER: Can I see it?
8        MR. DOSS: Yep. That's all I have.
9        (Discussion held off the record.)
10 BY MR. MILLER:
11    Q. Could you pronounce your last name for me?
12    A. "Sayl."
13    Q. "Sayl"?
14    A. Yes, sir.
15    Q. Mr. Sayl, my name is Rob Miller. I
16 represent Robyn Zavodnick. She's the lady that was
17 at the 7-Eleven and fell that day.
18    A. Right.
19    Q. Do you recall the date that she fell?
20    A. No, I don't remember.
21    Q. Do you remember if it was a weekday or
22 weekend?
23    A. I don't remember.
24    Q. Do you remember -- you do recall the time

Page 64

1  of day?
2     A. Time, yeah; roughly, yeah.
3     Q. If I said to you it was December 1, 2003,
4  would you have any reason to disagree with me?
5     A. 2003, I believe; but, yeah, December,
6  yeah.
7     Q. Okay. Do you know if it was the 1st of
8  December?
9     A. I don't.
10    Q. Okay. If I told you it was a Monday --
11    A. I don't remember.
12    Q. -- do you know if that's correct?
13    A. I don't know, really.
14    Q. All right. I just wanted to check that
15 right off the bat.
16    A. Right.
17    Q. Talking to you about your 7-Eleven and
18 just so I get a better feel -- I'm sorry to tell you,
19 but I haven't been there. But I won't rule it out
20 for the future.
21    A. Okay.
22    Q. But when you pull into your 7-Eleven,
23 okay, is the parking lot, as I understand it -- can
24 you enter from either side of the parking lot? Do

Page 65

1  you understand my question?
2     A. Either --
3     Q. Let me do it by very crude drawing. Say
4  this is the front of your 7-Eleven.
5     A. Right.
6     Q. And as I understand it, there's a sidewalk
7  along there, along the front?
8     A. Yes.
9     Q. And then this is not to scale and not the
10 correct number of spots.
11    A. Okay.
12    Q. But there's parking immediately in front?
13    A. Right.
14    Q. When cars park immediately in front, they
15 park perpendicular to that sidewalk, meaning either
16 the front of the car or the back of the car would be
17 closest to the sidewalk, not sideways?
18    A. Okay.
19    Q. All right. Is that correct?
20    A. That's correct.
21    Q. And then there's a driving lane or lanes?
22    A. Right.
23    Q. Are there two lanes that two cars can fit
24 side by side, or is it enough space for one car or

2

Kailish Sayl

18 (Pages 66 to 69)

Page 66

1  more than one car?
2      A.  One car.
3      Q.  And across from that driving lane, there's
4  another row of parked cars or parking spots. Again,
5  this drawing's not to scale and not the correct
6  number of spots.
7      A.  Yes, sir.
8      Q.  And so if someone wants to pull into the
9  parking lot -- and, by the way, is the front door
10 somewhere around the middle of the 7-Eleven?
11     A.  Middle; yeah.
12     Q.  All right.  And we already, I think,
13 established that there's like two doors and one
14 cutout area?
15     A.  Something like that.
16     Q.  I'm sort of like not the best drawer
17 either.
18         So when you pull into this 7-Eleven,
19 can you enter, looking at the store from the right
20 and left?
21     A.  Uh-huh.
22     Q.  Yes?
23     A.  Yes.
24     Q.  There's a way to pull in and then you can

Page 67

1  turn into these spots from both sides?
2      A.  No.  I think just one spot.
3      Q.  And looking, again, at the front, standing
4  sort of like on the street looking at the front, you
5  can pull in from the right side?
6      A.  Right.
7         MR. WAGNER:  Do you understand what
8  he's asking as to where the driveway is?
9         Isn't that what you're asking?
10        MR. MILLER:  I'm asking him exactly
11 what I'm asking him.
12        THE WITNESS:  That's, like you said,
13 this is a parking; this is a parking; this is my
14 front; this is the front door.
15 BY MR. MILLER:
16     Q.  Yes.
17     A.  As you're coming from here -- you cannot
18 come from here because it's, it's nowhere.
19     Q.  So you can't come from the left --
20     A.  Yes; left.
21     Q.  -- if you're looking at the front, but you
22 can come from the right?
23     A.  Right.
24     Q.  Can you exit to the left?

Page 68

1      A.  Yes, you can exit.
2      Q.  Okay.  So you can exit that way, but you
3  can't enter from the left?
4      A.  No, sir.
5      Q.  All right.  And I take it there's a big
6  sign out front that says "7-Eleven"?
7      A.  Yes.
8      Q.  All right.  And the sidewalk, does that
9  wrap around the sides of the building?
10     A.  Sidewalk; no.  We have no sidewalk on the
11 side of the building.
12     Q.  The sidewalk just is in the front of the
13 building?
14     A.  Just in the front.
15     Q.  And is your 7-Eleven a freestanding
16 building or is that connected to other stores or a
17 shopping center?
18     A.  Right.  It's a restaurant, La Casa Pasta.
19     Q.  Does it touch La Casa Pasta?
20     A.  Yeah; same wall.
21     Q.  So it's connected, actually, physically
22 connected?
23     A.  Yes.
24     Q.  Part of the shopping center?

Page 69

1      A.  Yes.
2      Q.  On which side -- if you're looking at the
3  7-Eleven, on which side is the La Casa Pasta?
4      A.  Right end.
5      Q.  From the direction cars can enter?
6      A.  Yes.
7      Q.  So somewhere over here is the, I'll call
8  it restaurant?
9      A.  Right.
10     Q.  All right.  And is there also parking in
11 front of the restaurant?
12     A.  Yes, sir.
13     Q.  So the parking would continue some
14 distance down?
15     A.  Right.
16     Q.  And on the left side of the 7-Eleven, is
17 there anything there or is it open space or parking?
18     A.  That has a parking lot.
19     Q.  It's a parking lot?
20     A.  Yeah.
21     Q.  Is there anything on the other side of the
22 restaurant that's immediately to your right?
23     A.  It's a parking space.
24     Q.  Okay.  Are there spots designated just for

Page 70

1  the restaurant?
2  A. Yes.
3  Q. And there's signs that say "only
4  restaurant parking" or "only La Casa Pasta parking"?
5  A. I don't know -- I don't think they have a
6  sign, but I have sign, "parking for 7-Eleven."
7  Q. So certain spots are designated parking
8  for 7-Eleven only?
9  A. Yes.
10 Q. Do you know how many spots there are
11 across the front of the 7-Eleven?
12 A. I think it's five.
13 Q. And how many spots or -- strike that.
14 The spots on the other side of the
15 drive area in the parking lot, how many spots are
16 there, going across?
17 A. I don't know.
18 Q. Are they designated just for 7-Eleven, or
19 they're not designated one way or another?
20 A. Actually, it's my parking lot in front of
21 7-Eleven.
22 Q. Okay. So all the spots in front of the
23 7-Eleven you designate, through signs, parking for
24 7-Eleven customers only?

Page 71

1  A. No. Front is, just front, not --
2  Q. That's what I want to ask you. Are these
3  spots, further away from the 7-Eleven, in front of
4  the 7-Eleven, are they just 7-Eleven spots, or are
5  they anybody's spots?
6  A. Anybody's spots.
7  Q. Do you know how many there are?
8  A. I don't know.
9  Q. Fair enough. Now, when it snows, who
10 removes the snow from the sidewalk?
11 A. Landlord.
12 Q. From the sidewalk immediately in front of
13 your 7-Eleven.
14 A. In front of 7-Eleven?
15 Q. Yeah.
16 A. I does that.
17 Q. The sidewalk immediately in front of
18 7-Eleven, you remove that snow?
19 A. Actually, I not supposed to, but I does
20 that.
21 Q. What makes you say you're not supposed to?
22 A. Because that's in the contract. Then you
23 have to ask 7-Eleven about.
24 Q. Well, does somebody from -- when you say,

Page 72

1  Ask somebody from 7-Eleven, do you mean like
2  corporate offices?
3  A. Corporate office; yeah.
4  Q. Did somebody at corporate office tell you
5  you're not supposed to remove the snow from the
6  sidewalk?
7  A. That's their agreement; anything in
8  parking lot is the landlord is responsible.
9  Q. But I'm asking you about the sidewalk.
10 A. Sidewalk, I don't read the whole contract.
11 I does clean and am doing that. But I'm not supposed
12 to, I believe, that.
13 Q. Okay. So it's your belief --
14 A. Yeah.
15 Q. -- you're not supposed to remove the snow
16 from the sidewalk in front of the 7-Eleven, but you
17 do it anyway?
18 A. Yes.
19 Q. Is that the same thing with putting down,
20 like, salt for ice?
21 A. Uh-huh. Sure.
22 Q. You do that on the sidewalk?
23 A. Yeah.
24 Q. And just so we're clear, the contract that

Page 73

1  you're referring to, is that the contact between
2  7-Eleven and Martuscelli?
3  A. Yes, sir.
4  Q. Okay. That's not the contract between
5  7-Eleven and you --
6  A. No.
7  Q. -- the franchise agreement?
8  A. No.
9  Q. Okay. How about the snow in the parking
10 lot in front of the 7-Eleven; who maintains that?
11 Who removes that?
12 A. Landlord.
13 Q. And why do you believe that they're
14 required to do that?
15 A. That's the 7-Eleven make that agreement,
16 not I made anything.
17 Q. 7-Eleven corporation?
18 A. Corporation, they made agreement with him.
19 Q. Okay. So 7-Eleven corporation told you
20 that the landlords are supposed to --
21 A. Right.
22 Q. -- remove the ice and snow from the
23 parking lot?
24 A. Parking lot.

Kailish Sayl

20 (Pages 74 to 77)

Page 74

1    Q. Okay. And how about, what's your
2  understanding of if there's any, I'll call it defects
3  in the parking lot, meaning cracks or depressions or
4  problems that may present themselves to people
5  walking or driving on the parking lot; who's supposed
6  to repair those?
7    A. Landlord.
8    Q. And why do you say that?
9    A. That's our contract.
10    Q. Are you talking about the contract between
11  7-Eleven corporation and Martuscelli?
12    A. Yes, sir.
13    Q. And have you ever read that contract?
14    A. I don't do that.
15    Q. Have you ever read the contract?
16    A. No, I don't read that.
17    Q. Have you ever hired somebody to read the
18  contract for you?
19    A. No.
20    Q. Are you relying solely on what 7-Eleven
21  tells you?
22    A. Sure.
23    Q. And who from 7-Eleven explained to you the
24  contract between 7-Eleven corporation and

Page 75

1  Martuscelli?
2    A. I could call someone to find out, you
3  know.
4    Q. No, no. Do you have a recollection of who
5  told you?
6    A. Who told me?
7      MR. WAGNER: What actual person, you
8  mean?
9      MR. MILLER: Yeah. He said 7-Eleven
10  told him. 7-Eleven can't speak.
11      THE WITNESS: I don't remember any
12  name because nine years before I owned that store.
13  So I don't remember now.
14  BY MR. MILLER:
15    Q. Is the conversation about the maintenance
16  and repair of the sidewalk and the parking lot that
17  you had with 7-Eleven; is that something you had back
18  in 1998 when you obtained the franchise?
19    A. Yes.
20    Q. Have you reviewed that or went over that
21  again with anybody from 7-Eleven since 1998 when you
22  obtained the franchise?
23    A. I did that once, a long time, you know
24  when I -- I can't say -- I will say -- I did that

Page 76

1  once, but I can't remember when. But I did that.
2    Q. Well, was it 1998 or are you saying once
3  since 1998?
4    A. When I was a new owner, you know, I was a
5  little excited; I read all, you know. Since then, I
6  know that the parking lot is not, not my
7  responsibility.
8    Q. Okay. Now, did you work at this
9  particular -- do you own any other 7-Elevens? Were
10  you a franchisee back in 2003?
11    A. Yes, I had another 7-Eleven.
12    Q. Where?
13    A. In Philadelphia Pike, Delaware.
14    Q. Is that the only other 7-Eleven?
15    A. Yes, sir.
16    Q. And did you physically work at that
17  particular 7-Eleven on Philadelphia Pike?
18    A. Yeah. I worked once in a while. Yes.
19    Q. What does "once in a while" mean?
20    A. Because I had a store manager.
21    Q. Okay.
22    A. I just go once a week.
23    Q. What was the name of the manager?
24    A. Mohammed Chefi (phonetic) Vahora.

Page 77

1    Q. Mohammed --
2    A. -- Chefi Vahora.
3    Q. And Mohammed no longer works for you?
4    A. No.
5    Q. Doesn't work for that other 7-Eleven
6  either?
7    A. No, sir.
8    Q. Does he have his own franchise?
9    A. No, sir.
10    Q. Do you know where he is?
11    A. Yes, sir.
12    Q. Where?
13    A. In Pennsylvania.
14    Q. You just don't know what town?
15    A. Norristown.
16    Q. Do you know how to spell his last name?
17    A. Yeah. Sure.
18    Q. How?
19    A. Yeah. V-A-H-O-R-A.
20    Q. V-A-H-O-R-A?
21    A. But he don't have anything to do with the
22  896 store.
23    Q. Do you know his phone number?
24    A. No.

Corbett & Wilcox

Kailish Sayl

Page 78

1  Q.  Do you know what street in Norristown?
2  A.  No, sir.
3  Q.  Is he married?
4  A.  Yes, sir.
5  Q.  What's his wife's name?
6  A.  I don't know.
7  Q.  You don't know his wife's name?
8  A.  (The witness shook his head.)
9  Q.  Did he ever work at the 896 7-Eleven
10 store?
11 A.  Maybe long time, once, once in a while,
12 when I need help.
13 Q.  Did you work at the 896 7-Eleven, the one
14 where this incident occurred, every day?
15 A.  You're talking about me?
16 Q.  You.
17 A.  Not every day, but I worked.
18 Q.  Was there a set schedule that you worked?
19 A.  No, sir.
20 Q.  Were there set days that you worked?
21 A.  No, sir.
22 Q.  Did you work Saturdays and Sundays?
23 A.  Sometimes.
24 Q.  Is there any record that's kept which

Page 79

1  would indicate what days it was that you were there
2  or not there?
3  A.  No, sir.
4  Q.  Is there anything indicating the hours
5  you -- you don't clock in, clock out?
6  A.  No, sir. I'm store owner.
7  Q.  Did you have any other employees?  You
8  mentioned one earlier that was working with you, a
9  female, at the time?
10 A.  Right.
11 Q.  Jennifer, I think her name was?
12 A.  No.  Janice.
13 Q.  Janice.  I'm sorry.  Any other employees
14 at that 7-Eleven --
15 A.  No, sir.
16 Q.  -- back in 2003?
17 A.  No, sir.
18 Q.  So it's either you or Janice there or both
19 of you?
20 A.  When incident happened.
21 Q.  No, no.  I'm asking you in 2003 --
22 A.  Uh-huh.
23 Q.  -- did anybody work at your 7-Eleven on
24 Route 896 other than you and Janice?

Page 80

1  A.  Yes, of course.
2  Q.  Who?
3  A.  I had two, three people.  They're gone
4  actually.
5  Q.  What are their names?
6  A.  Some still working, some of them; yeah.
7  Q.  I'm sorry?  Some still work there?
8  A.  Yeah.  Janice still working for me.
9  Q.  Anyone else that also worked back then?
10 A.  No.  They all gone.
11 Q.  Okay.  What were their names?
12 A.  What was it?  Kadir.
13 Q.  I'm sorry?
14 A.  Kadir.
15 Q.  Spell it.
16 A.  K-A-D-I-R.
17 Q.  What's his last name?
18 A.  Mohammed.
19 Q.  Mohammed?
20 A.  Uh-huh.
21 Q.  And where does he live; do you know?
22 A.  I don't know.
23 Q.  When did he leave your employment?
24 A.  Like, three, four years now.  I think

Page 81

1  three years at least.
2  Q.  Okay.
3  A.  Yeah.
4  Q.  So he wasn't working for your 7-Eleven
5  back in November or December of 2003?
6  A.  I believe that.  But I can't remember
7  exactly.  You know, so many people in and out.
8  Q.  So any others that you can remember?
9  A.  Nope.
10 Q.  You don't remember any other names?
11 A.  I would look my payroll over; then I could
12 tell you.
13 Q.  Okay.  Do you have payroll records?
14 A.  Yes, sir.
15 Q.  Are they easily obtainable by you?
16 A.  I could call my corporate office.
17 Q.  Where's your corporate office located?
18 A.  Dallas.
19 Q.  Can you do that for the six months
20 preceding December --
21 A.  I can request.
22 Q.  -- through December 31, 2003?
23 A.  I can request.
24 Q.  Just so we're clear, July 31 through

Kailish Sayl

22 (Pages 82 to 85)

Page 82

1  December 31, '03 payroll records?
2          MR. WAGNER: Just so we're clear, the
3  request has to come to me.
4          MR. MILLER: That's true.
5          MR. WAGNER: I would ask that you just
6  send us any written request whatsoever, even if it's
7  in the form of a letter. And then we will address
8  it.
9          MR. MILLER: Okay. If you want, I
10  could write it out for you now, if you can't take a
11  note.
12          MR. WAGNER: No. I'd really prefer
13  that you just send it to us in discovery, and then we
14  will address it.
15          MR. MILLER: Okay.
16  BY MR. MILLER:
17      Q. All right. Now, you testified earlier
18  that if 7-Eleven does any type of inspection, you
19  don't even know about it?
20      A. No.
21      Q. Because they're there; they leave?
22      A. They come anytime.
23      Q. They don't tell you --
24      A. No, sir.

Page 83

1      Q. -- when they're there? They don't tell
2  you when they leave?
3      A. No, sir.
4      Q. Do they tell you how you're doing?
5      A. Yes. If something wrong, yes.
6      Q. Okay. Do they give it to you in written
7  form?
8      A. Yes.
9      Q. They do?
10      A. Uh-huh.
11      Q. But if nothing's wrong, they don't write
12  anything down saying, Good job or everything's okay?
13      A. Sometimes they give me notice, you know,
14  what they check or what didn't check.
15      Q. And do you keep those notes?
16      A. No, not yet.
17      Q. Do you know what the notes are called?
18      A. They're called, like -- some kind of
19  inspection, they call it. Like, you -- some kind
20  of -- I can't remember. They have an inspection form
21  or something like that.
22      Q. So, basically, there's inspection notes of
23  some kind that are generated. Do you know if you
24  received any in 2003?

Page 84

1      A. Yeah; I'm sure.
2      Q. Do you know how many?
3      A. No, I don't know how many.
4      Q. Do you know what, if anything, they said?
5      A. Means everything all right; if they didn't
6  say anything to me, means everything's fine.
7      Q. Do they inspect the inside? the
8  outside? the parking lot? the sidewalk? the roof?
9  Where do they inspect, if you know?
10      A. Every single thing, sir: inside, outside,
11  roof, floor, parking lot, lines on parking lot.
12      Q. Are there specific spots on the form that
13  they check off for each thing that they looked at; do
14  you know?
15      A. It doesn't have a picture; but they tell
16  you left side, right side, you know, front, back,
17  like that.
18      Q. Okay. Is it a one-sided, one-page form?
19  Or is it multiple pages, multiple sides?
20      A. No. It's more than three pages, I
21  believe.
22      Q. More than three?
23      A. Yeah.
24      Q. What color are the pages?

Page 85

1      A. I have no idea.
2      Q. Okay. But, in any event, if they're
3  there, they don't tell you why they're there?
4      A. Right; because they come anytime; yeah.
5      Q. Do you do any other type of inspection of
6  the exterior of your property?
7      A. If I does them?
8      Q. Yeah. Do you do any?
9      A. Yeah. I check almost every morning.
10      Q. Almost every morning?
11      A. Yeah. That's part of my job.
12      Q. Is that when you arrive?
13      A. Yes, exactly.
14      Q. Is there any particular time that you
15  would arrive each day?
16      A. No, sir.
17      Q. Do you remember what time you arrived on
18  December 1, 2003?
19      A. I believe between 6:00 and 8:00, I believe
20  that.
21      Q. Okay.
22      A. I can't tell you exactly.
23      Q. Well, when Miss Zavodnick came to you and
24  said that she had fallen, do you know how long you

Corbett & Wilcox

Kailish Sayl

Page 86

1  had been there that day?
2     A.  No, I don't remember.
3     Q.  Okay.  Do you know if you were there the
4  day before her fall?
5     A.  If I was there the day before?
6     Q.  Yeah.
7     A.  Yes.
8     Q.  You were there the day before?
9     A.  Yeah; because I work every day at that
10 time.
11    Q.  Why?
12    A.  Need somebody to work.
13    Q.  Back in November and December you worked
14 every day, of 2003, seven days a week?
15    A.  No, sir; just almost every day.
16    Q.  So the day before, do you know if that was
17 one of the days you worked or one of those days that
18 you didn't work?
19    A.  I think I worked.
20    Q.  Do you know what hours you worked?
21    A.  No.
22    Q.  Do you know if you performed an inspection
23 when you arrived on the morning that Miss Zavodnick
24 fell?

Page 87

1     A.  Yes.  If I'm in the store, I does that.
2     Q.  Okay.  How long does it take you to
3  perform your inspection?
4     A.  Ten, 15 minutes.
5     Q.  What do you do?
6     A.  I just walk around and see how the store
7  looks, inside, outside.
8     Q.  Specifically, are you looking for anything
9  in particular?  Are you making notes?  Or is anybody
10 walking with you?
11    A.  No.
12    Q.  Nobody's with you?
13    A.  No.  I just walk myself.
14    Q.  Do you have a piece of paper to make
15 notes?
16    A.  No, sir.
17    Q.  And is this inside and outside?  Just
18 outside?  Just inside?
19    A.  Inside and outside.
20    Q.  And does it include the back area, stock
21 area that you do this inspection?
22    A.  No, I don't do that.
23    Q.  Do you inspect the selling floor?
24    A.  Yes, sir.

Page 88

1     Q.  And do you inspect, like, the cashier,
2  behind-the-counter area?
3     A.  Yeah.
4     Q.  And the signage in the front; is that part
5  of your inspection?
6     A.  Signage?
7     Q.  Are there 7-Eleven signs or any type of
8  advertisements you may have out there?  Do you
9  inspect them?
10    A.  No, I don't inspect that.  Because I
11 believe, it's there, it's there.
12    Q.  Do you inspect the actual sidewalk in
13 front?
14    A.  Yes, sir.
15    Q.  What are you looking for when you inspect
16 the sidewalk?
17    A.  Same thing:  if any crack or any holes or
18 any, something on the floor, like a broken bottle,
19 glass, something like that.
20    Q.  And how about the parking lot?
21    A.  Same thing; I look --
22    Q.  You inspect the entire parking lot in
23 front of your 7-Eleven?
24    A.  Yeah; in front.

Page 89

1     Q.  Prior to December 1, 2003 -- and, by the
2  way, that inspection takes, you said, about 10, 15
3  minutes?
4     A.  Yeah.  I just walk around.
5     Q.  Prior to December 1, 2003, do you recall
6  ever having any type of issue with the sidewalk or
7  the parking lot that you had to call 7-Eleven or
8  Martuscelli, the owner of the property, that you
9  wanted them to address?
10    A.  You're talking about before the incident?
11    Q.  Yeah.  Before Miss Zavodnick fell; at any
12 time since 1998.
13    A.  No, I don't think I ever call.
14    Q.  Never once called them and said, Look,
15 there's a problem here with the sidewalk or the
16 parking lot; could you fix this for me?
17    A.  For parking lot, I'm sure I never called.
18    Q.  Had you at any time between 1998 and the
19 date Miss Zavodnick fell had any construction or
20 repair work performed on the parking lot?
21    A.  Before?
22    Q.  Yes.
23    A.  I think the store owner, he does that
24 whole parking lot.  He put new blacktop or something

Kailish Sayl

24 (Pages 90 to 93)

Page 90

1 like that.
2    Q. Was that only one time he did it, or was
3 it more than once that he did it?
4    A. Yeah; I believe more than once.
5    Q. Do you know the most recent time prior to
6 Miss Zavodnick's fall that he did it?
7    A. No, I don't remember that. I think he did
8 that, but I can't remember exactly when he did. I
9 know in the morning when I came, like the whole
10 parking lot was like black and nice. So I can't
11 remember when --
12    Q. I'm sorry?
13    A. The parking lot was, like, clean and all
14 black and nice. I can't remember.
15    Q. Oh, black and nice?
16    A. Yeah.
17    Q. I thought you said "ice."
18    A. No. It was a beautiful, nice. Yeah.
19    Q. Okay.
20    A. So -- but I can't remember when.
21    Q. You don't remember when that was?
22    A. No.
23    Q. It might have been years before? Might
24 have been whatever?

Page 91

1    A. Yeah. Something like that. I don't know.
2       MR. DOSS: Might have been the day
3 before.
4       THE WITNESS: Maybe. I don't
5 remember.
6       MR. WAGNER: We've established that
7 the witness doesn't remember when it was.
8       MR. MILLER: That's fine.
9       MR. WAGNER: Presumably, there are
10 records that might --
11       MR. MILLER: And, presumably, I'll
12 continue asking questions.
13 BY MR. MILLER:
14    Q. Dealing with your store at the moment Miss
15 Zavodnick came in, okay? She comes in at that
16 moment; do you remember if you were behind the
17 counter?
18    A. I was.
19    Q. You were behind the counter when she comes
20 in to tell you about the fall?
21    A. Yes.
22    Q. And she had coffee in her hand or a coffee
23 cup or something?
24    A. I don't remember.

Page 92

1    Q. Okay. Do you remember if there -- what
2 were you doing at the moment when she first tried to
3 get your attention or when she first got your
4 attention?
5    A. I was behind the counter. So, obviously,
6 I was taking care of customers.
7    Q. Where was Janice?
8    A. Next to me.
9    Q. What was she doing?
10    A. Same. It was busy.
11    Q. Okay. Are there two cash registers? one
12 cash register?
13    A. Two.
14    Q. And were you both waiting on customers at
15 each cash register?
16    A. Yes, I believe. Yes.
17    Q. Do you know how many -- was there a line,
18 how deep the line was, if you recall?
19    A. I can't remember that.
20    Q. Is there a morning rush hour, generally,
21 at your store?
22    A. Yes.
23    Q. What are the morning rush hours during the
24 week?

Page 93

1    A. Between 6:00 and 9:00.
2    Q. Do you consider your store busy between
3 6:00 and 9:00 in the morning --
4    A. Yes, sir.
5    Q. -- on a week day?
6    A. Yes, sir.
7    Q. And was the day that Miss Zavodnick came
8 in and told you that she fell consistent with your
9 normal morning rush hour type business?
10    A. Yeah; I believe that.
11    Q. Do you recall if there was a line of
12 people trying to purchase things?
13    A. That I don't recall.
14    Q. You don't know one way or another?
15    A. No, I don't.
16    Q. Okay. When was the last time that you had
17 been outside prior to Miss Zavodnick coming in and
18 telling you that she fell?
19    A. I believe the same morning.
20    Q. When you first arrived?
21    A. Correct.
22    Q. When's the last time prior to Miss
23 Zavodnick coming and telling you that she fell that
24 you looked through the windows at the parking lot?

Kailish Sayl

25 (Pages 94 to 97)

Page 94

1    A.  What do you mean?  I don't understand your
2  question.
3    Q.  Well, when you were standing at the cash
4  register when Miss Zavodnick first got your
5  attention, were you able to -- if you wanted to look
6  at your parking lot, would you look to your left or
7  to your right?
8    A.  When I look -- right.
9    Q.  And when you look to your right, you look
10  through the glass walls or glass front to look into
11  the parking lot?
12    A.  Yes.
13    Q.  And were you able to see into the parking
14  lot?
15    A.  Yes.
16    Q.  When's the last time you had done that, as
17  you recall, prior to Miss Zavodnick getting your
18  attention that she fell?
19    A.  I look all the time.
20    Q.  Okay.  When's the last time you have a
21  specific recollection of looking?
22    A.  I can't remember.
23    Q.  Okay.  Do you know at the time that Miss
24  Zavodnick came in and said that she fell how many

Page 95

1  cars were in the parking lot?
2    A.  Really, I don't remember that too.
3    Q.  Okay.  So you don't know if it was packed
4  with cars or completely empty with cars prior to her
5  telling you, Hey, I fell?
6    A.  Actually, I remember a little bit when I
7  went with her outside.
8    Q.  That's not what I'm asking.
9    A.  Right.
10    Q.  I'm asking about before.
11    A.  I don't remember.
12    Q.  Do you know how long before she fell that
13  she came in to tell you that she fell?
14    A.  No, sir.  I don't know.
15    Q.  So you don't know if it was minutes or
16  longer?
17    A.  Right.  I don't know.
18    Q.  Do you recall what type of shoes she was
19  wearing?
20    A.  That I remember very good.
21    Q.  Oh, you do?
22    A.  Yeah.
23    Q.  What do you remember?
24    A.  That size, underneath?  High.  You know,

Page 96

1  shoes, like, very pointy.
2    Q.  Very pointy shoes?  Okay.
3    A.  I remember that --
4    Q.  What color shoes?
5    A.  I don't remember.
6    Q.  You don't remember the color?
7    A.  No.
8    Q.  Was the toe exposed?
9    A.  I don't remember that because...
10    Q.  Were they boots that went high up on her
11  leg?
12    A.  All I remember, when she said that, first
13  thing, I look -- you know, I look her shoes, you
14  know, because -- and I think I remember that I told
15  her, too, I said, Your shoes are a problem, too.  I
16  said, If my parking lot have a problem, I think your
17  shoes have a problem, too.
18      She said, What do you mean?
19      I remember very good.
20    Q.  Tell me about that.  Were you still inside
21  the store when you said that to her?
22    A.  Yeah.
23    Q.  So she comes in and tells you that she
24  falls?

Page 97

1    A.  Yeah; that -- yeah.  Yes.  I was in the
2  store.
3    Q.  And sometime later you go outside with
4  her?
5    A.  Right.  I think this conversation happened
6  when we was inside the store.
7    Q.  So before you go outside, you tell her
8  that she -- she has a problem with her shoes?
9    A.  Yes, I guess.
10    Q.  What were the problems with her shoes?
11    A.  I believe it was too pointy, you know,
12  like, like a nail.
13    Q.  Were they broken, the shoes?
14    A.  I don't remember that.
15    Q.  From time to time prior to the moment that
16  Miss Zavodnick came to you, have you had customers in
17  your store who had high heels on?
18    A.  (Shrugged.)
19    Q.  You didn't --
20    A.  I don't remember shoes, you know.  Yeah.
21    Q.  Would it be something that you would
22  expect in your store, to have from time to time
23  people come in, customers come in that may have high
24  heels on?

Kailish Sayl

26 (Pages 98 to 101)

Page 98

1    A. I believe, but I don't look at everyone's
2  shoes. I look face.
3    Q. How high were the heels for Miss
4  Zavodnick? You said "pointy." I just want to know
5  how high.
6    A. High, I can't...
7    Q. Do you know?
8    A. I can't remember how high. But was a good
9  size, I believe.
10    Q. What's "a good size" mean?
11    A. That's, I can't tell you exactly how many
12  inch.
13      MR. WAGNER: We don't want you to
14  guess.
15      THE WITNESS: That's why. I don't
16  know.
17      MR. WAGNER: If you know, say so. If
18  you don't know, say that.
19      THE WITNESS: Right. That's why I
20  said I don't know.
21  BY MR. MILLER:
22    Q. Let me just direct your attention, since
23  we're on the topic, back to the log notes of, they're
24  marked February 11th but the entry says Monday

Page 99

1  February 2, '04. Before you look at that, tell me
2  specifically -- other than you telling her that there
3  must be a problem with her shoes, did you say
4  anything else to her about her shoes?
5    A. What was that?
6    Q. Did you say anything else to her about her
7  shoes other than, There must be a problem with your
8  shoes?
9    A. No. I don't think I said anything else.
10    Q. Did she say anything to you when you said
11  that to her?
12    A. No, she didn't say anything to me.
13    Q. By the way, were they lace-up, strap-up,
14  zipper-up --
15    A. Oh, no. I don't remember at all.
16    Q. Did you bend down to look at them? Or
17  just were you standing and she's standing and you
18  just looked down?
19    A. Yeah. Because I was walk onto the
20  concrete, you know. Then I looked down.
21    Q. Now, directing your attention on the
22  bottom paragraph of the initial page for that
23  conversation of February 2, 2004, it says, K. --
24  which, again, I think we established earlier refers

Page 100

1  to you -- said it was not wide and not deep.
2      And that's referencing to what was the
3  hole.
4      And the next sentence says, K. said
5  claimant was not wearing high heels.
6      Do you recall telling anybody at
7  7-Eleven that the claimant, being Miss Zavodnick, was
8  not wearing high heels?
9    A. No.
10    Q. Okay. Does that help refresh your
11  recollection of whether or not she was wearing high
12  heels?
13    A. Actually, what is that in? I don't
14  understand that. What is that? I mean, I talked to
15  someone on the phone or something?
16    Q. I'm just asking you if you have a
17  recollection of telling anybody at 7-Eleven that she
18  was not wearing high heels.
19    A. No, I never tell nobody.
20    Q. Okay. Fine. Does reading this sentence
21  help refresh your recollection of whether or not you
22  ever said it?
23    A. I never said nobody anything.
24    Q. Did you ever -- does it help refresh your

Page 101

1  recollection as to whether or not you ever spoke to
2  anybody at 7-Eleven about the shoes or the heels that
3  Miss Zavodnick was wearing?
4    A. I never said anything about shoes.
5    Q. Did they ask you about shoes?
6    A. No, sir.
7    Q. Okay. So she comes in and you're behind
8  the counter. And at some point in time, you walk out
9  from behind the counter?
10    A. Right.
11    Q. How long did it take you to do that? Were
12  you waiting on a customer and had to close him out
13  and then you went? Or were you breaking at that
14  point? What were the circumstances?
15    A. I don't remember exactly. But I remember
16  when she said that, I just walked out to see if she's
17  all right.
18    Q. Okay.
19    A. So that's...
20    Q. Did you have any conversation, other than
21  her telling you that she fell, while you were behind
22  the counter?
23    A. No. I didn't say anything when I was
24  behind the counter.

Corbett & Wilcox

Page 102

1    Q.   The first conversation that you had was in
2    the store but with you in the front of the counter?
3    A.   Right.
4    Q.   Okay.  Other than the high heels and your
5    saying something's wrong with her shoes, tell me
6    about the conversation you initially had right then
7    and there.
8    A.   Where, inside the store or outside?
9    Q.   Inside the store.
10   A.   We just walked out.  That's when she tell
11   me what happened.  So I asked her, like, to go
12   outside and see what happened.
13   Q.   Well, in telling you what happened, was
14   that, "I fell"?
15   A.   That she said.
16   Q.   Did she say anything else?
17   A.   No, sir.
18   Q.   Did you say anything to her other than,
19   Well, if you fell, then there must be a problem with
20   your shoes?
21   A.   Yes.  I said something else, too.
22   Q.   What?
23   A.   I said if you need help.
24   Q.   So you asked her if she needed help?

Page 103

1    A.   If you need help or if you want to sit
2    down in my office.  Then I said, If you want me to
3    call 911 or if you want coffee or -- oh, even you
4    want cold water to drink.  I asked this.
5         All she said, No.  I'm fine.
6    Q.   Okay.  And did you ask her at that point
7    where it was that she fell?
8    A.   No.  She showed me that.
9    Q.   While you were in the store, did you say,
10   Where did you fall?
11   A.   What's that?
12   Q.   While you were in the store, did you say
13   to her, Where did you fall?
14   A.   Yes.
15   Q.   You also asked where she fell?
16   A.   Right.
17   Q.   And what did she say in response to that?
18   A.   She said outside.
19   Q.   Did you ask her where outside?
20   A.   Yes, I asked her where outside.
21   Q.   What then did she say?
22   A.   She pointed me where it is.
23   Q.   I'm not talking about while you're
24   outside.  I'm talking about while you're inside the

Page 104

1    store --
2    A.   Uh-huh.
3    Q.   -- did you ask her, Where did you fall?
4    A.   Yes, I asked her.
5    Q.   And did she point?  Or did she tell you at
6    that point while you were inside the store where she
7    had fallen?
8    A.   No, she didn't point.  She told me that
9    outside.
10   Q.   Did she say on the sidewalk, in the
11   parking lot, or she just said outside?
12   A.   Outside.
13   Q.   Did you have any other conversation inside
14   the store?
15   A.   No, sir.
16   Q.   Then the two of you walked out together?
17   A.   Yes, sir.
18   Q.   Did you know where she fell prior to you
19   walking outside?
20   A.   No, sir.
21   Q.   Did she tell you about a hole in the
22   parking lot while you were inside?
23   A.   No, sir.
24   Q.   When you walked outside, did you see the-

Page 105

1    hole?
2    A.   Yes.
3    Q.   And where were you standing when you saw
4    the hole?
5    A.   Right by the parking lot.
6    Q.   Were you in the parking lot or were you in
7    the store or on the sidewalk, somewhere else?
8    A.   Right by the parking lot.
9    Q.   All right.  Physically, how far away from
10   the hole were you -- a foot? ten feet? a hundred
11   feet?
12   A.   Maybe a few feet.
13   Q.   You were standing in the parking lot a few
14   feet away?
15   A.   Right.
16   Q.   And I think we established earlier there
17   was no car at that time in the spot where this hole
18   was?
19   A.   Right.
20   Q.   By the way, is there any video
21   surveillance used for the 7-Eleven on the exterior of
22   the property?
23   A.   No, sir.
24   Q.   Nothing that shows the parking lot or what

Kailish Sayl

28 (Pages 106 to 109)

Page 106

1  may have happened to her --
2         MR. WAGNER: When do you mean?
3  BY MR. MILLER:
4    Q.  -- back at the time of the accident?
5    A.  No.  Time of the accident, I didn't have
6  anything outside.
7    Q.  Now, when you looked was -- she was
8  standing next to you?
9    A.  Yes.
10   Q.  Did you see coffee on the ground?
11   A.  Actually, I don't remember at all.
12   Q.  Was her cup on the ground or was it in her
13  hand or had she thrown it away; do you know?
14   A.  I, I'm sure about I didn't see a cup in
15  her hand, but I didn't see anything, cup on the
16  ground anywhere.
17   Q.  Her newspaper; do you know if she was
18  carrying a newspaper, if there was one on the ground?
19   A.  Newspaper?
20   Q.  Yeah.
21   A.  I don't remember about newspaper.
22   Q.  Now, I believe it's your testimony that
23  this photograph that was marked as -- just marked as
24  Exhibit 1, but Sayl 1, your testimony is that -- and

Page 107

1  I'm pointing to an area; this is the area that she
2  fell?
3    A.  Yes.
4    Q.  Okay.  And what I'm referring to on this
5  photograph is sort of there's a car parked to the
6  left of the photograph and there's a parking spot to
7  the right of that car.  And close to the parking
8  stop, there's like a darkened area with a little bit
9  of light area in the middle of it.
10   A.  Right.
11   Q.  That's where she fell?
12         MR. WAGNER: Objection.  The witness
13  has never said that's where she fell because he's
14  clearly testified he didn't see her fall.
15         MR. MILLER: Fine.  I'll rephrase.
16  BY MR. MILLER:
17   Q.  Is that what she pointed to?
18   A.  Yeah; somewhere here.
19   Q.  Do you have any reason to believe that she
20  wasn't telling you the truth when she said she fell?
21   A.  Actually, when I looked, I didn't see any,
22  like, bleeding.
23   Q.  Okay.
24   A.  I didn't see anything, like she can't

Page 108

1  walk.
2    Q.  Okay.
3    A.  I didn't see she just, like, doing
4  something, like in pain or something, you know,
5  nothing.
6         MR. WAGNER: You didn't see those
7  things?
8         THE WITNESS: No, I did not see
9  anything like that.  So I don't --
10  BY MR. MILLER:
11   Q.  You don't have a medical degree, do you?
12   A.  No, sir.
13   Q.  And you didn't do any physical examination
14  of her, did you?
15   A.  No.  I have no time for that when you work
16  for 7-Eleven, you know.
17   Q.  You have no time for that?  Okay.
18         Other than not -- her being able to
19  walk and you not seeing blood, any other reason to
20  believe that she didn't fall like she told you?
21   A.  Actually, simple answer, I did not see
22  that.
23   Q.  Do you have any reason to believe that she
24  did not fall like she told you?

Page 109

1    A.  I can't tell you.
2         MR. WAGNER: Other than what he's just
3  testified to?
4         MR. MILLER: Other than the lack of
5  blood and her being able to walk --
6         THE WITNESS: Right.
7         MR. WAGNER: And that he didn't see
8  anything when he looked down on the ground.
9         MR. MILLER: That's not what I asked.
10        MR. WAGNER: That's what he just said.
11  And you said --
12        MR. MILLER: No, no.  Don't put words
13  in his mouth.  Don't prompt him when I ask a
14  question.
15        MR. WAGNER: Excuse me, counselor.
16        MR. MILLER: Please don't speak over
17  me.
18        MR. WAGNER: Well, you're speaking
19  over me.  I'm objecting, and you were speaking over
20  me.
21        MR. MILLER: I apologize if that's the
22  case.
23        MR. WAGNER: Okay.
24        MR. MILLER: Why don't you state what

Corbett & Wilcox

Kailish Sayl

Page 110

1  you wanted to state.
2      MR. WAGNER: Your question ignored his
3  immediately prior answer, completely ignored it as if
4  he didn't make that answer. And you're just asking
5  him, again, the same thing.
6      MR. MILLER: I'm not -- that's not
7  what I think happened.
8      MR. WAGNER: I think it is.
9      MR. MILLER: But I'll rephrase.
10      THE WITNESS: Sure. Go ahead.
11 BY MR. MILLER:
12   Q.   Other than you not seeing blood and you
13 not seeing her fall and her being able to walk --
14   A.   Uh-huh.
15   Q.   -- is there anything else that gives you
16 reason to believe she did not fall?
17      MR. WAGNER: Objection. Unless you
18 want to go back and re-read the questions and the
19 answers that went on for about five minutes, he
20 supplied something else as well. And now you're
21 choosing just to ignore that?
22      MR. MILLER: No. I'm asking him to
23 clarify.
24      MR. WAGNER: You're not asking him to

Page 111

1  clarify. You're asking him the same thing all over
2  again. And I object to it.
3      MR. MILLER: No, I'm not. Because I
4  think I asked him another question. You might not
5  like his answer, but I asked him another question.
6      MR. WAGNER: Counsel, don't get
7  sarcastic.
8      MR. MILLER: I'm not.
9      MR. WAGNER: Let's go back and re-read
10 the testimony, then. I'll ask the court reporter to
11 go back and re-read what the last series of questions
12 and answers were.
13      MR. MILLER: Go ahead.
14      (The court reporter read back the
15 following:
16      "Q  Do you have any reason to believe
17 that she wasn't telling you the truth when she said
18 she fell?
19      "A  Actually, when I looked, I didn't
20 see any, like, bleeding.
21      "Q  Okay.
22      "A  I didn't see anything, like she
23 can't walk.
24      "Q  Okay.

Page 112

1      "A  I didn't see she just, like,
2  doing something, like in pain or something, you know,
3  nothing.
4      "Mr. Wagner: You didn't see those
5  things?
6      "A  No, I did not see anything like
7  that. So I don't --
8      "Q  You don't have a medical degree,
9  do you?
10      "A  No, sir.
11      "Q  And you didn't do any physical
12 examination of her, did you?
13      "A  No. I have no time for that when
14 you work for 7-Eleven, you know.
15      "Q  You have no time for that? Okay.
16      "Other than not -- her being able to
17 walk and you not seeing blood, any other reason to
18 believe that she didn't fall like she told you?
19      "A  Actually, simple answer, I did
20 not see that.
21      "Q  Do you have any reason to believe
22 that she did not fall like she told you?
23      "A  I can't tell you.
24      "Mr. Wagner: Other than what he's

Page 113

1  just testified to?
2      "Mr. Miller: Other than the lack of
3  blood and her being able to walk --
4      "A  Right.
5      "Mr. Wagner: And that he didn't see
6  anything when he looked down on the ground.")
7      MR. MILLER: He read it back. That's
8  not what he said.
9      MR. WAGNER: You clearly left out "I
10 didn't see that." He said that.
11      MR. MILLER: "He didn't see that"
12 means -- he was referring to "I didn't see her fall."
13      MR. WAGNER: Well, that's your
14 interpretation. But --
15      MR. MILLER: Well, I'm asking him to
16 clarify.
17      MR. WAGNER: All right. So you left
18 that out too.
19      MR. MILLER: Other than the blood and
20 unable to walk, was there anything else?
21      He could have said, Well -- simply say
22 you didn't see it.
23      MR. WAGNER: He had just said, "I
24 didn't see that."

Kailish Sayl

30 (Pages 114 to 117)

Page 114

1    MR. MILLER: No. I just said --
2    MR. WAGNER: He just said it.
3    THE WITNESS: Yeah. I said "I didn't
4  see that."
5    MR. WAGNER: Clearly, he just said
6  that.
7    MR. MILLER: And that's what he's
8  entitled to clarify.
9    MR. WAGNER: But you're not entitled
10  to re-ask the questions.
11    (Discussion held off the record.)
12  BY MR. MILLER:
13    Q. When you say you didn't see that, are you
14  referring to "that" being her fall? "that" being
15  blood? "that" being something else?
16    A. Same thing; I didn't see that she fall.
17    Q. Recognizing -- we all understand you did
18  not see her fall.
19    A. That's it.
20    Q. And you also testified when I asked you,
21  Is there any reason for you to believe that she did
22  not fall, as she told you; you referenced you did not
23  see that, meaning you didn't see her fall?
24    A. Right.

Page 115

1    Q. Also you did not see blood?
2    A. Right.
3    Q. And you did not see -- she was able to
4  walk?
5    A. Right.
6    Q. Other than those reasons, are there any
7  other reasons that you have to believe that she did
8  not fall as she told you?
9    A. I don't have any other reasons.
10    Q. Okay. Now, when you went outside with
11  Miss Zavodnick, she points to the area that's shown
12  on Exhibit 1; okay?
13    A. Okay.
14    Q. Is that correct?
15    A. Yes.
16    Q. And when you looked at the area that's
17  shown on Exhibit 1, I believe your earlier testimony
18  is you see a hole?
19    A. Right.
20    Q. And the hole, you already testified about
21  the size and --
22    A. Right.
23    Q. -- the dimension. Okay.
24    Did you ask her, other than through

Page 116

1  her pointing, what was it about that hole or that
2  area that caused you to fall?
3    A. If I asked her?
4    Q. Yeah. Did you have any detailed
5  conversation like that?
6    A. No, sir.
7    Q. Do you have -- what do you next say? She
8  points to it. What do you next say?
9    A. Same thing I asked her, if you needed some
10  help, like I told you before.
11    Q. Anything else?
12    A. Medical help or whatever; yeah.
13    Q. Okay.
14    A. Yeah.
15    Q. Had you seen that hole anytime prior to
16  her taking you outside -- weeks before? days
17  before? hours before?
18    A. Not really.
19    Q. Okay. Did you see the discoloration in
20  that area at any time prior to her taking you outside
21  on any of your inspections?
22    A. You mean that --
23    Q. The area that she pointed to.
24    A. It was, it was okay. It was all right.

Page 117

1    Q. And in the condition that you looked at it
2  when she pointed to it and you see the hole, did you
3  consider that area to be okay, all right?
4    A. Yeah, because was like a little blacktop
5  missing; that's it.
6    Q. Okay.
7    A. Otherwise, was, everything looks to be
8  fine.
9    Q. And if that's something that you would see
10  during the course of your inspection, you would
11  consider that to pass inspection or to be all right
12  or okay?
13    A. Yeah. Yeah, I would say that.
14    Q. Were there other areas in the parking lot
15  in similar condition to the area that she pointed to
16  when she brought you outside?
17    A. Yeah. Yes.
18    Q. How many -- more than five? less than
19  five? more than ten?
20    A. Yes. Maybe other side, I think one or
21  two. Yeah.
22    Q. And were there holes there? Were there
23  pieces of blacktop missing? Were there depressions?
24  How would you describe those other areas?

Kailish Sayl

31 (Pages 118 to 121)

Page 118

1    A.  Almost same; looked like same.
2    Q.  And during the inspections that you had
3  performed for the, let's say, month prior to this
4  incident, her bringing you outside and showing you
5  the area, is that the way that the parking lot
6  looked?
7    A.  Yes, sir.
8    Q.  And in any of those inspections during the
9  one month prior where you saw these holes or
10  conditions in the parking lot, did you call 7-Eleven
11  and ask them to fix it?
12    A.  Yeah.
13    Q.  Okay.  How many times before Miss
14  Zavodnick brought you outside and pointed to it had
15  you called 7-Eleven and asked them to fix it?
16    A.  I can't remember how many times.
17    Q.  More than one?
18    A.  I can't remember.
19    Q.  Well, at least one?
20    A.  I can't remember.
21    Q.  Well, you said you called them before, so
22  we know you did it once?
23    A.  That's agreeable.
24    Q.  Do you know if you did it more than one?

Page 119

1    A.  I can't remember.
2    Q.  Okay.  Do you know how long before the
3  date Miss Zavodnick fell that you had called 7-Eleven
4  and asked them to come out and fix it?
5    A.  After incident happened?
6    Q.  No; before the incident happened.
7    A.  I can't remember any.
8    Q.  Do you know if it was a week before? a day
9  before? a month before?
10    MR. WAGNER:  The witness has clearly
11  testified he doesn't know, doesn't remember.
12    MR. MILLER:  I know.  I'm just trying
13  to get an estimate.
14    THE WITNESS:  I have no idea.
15  BY MR. MILLER:
16    Q.  Do you know who you spoke to at 7-Eleven?
17    A.  I -- you know, maintenance, like, a
18  hundred people works there.  I don't know who I
19  talked to.
20    Q.  Did you call anybody at the landlord,
21  Martuscelli Investments, and ask them to come and fix
22  or tell them about this condition?
23    A.  You are talking about before; right?
24    Q.  Before.

Page 120

1    A.  No.
2    Q.  Is that something that you would have
3  expected 7-Eleven to do?  Strike that.
4    When you called prior to Miss
5  Zavodnick's fall, sometime before, did you --
6    MR. DOSS:  Called who?
7    MR. MILLER:  Called 7-Eleven.  Thank
8  you.
9  BY MR. MILLER:
10    Q.  When you called 7-Eleven prior to Miss
11  Zavodnick's fall telling them about the condition of
12  the parking lot, did you have an expectation that
13  7-Eleven would tell the landlord?
14    A.  Yes, sir.  They're supposed to be.
15    Q.  And was it your expectation that either
16  7-Eleven or the landlord would come and repair this
17  hole and these conditions?
18    A.  I don't think 7-Eleven; is supposed to be
19  landlord.
20    Q.  Was it your expectation that somebody
21  would come out and fix the problem?
22    A.  Yes.
23    Q.  After you made the initial call, do you
24  know if you ever followed up with the landlord or

Page 121

1  7-Eleven before Miss Zavodnick's fall to find out
2  when somebody's coming out to fix the problem?
3    A.  I, I believe my job is done when I call.
4  After that, 7-Eleven and landlord.
5    Q.  So you never followed up again?
6    A.  They taking care for me, 7-Eleven and
7  corporate office.
8    Q.  But I'm saying you personally or any of
9  your employees at the franchise never followed up
10  again with another phone call to see what 7-Eleven or
11  the landlord was doing?
12    A.  I don't think I -- I don't remember if I
13  did or not.
14    Q.  Did you put out any type of warnings to
15  pedestrians to let then know that there's this hole
16  or these conditions that you called to have repaired?
17    A.  This is no hole.  I never said that a hole
18  was there.
19    Q.  Okay.  The conditions --
20    A.  As a matter of fact, it was missing
21  blacktop.
22    Q.  Okay.  Fair enough.  The missing blacktop,
23  as you describe it now, did you ever put a sign up to
24  let pedestrians know that blacktop's missing?

Kailish Sayl

32 (Pages 122 to 125)

| Page 122 | Page 124 |
|---|---|
| 1    A.  I don't think it's dangerous for my<br>2  customer to have to put sign.<br>3    Q.  Did you ever put a sign up?<br>4    A.  No, sir.<br>5    Q.  No warnings whatsoever?<br>6    A.  No, I don't need to, I believe.<br>7    Q.  Okay.  Is the area that Miss Zavodnick<br>8  went outside with you on the day of her fall and<br>9  pointed to, is that an area where people walk?<br>10    A.  Yes, sir.<br>11    Q.  It's not a surprise to you that a<br>12  pedestrian or customer of your store would walk in<br>13  the area that she pointed to?<br>14    A.  They walk.<br>15    Q.  Okay.  So, now, Miss Zavodnick ultimately<br>16  leaves your 7-Eleven?<br>17    A.  Yes; after that.<br>18    Q.  And how long after she leaves do you call<br>19  7-Eleven -- within an hour? later that afternoon?<br>20    A.  I don't remember exact time.  But I know I<br>21  called same day.<br>22    Q.  Do you know if it was in the morning or<br>23  after lunch?<br>24    A.  No.  That was in the morning. | 1    MR. WAGNER:  Objection.  That is not<br>2  his testimony whatsoever.  And I'm not going to<br>3  permit you to twist his answers.<br>4    MR. MILLER:  I'm not trying to twist.<br>5    MR. WAGNER:  Well, objection.  That is<br>6  not at all his testimony.<br>7    MR. MILLER:  He can say he never told<br>8  him that, or he can say he told him that.  I'm not<br>9  mischaracterizing testimony.<br>10    MR. WAGNER:  Objection.  And I'm<br>11  instructing the witness not to answer that because<br>12  that is a complete mischaracterization of what he<br>13  testified to.<br>14    MR. MILLER:  I don't think so.<br>15    MR. WAGNER:  If you want to discuss it<br>16  off the record, we can do that.<br>17    MR. MILLER:  I don't need to.<br>18    MR. WAGNER:  Okay.<br>19    MR. MILLER:  I already have that.<br>20  BY MR. MILLER:<br>21    Q.  Did you ask them to fix it?<br>22    A.  Yes.  That's the reason I called.<br>23    Q.  Did you ask them to call Martuscelli to<br>24  come fix it? |

| Page 123 | Page 125 |
|---|---|
| 1    Q.  And do you recall specifically what you<br>2  told them?<br>3    A.  I, I don't remember what I said exactly,<br>4  but I said about parking lot.<br>5    Q.  And did you tell them that it needs to be<br>6  repaired?<br>7    A.  Yeah.<br>8    Q.  And did you tell them that you had called<br>9  at least once before?<br>10    MR. WAGNER:  Objection.  He never<br>11  testified to that.<br>12    MR. MILLER:  Well, he said he called<br>13  once before.<br>14    MR. WAGNER:  He said there was a prior<br>15  occasion when a similar call had been made.<br>16    MR. MILLER:  Strike the question.<br>17    MR. WAGNER:  Well, counsel --<br>18    MR. MILLER:  Counsel, I struck the<br>19  question.  I struck the question.  Do you still want<br>20  to object to a question that's no longer there?<br>21    MR. WAGNER:  Go ahead.<br>22  BY MR. MILLER:<br>23    Q.  Did you tell them that you had called once<br>24  before about the condition of the parking lot? | 1    A.  It's not my job, sir.<br>2    Q.  And did you complete any incident report<br>3  regarding Miss Zavodnick's fall at all at any time?<br>4    A.  No.  I don't think I did that.<br>5    Q.  After your call that day to 7-Eleven, you<br>6  say they show up the next day?<br>7    A.  Yes.  I believe, yeah.<br>8    Q.  And you don't know if it was morning or<br>9  afternoon?<br>10    A.  No, sir.  I don't remember.<br>11    Q.  And did you have to call them again prior<br>12  to them showing up the next day or just the one call<br>13  was enough?<br>14    A.  Yeah; just one was enough.  They did good<br>15  job; yeah.<br>16    Q.  So they came out.  And how many spots did<br>17  they repair that next day?<br>18    A.  I don't remember how many spots, but they<br>19  did repair all, whatever it was.<br>20    Q.  After they repaired the spots, did it look<br>21  like what is shown in Zavodnick 1 on the right-hand<br>22  side, middle photograph?<br>23    A.  What is that?<br>24    Q.  You see this parking lot? |

Corbett & Wilcox

Kailish Sayl

Page 126

1      A. Right.
2      Q. Okay. Do you know if that's the parking
3  lot in front of your 7-Eleven?
4      A. Right.
5      Q. Do you know?
6      A. Yes.
7      Q. It is?
8      A. Uh-huh.
9      Q. You have to say yes.
10     A. Yes.
11     Q. Okay. And after the 7-Eleven crew came
12  and repaired the parking lot --
13     A. Right.
14     Q. -- did it look as it's shown in this
15  middle photograph on the right of Zavodnick 1?
16     A. Yes.
17     Q. And I count four, in this photograph, four
18  spots that are like darker patches. Did they fill
19  all four of those spots?
20     A. I don't remember, but I believe that;
21  yeah.
22     Q. Okay. And what I see, actually, in the
23  bottom left-hand picture is one, two, three, four,
24  five spots. Do you know if they filled five spots?

Page 127

1      A. Yeah; I believe that.
2      Q. Do you know if they filled more than five
3  spots; maybe the photograph just doesn't show it?
4      A. I don't remember.
5      Q. But to the best of your recollection,
6  these five spots were filled that day after Miss
7  Zavodnick's fall?
8      A. Actually, I can't tell you all the same
9  day. But I know that the spot where incident
10  happened, they did, yeah; they did that.
11     Q. On the day they came out the next day, did
12  they fill more than one spot or just one spot?
13     A. That's -- I don't remember.
14     Q. Did they have to come back a second day or
15  a third day or sometime later?
16     A. No, they didn't come. They just come
17  once, and they did what they're supposed to do.
18     Q. Since they filled this -- the spot --
19  we'll deal with only the spot of Miss Zavodnick.
20  Since they filled that spot and if we were to drive
21  there today, does it look the same as it does in the
22  photographs marked as Zavodnick 1?
23     A. No. I think -- landlord, he did
24  everything again; whole parking lot.

Page 128

1      Q. He repaved the entire parking lot again?
2      A. Whole parking lot; yeah. My side and his
3  side.
4      Q. Do you know when that was done?
5      A. No, I don't remember.
6      Q. Was it, you know, was it in 2006?
7      A. I'm sure it's not 2006.
8      Q. Was it in 2005?
9      A. I don't remember that.
10     Q. Do you know if it was warm weather, cold
11  weather when they did it?
12     A. Yeah. There was warm weather.
13     Q. Do you remember how long it took them to
14  do the parking lot area in front of 7-Eleven?
15     A. I believe that between two or three days.
16     Q. And do you know the reason for them doing
17  it?
18     A. No, I don't know why he did that.
19     Q. Did you speak to anybody at the landlord
20  and ask them why they're doing it?
21     A. No.
22     Q. Were they doing it in response to any
23  complaints by you, the restaurant, or any other
24  customers in the shopping center?

Page 129

1      MR. DOSS: Objection as to form since
2  he just said he doesn't know why.
3  BY MR. MILLER:
4      Q. Well, if you know it was done in response.
5      A. No.
6      Q. No, you don't know; or, no, it wasn't?
7      A. I don't know.
8      Q. Okay. Prior to the entire parking lot
9  being done and after at least this patch being filled
10  by 7-Eleven, was there any further depression in the
11  area? In other words, did the patch sink or did any
12  of it chip away, if you know?
13     A. Yeah; it still have some.
14     Q. Okay. You're talking about now they still
15  have some?
16     A. Right.
17     Q. In the same general --
18     A. Well, it's not as bad; just not even.
19     Q. Okay. And how about before they repaved
20  the parking lot?
21     MR. WAGNER: What do you mean, how
22  about? What's your question?
23  BY MR. MILLER:
24     Q. What was the condition of it before they

Kailish Sayl

34 (Pages 130 to 133)

Page 130

1  completely repaved it?
2      A.  It was all right.
3      Q.  Did you take this photograph that's marked
4  as Zavodnick 1?
5      A.  I never take any picture.
6      Q.  Marked as, I'm sorry, Sayl 1 -- right?
7          MR. DOSS:  Uh-huh.
8  BY MR. MILLER:
9      Q.  Do you know who took the photograph?
10     A.  No, sir.
11     Q.  Have you ever seen the photograph before
12  the start of today's deposition?
13     A.  No, I don't think so.
14         MR. WAGNER:  Which photographs are you
15  talking about?
16         MR. MILLER:  The one that's marked as
17  1.  That's what I asked him; Sayl 1.
18         THE WITNESS:  Uh-uh.
19  BY MR. MILLER:
20     Q.  Did you see any photographs prior to the
21  start of today's deposition?
22     A.  No.
23     Q.  None?  You're certain?
24         MR. WAGNER:  Well, are you talking

Page 131

1  about other than his discussions with counsel?
2          MR. MILLER:  I'm asking if he saw any
3  photographs.
4          MR. WAGNER:  Well, I object to the
5  discussions with counsel.
6          MR. MILLER:  I didn't ask him about
7  discussions with counsel.  I asked him if he looked
8  at any photographs.
9          MR. WAGNER:  I object to anything that
10  would have been discussed in discussions with
11  counsel.  I assume that you're talking about other
12  than that.
13         MR. MILLER:  I don't think looking at
14  a document is protected by attorney-client privilege.
15  The conversation is.
16         MR. WAGNER:  I don't agree with you
17  about that.  But I'd just like you to clarify that
18  anyway.
19         MR. MILLER:  Well, I'm not.
20         MR. WAGNER:  Okay.  So we'll leave it
21  unclear.
22         MR. MILLER:  It's not unclear.
23  BY MR. MILLER:
24     Q.  Looking at Zavodnick 1, the bottom

Page 132

1  left-hand picture, are you able to determine from
2  that photograph which hole or which spot, rather, was
3  the spot where Miss Zavodnick pointed to that she
4  fell?
5      A.  I think it was that.
6      Q.  Okay.
7      A.  This one; yeah.  That spot.
8      Q.  Okay.  You're pointing, it looks like,
9  starting from the bottom working your way up, between
10  the second and third?
11     A.  Not second and third.  I think -- this is
12  the first; this is the second.
13     Q.  Okay.
14     A.  That's what I'm saying.
15     Q.  So it's your recollection that the second
16  spot is the spot that Miss Zavodnick pointed to?
17     A.  Yeah; right.
18     Q.  Okay.  For the record, the witness has
19  previously placed a circle on one of these
20  photographs as to exactly the spot that he thinks, at
21  least, Miss Zavodnick showed him.
22         MR. DOSS:  Which is marked as Sayl 2.
23         MR. MILLER:  Right; and which is the
24  middle photograph on the right side.  And I asked him

Page 133

1  to look at the bottom photograph on the left and see
2  if he's able to determine that.  And he pointed to,
3  starting from the bottom, the second spot from the
4  bottom.
5  BY MR. MILLER:
6      Q.  Is that correct?  Is that where you
7  pointed?
8      A.  Let me see.  Because I'm confusing in the
9  pictures.
10     Q.  Looking at this photograph --
11         MR. MILLER:  Did you get that?  He's
12  confused in these pictures.
13         THE WITNESS:  I'm just confused.  I'm
14  sorry.
15  BY MR. MILLER:
16     Q.  That's okay.  I'm not trying to -- just
17  asking you -- I'm not asking you about this
18  photograph.  It's the middle on the left.
19         I'm asking you about the bottom on the
20  right.  And we'll start at the bottom, the first
21  patch being one; second, two; third, three; fourth,
22  four; fifth, five.  If you know, looking at those
23  numbers, or looking at those patches, which of the
24  numbers would be the spot that she pointed to?

Page 134

1    A. I could see that's the spot, but here
2  is --
3         MR. WAGNER: Wait. I'm sorry. For
4  the record, the witness just pointed now to the upper
5  right photograph. And, furthermore, for the record,
6  the witness is pausing an extended period of time,
7  suggesting, at least to me, that he's uncertain and
8  confused.
9         MR. MILLER: Perhaps he's --
10        MR. WAGNER: And, counsel, you're
11  covering, now, the other photographs.
12        MR. MILLER: Well, just because I
13  don't want him to refer to the other photographs --
14        MR. WAGNER: I'm sorry, but he's
15  already -- I didn't mean to interrupt you.
16        He has already marked on a photograph
17  the spot that she showed him. And I object to your
18  refusing to allow him to refer to that so that he can
19  clarify his own thinking.
20        So I either want that uncovered so
21  that he can see what he's already marked when he
22  answers your question, or I'm going to instruct him
23  not to answer.
24        Which is it? You're not going to

Page 135

1  uncover the photograph?
2         MR. MILLER: If you have -- because
3  every time I ask him about this photograph, he's
4  pointing to a different spot. So I only want
5  him to look at this photograph because earlier he
6  pointed to the second spot.
7         So, now, if he doesn't know or you're
8  not sure, I can respect that. But --
9         THE WITNESS: Okay. I say I don't
10  know because I can't -- I'm a little confused this
11  picture here.
12  BY MR. MILLER:
13     Q. Okay.
14     A. Yeah.
15     Q. That's fine.
16     A. Yeah.
17        (Discussion held off the record.)
18  BY MR. MILLER:
19     Q. Do you know of a company called PRYDE,
20  P-R-Y-D-E, somehow associated with the corporate
21  office of 7-Eleven?
22     A. No.
23     Q. Were they ever the claims company for
24  7-Eleven; do you know?

Page 136

1    A. (The witness shook his head.)
2    Q. No, you don't know; or, no, they weren't?
3    A. No, I don't know.
4       (Discussion held off the record.)
5  BY MR. MILLER:
6    Q. Do you know somebody name Fred Cushing?
7    A. Yes.
8    Q. Who's that?
9    A. He's my field rep. He's my supervisor.
10   Q. What do you mean by field rep/supervisor?
11   A. He come every week to talk to me.
12   Q. Did you call him about this incident?
13   A. I don't remember that, if I did.
14   Q. Do you know if you called him the day of
15  the incident?
16        MR. WAGNER: He says he doesn't
17  remember whether he called him.
18        MR. MILLER: He says he doesn't
19  remember that. I'm asking specifically if he knows
20  he called him on the day of the incident.
21        THE WITNESS: I don't remember, sir.
22  BY MR. MILLER:
23    Q. Do you know if he ever came out and took a
24  look at the parking lot after the fall?

Page 137

1    A. I really don't remember.
2    Q. Do you know if he ever took pictures of
3  the parking lot?
4    A. Not in my knowledge.
5    Q. Is he still your field rep?
6    A. Yes, he is.
7    Q. Is there any reason -- you said you called
8  corporate after the fall. Is there a reason why you
9  report directly to them as opposed to Mr. Cushing?
10   A. I'm not supposed to call Mr. Cushing. I'm
11  supposed to call my maintenance department.
12   Q. Okay. Your -- I'm sorry?
13   A. For the maintenance.
14   Q. Maintenance department?
15   A. Yeah.
16   Q. Okay. So if there was any problems with
17  the 7-Eleven maintenance, you wouldn't call Fred
18  Cushing; you would call 7-Eleven corporate office?
19   A. Yes, sir; you're right.
20   Q. And that's the same before and after the
21  fall?
22   A. Yes, sir.
23   Q. Have you ever spoken to anybody from
24  Martuscelli, your landlord, about this fall?

Kailish Sayl

36 (Pages 138 to 141)

Page 138

1  A. Yeah; I talked to owner.
2  Q. Who did you talk to?
3  A. He's the owner.
4  Q. The owner?
5  A. He's the landlord.
6  Q. Specifically about the fall?
7  A. Yes.
8  Q. Okay. And that was like -- you said, I
9  think, that was after the --
10  A. After the incident.
11  Q. -- the repairs were done by 7-Eleven?
12  A. Yes.
13      MR. WAGNER: Objection. Counsel, I'm
14  not at all sure that that was his testimony.
15      MR. MILLER: I'm sorry.
16  BY MR. MILLER:
17  Q. Whatever your testimony was earlier;
18  you're talking about the next day that you saw him?
19      MR. WAGNER: After the incident; he
20  certainly testified to that.
21      MR. MILLER: Yeah. The next day;
22  whether the repairs were already done at that point
23  or not. I didn't mean to put words in your mouth --
24  believe it or not.

Page 139

1      That's all I have.
2      MR. WAGNER: Just a few questions to
3  clarify.
4  BY MR. WAGNER:
5  Q. Mr. Sayl, when this lady, Miss Zavodnick,
6  came into your store and told you that she fell, you
7  then went outside with her; correct?
8  A. Yes.
9  Q. And she showed you an area that you looked
10  at and, specifically, you told us that it appeared
11  that there was some missing blacktop; is that
12  correct?
13  A. Yes, sir.
14      MR. MILLER: Objection to the form.
15  BY MR. WAGNER:
16  Q. Had you ever seen that condition that she
17  pointed out to you then before that time?
18      MR. MILLER: Objection.
19      THE WITNESS: No, I don't think so.
20  BY MR. WAGNER:
21  Q. And had you ever called anybody about that
22  before that time?
23      MR. MILLER: Objection.
24      THE WITNESS: No, sir.

Page 140

1      MR. WAGNER: I have no other
2  questions. Thank you.
3  BY MR. DOSS:
4  Q. Other than the one conversation or contact
5  you described with the owner, a man, in your store at
6  some point after this incident, did you have any
7  other conversations with anybody else from
8  Martuscelli or the owner or the landlord about this
9  incident?
10  A. No, sir.
11      MR. DOSS: Okay. That's all I have.
12      MR. MILLER: Okay.
13      MR. WAGNER: Anything further?
14      MR. MILLER: No, nothing else.
15      (Discussion held off the record.)
16      (Exhibit 3 was marked for
17  identification.)
18      (Deposition concluded at 3:19 p.m.)
19      I HAVE READ THE FOREGOING DEPOSITION,
20  AND IT IS TRUE AND CORRECT TO THE BEST OF MY
21  KNOWLEDGE.
22      _____
       KAILASH SAYL
23
24

Page 141

1      INDEX
2  BY MR. DOSS:        2
   BY MR. MILLER:     63
3  BY MR. WAGNER:     139
   BY MR. DOSS:       139
4
5      EXHIBITS
6  NAME    DESCRIPTION          PAGE
7  1    Photograph              43
8  2    Six Photographs         63
9  3    Hand-Drawn Sketch      140

10  (The original Exhibits 1, 2,
    and 3 were retained by Mr. Doss,
11  Mr. Wagner, and Mr. Miller,
    respectively; copies are attached
12  hereto.)
13
14
15
16
17
18
19
20
21
22
23
24

Kailish Sayl

Page 142

```
 1      CERTIFICATION
 2
 3
 4        I, ADAM D. MILLER, Registered
 5   Professional Reporter, certify that the foregoing is
 6   a true and accurate transcript of the foregoing
 7   deposition, that the witness was first sworn by me at
 8   the time, place and on the date herein before set
 9   forth.
10        I further certify that I am neither
11   attorney nor counsel for, not related to nor employed
12   by any of the parties to the action in which this
13   deposition was taken; further, that I am not a
14   relative or employee of any attorney or counsel
15   employed in this case, nor am I financially
16   interested in this action.
17
18
19   _____
20   Adam D. Miller
     Registered Professional Reporter, Notary Public,
21   and Certified Shorthand Reporter of the State of
     Delaware #109-RPR (Exp. 01-31-2008)
22
23
24
```

Corbett & Wilcox